

**CSC**

**LYN / ALL**
**Transmittal Number: 22924902**
**Date Processed: 03/18/2021**

# Notice of Service of Process

| Primary Contact: | Sharon Brooks - MS 08-A<br>The Travelers Companies, Inc.<br>One Tower Square<br>Rm 8MS<br>Hartford, CT 06183-0001 |
|---|---|

| Entity: | The Travelers Lloyds Insurance Company<br>Entity ID Number 2380750 |
|---|---|
| Entity Served: | Travelers Lloyds Insurance Company |
| Title of Action: | Amerisure Mutual Insurance Company vs. The Travelers Lloyds Insurance Company |
| Matter Name/ID: | Amerisure Mutual Insurance Company vs. The Travelers Lloyds Insurance Company (11059123) |
| Document(s) Type: | Citation/Petition |
| Nature of Action: | Contract |
| Court/Agency: | Travis County District Court, TX |
| Case/Reference No: | D-1-GN-21-000954 |
| Jurisdiction Served: | Texas |
| Date Served on CSC: | 03/17/2021 |
| Answer or Appearance Due: | 10:00 am Monday next following the expiration of 20 days after service |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Julie A. Shehane<br>214-712-9500 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# EXHIBIT 1

CITATION
THE STATE OF TEXAS
**CAUSE NO. D-1-GN-21-000954**

AMERISURE MUTUAL INSURANCE COMPANY,

, Plaintiff

vs.

THE TRAVELERS LLOYDS INSURANCE COMPANY

, Defendant

TO:   TRAVELERS LLOYDS INSURANCE COMPANY
      BY SERVING THROUGH ITS REGISTERED AGENT
      CORPORATION SERVICE COMPANY
      211 EAST 7TH ST STE 620
      AUSTIN, TEXAS 78701

Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the AMERISURE MUTUAL INSURANCE COMPANY'S ORIGINAL PETITION of the PLAINTIFF in the above styled and numbered cause, which was filed on MARCH 4,2021 in the 250TH JUDICIAL DISTRICT COURT of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, March 09, 2021.

REQUESTED BY:
JULIE ANN SHEHANE
900 JACKSON ST STE 100
DALLAS, TX 75202-4452
BUSINESS PHONE:(214)712-9500   FAX:(214)712-9540

Velva L. Price
Travis County District Clerk
Travis County Courthouse
1000 Guadalupe, P.O. Box 679003 (78767)
Austin, TX 78701

PREPARED BY: VICTORIA BENAVIDES

- - - - - - - - - - RETURN - - - - - - - - - -

Came to hand on the _17th_ day of _MARCH_, _2021_ at _10_ o'clock _A_M., and executed at ____

____ within the County of ____ on the ____ day of

____, ____, at ____ o'clock ____M.,

by delivering to the within named ____, each in person, a true copy of this citation

together with the AMERISURE MUTUAL INSURANCE COMPANY'S ORIGINAL PETITION accompanying pleading, having first attached such copy of

such citation to such copy of pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

Sworn to and subscribed before me this the

____ day of ____, _____

____ Notary Public, THE STATE OF TEXAS

____ Sheriff / Constable / Authorized Person

By:____

____ Printed Name of Server

____ County, Texas

D-1-GN-21-000954

SERVICE FEE NOT PAID

P01 - 000104055

DELIVERED:
ON _03_ / _17_ / _2021_
BY __US  PSC-12617__

3/4/2021 11:19 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-21-000954**
**Victoria Benavides**

CAUSE NO. _____

D-1-GN-21-000954

| | | |
|---|---|---|
| AMERISURE MUTUAL INSURANCE COMPANY, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 250th   JUDICIAL DISTRICT |
| | § | |
| THE TRAVELERS LLOYDS INSURANCE COMPANY | § | |
| | § | |
| *Defendant.* | § | TRAVIS COUNTY, TEXAS |

## AMERISURE MUTUAL INSURANCE COMPANY'S ORIGINAL PETITION

**TO THE HONORABLE DISTRICT JUDGE:**

**COMES NOW** Plaintiff Amerisure Mutual Insurance Company ("Plaintiff" or "Amerisure"), for itself and its rights as subrogee of its named insured, Bartlett Cocke, L.P. and Bartlett Cocke General Contractors, LLC (collectively, "Bartlett Cocke"), and files this Original Petition against Defendant The Travelers Lloyds Insurance Company ("Defendant" or "Travelers").

### I.
### PARTIES

1.      Amerisure is a company organized under the laws of the State of Michigan with a principal place of business in Farmington Hills, Michigan. Amerisure was and is duly authorized by the Texas Department of Insurance to issue insurance policies in the State of Texas.

2.      The Travelers Lloyds Insurance Company is a Lloyds insurer organized under the laws of Texas with a principal place of business in Connecticut.  Travelers is and was duly authorized by the Texas Department of Insurance to issue insurance policies in the State of Texas.  Service of process may be made on Travelers through its registered agent for service, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, TX 78701.

## II.
## JURISDICTION AND VENUE

3.     This is a civil action in which this Court has original jurisdiction under Chapter 37 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

4.     Venue is proper in this Court, pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE Section 15.002(a)(1) in that a substantial part of the events giving rise to this matter occurred in Travis County.

5.     Pursuant to TEXAS RULE OF CIVIL PROCEDURE 47(c)(2), Plaintiff states it seeks monetary relief over $250,000 but not more than $1,000,000. However, this amount is based on the defenses costs in the Underlying Lawsuit, which is still pending. The defense costs continue to grow and accumulate and, as a result, the amount Plaintiff seeks to recover correspondingly grows and accumulates, in addition to interest, costs of court, attorney's fees, and all other relief to which Plaintiff is entitled.  The damages sought are within the jurisdictional limits of this Court.

## III.
## STATEMENT OF CASE

6.     Plaintiff brings this suit, asserting its rights, including its rights as subrogee of its named insured, Bartlett Cocke, and seeks a declaration that Bartlett Cocke is an additional insured under one or more of Defendant's policies, and that Defendant has a duty to defend Bartlett Cocke in an underlying construction defect lawsuit styled *Austin Independent School District v. Bartlett Cocke General Contractors F/K/A Bartlett Cocke, L.P.*; Cause No. D-1-GN-18-005872, in the 261st Judicial District Court of Travis County, Texas ("Underlying Lawsuit"). Plaintiff further asserts that Defendant has breached its duty to defend Bartlett Cocke, entitling Plaintiff to all damages resulting from Defendant's breach.

7.     Plaintiff issued consecutive commercial general liability policies to Bartlett Cocke covering the time period of April 30, 2006 through April 30, 2013 and has been defending Bartlett Cocke in the Underlying Lawsuit.

8.     Defendant issued consecutive commercial general liability policies to its named insured, FT Woods, covering the time period of September 2, 2005 through September 2, 2013.

## IV.
## CONTRACT BETWEEN BARTLETT COCKE AND FT WOODS

9.     Bartlett Cocke contracted with Travelers' named insured, FT Woods, to perform certain construction work on the Gus Garcia Young Men's Leadership Academy located at 7414 Johnny Morris Road, Austin, TX 78724 ("the Project"). As part of the contract between Bartlett Cocke and FT Woods, FT Woods was required to name Bartlett Cocke "as an Additional Insured on any General Liability, Umbrella Liability, and Automobile Liability policies of insurance covering [FT Woods'] scope of work and required by Section 17.01, above." See Exhibit A. Section 17.01 of the contract between FT Woods and Bartlett Cocke required that FT Woods:

"shall maintain in full force and effect, at its own expense, the following minimum insurance coverage . . . :

.        .        .        .

(B) Commercial General Liability Insurance including Broad Form Property Damage Liability Coverage, with minimum limits as follows:    $1,000,000 Each Occurrence, $2,000,000 Products and Completed Operations Aggregate/$2,000,000 General Aggregate. The Commercial General Liability Policy will include the following coverage's [SIC] where applicable:

(1)    Bodily Injury & Property Damage on an "Occurrence" Basis

.        .        .

(4)    Broad Form Blanket Contractual

.        .        .        .

(6)    Products/Completed Operations

.        .        .

(13)    Broad Form Property Damage

.        .        .        .

Exhibit A.

10.     The contract between Bartlett Cocke and FT Woods is dated May 6, 2006 and contains the signature of FT Woods' Vice President, which is also dated May 5, 2006.  Exhibit A.  Exhibit "D" of the contract contained FT Woods' scope of work, in part, as follows:

> .     .     .     .
>
> 28.     All concrete work including structural, site and miscellaneous . . ., including layout from control, footing, excavation, grouting base plates, pumping, saw cutting, curing, concrete stairs, concrete retainers, and city approaches.
>
> 29.     Drilled piers and reinforcing steel complete including embeds, anchor bolts, site headwells and concrete retaining walls per Contract Documents.
>
> .     .     .     .
>
> 33.     Site concrete work to include basketball courts, transformer pads, equipment pads, stained/stamped ramps, bollards, sand and sidewalk work complete per Contract Documents.

Exhibit A.

## V.
## THE UNDERLYING LAWSUIT AND TENDERS MADE

11.     The Underlying Plaintiff filed its Original Petition on September 26, 2018, alleging the following:

> The first design was a "pier and beam" foundation that would utilize concrete piers to raise the building above the soil and thereby separate the foundation from the ground so that there would be no upward pressure from the expansive clay.  Kleinfelder recommended that the piers be underreamed, or bell shaped, to resist the uplift forces from the expansive clays, and that the bells were to be 2 to 2.5 times the diameter of the pier shaft.  The minimum pier depths recommended by Kleinfelder were the deeper of (i) 25 feet below the finished floor slab elevation, or (ii) 20 feet below the existing ground surface.
>
> .     .     .     .
>
> The School was ultimately designed so that most of the structure is supported by a pier and beam, with three additional slabs, adjacent to the pier and beam structure, that support the School's mechanical and electrical systems (the "Equipment Pads").

See Exhibit B.

12.     The Original Petition goes on to state that after construction:

> the soils underneath expanded and heaved resulting in substantial damage to the building. For example, the Equipment Pads have heaved several inches in places resulting not only in cracked foundations but also significant damage to the School's mechanical systems. . . . The School's commons courtyard, which was also constructed as a ground supported slab, has experienced significant movement resulting in separations at construction joints, elevation differentials, and is now sloped toward the building. Likewise, the flatwork adjacent to the Equipment Pads and the pier-and-beam-supported structure have heaved or moved resulting in cracks, gaps, and doors becoming unopenable. The portion of the School supported by the pier and beam foundation has also experienced distress such as significant cracks in the floors and walls, separations at joints in the hollow core planks, and cracks in the concrete beams spanning between piers.

Exhibit B.

13.     The Original Petition complains that "Bartlett Cocke failed to construct the bell portion of the underreamed piers in accordance with the recommendations of Kleinfelder, or as specified in Guerra's plans. Bartlett Cocke also failed to properly construct the dowel installations at the pavement joints at the school. The design deficiency and construction defects relating to the piers have resulted in significant damage and distress to the School." Exhibit B.

14.     Plaintiff sued Bartlett Cocke alleging negligence and that it "breached the standard of care for general contractors in failing to properly construct the School piers and the dowel installations as the pavement joints at the School." Exhibit B. Plaintiff also alleged that Bartlett Cocke breached the implied warranty that the work related to the construction of the school "would be of good and workmanlike quality," and various deficiencies and construction defects caused damages to the School. Plaintiff also made allegations against Bartlett Cocke for breaching its Construction Manager Agreement because the School was not constructed in accordance with industry standards and was not constructed free of construction defects. Exhibit B.

15.   The Original Petition, at a minimum, implicates FT Woods' scope of work in that it complains about faulty construction of the drilled piers, structural concrete work, and other concrete work, which damaged other portions of the School. Exhibit B.

16.   On November 13, 2018, a tender was made for the defense of Bartlett Cocke from the Underlying Lawsuit. Specifically, demand was made that FT Woods' insurers, including Travelers, defend Bartlett Cocke from the claims asserted in accordance with the contract requirement that FT Woods name Bartlett Cocke as an additional insured to its policies. See Exhibit C. The tender letter was sent to Travelers and also included a copy of Plaintiff's Original Petition, Plaintiff's First Supplemental Petition, and the Subcontract Agreement between Bartlett Cocke and FT Woods. Exhibit C. Travelers has failed to fund any part of the defense of Bartlett Cocke.

17.   On February 20, 2019, Plaintiff filed a First Amended Petition. The First Amended Petition contains substantially the same allegations as previously quoted from the Original Petition. See Exhibit D.

18.   On December 27, 2019, a renewed tender was made for the defense of Bartlett Cocke from the claims asserted in the Underlying Lawsuit. The demand was again made that FT Woods' insurers, including Travelers, defend and indemnify Bartlett Cocke as an additional insured pursuant to the Subcontract and the terms of the insurance policies. See Exhibit E. Copies of the Plaintiff's First Amended Petition and the subcontract between Bartlett Cocke and FT Woods was provided with this tender letter. Exhibit E. As of the date of the filing of this Petition, Travelers still has not agreed to defend Bartlett Cocke.

## VI.
## THE POLICIES

19.     Travelers issued consecutive commercial general liability policies to FT Woods covering the time period of September 2, 2005 through September 2, 2013. The policy numbers include: DT CO 5459B845-TLC-05, DT CO 5459B845-TLC-06, DT CO 5459B845-TLC-07, DT CO 5459B845-TLC-08, DT CO 5459B845-TLC-09, DT CO 5459B845-TLC-10, DT CO 5459B845-TLC-11, and DT CO 5459B845-TLC-12 (collectively, "the Policies").

20.     Pursuant to the terms of the Policies issued by Travelers to FT Woods, Bartlett Cocke qualifies as an additional insured. To date, Plaintiff has been exclusively defending Bartlett Cocke in the Underlying Lawsuit when Bartlett Cocke is also owed a defense by FT Woods' carrier, Travelers.

21.     Specifically, each of the Policies contains a Blanket Additional Insured (Contractors) endorsement that confers coverage to additional insureds where required in a "written contract requiring insurance." As there is such a contract requiring that FT Woods name Bartlett Cocke as an additional insured to its policies and for such policies to include products-completed operations coverage, FT Woods' policies issued by Travelers confer additional insured status to Bartlett Cocke.

22.     Without question, the Underlying Lawsuit's pleadings allege accidentally caused "property damage" that occurred during one or more of the relevant Travelers policy periods. Moreover, the pleadings allege "property damage" to other parts of the Project that was allegedly caused by the negligent performance of FT Woods' scope of work, such as floors and walls and other damage to the building.

23.     The allegations in the Underlying Lawsuit specifically allege that Bartlett Cocke is liable for "property damage" caused by construction defects in the scope of work that FT

Woods performed under the Subcontract. Specifically, Plaintiff complained about the concrete piers, structural concrete work, and other concrete work that damaged other work at the project. The allegations, therefore, trigger Travelers' duty to defend Bartlett Cocke as an additional insured.

24.    Plaintiff specifically alleges that the Defendant's policies at issue unambiguously obligate the Defendant to defend Bartlett Cocke in the Underlying Lawsuit as an additional insured or, alternatively, that the policies are ambiguous and all ambiguities are resolved in favor of coverage.

## VII.
## DECLARATORY JUDGEMENT

25.    Plaintiff incorporates paragraphs 1-24 as if fully set forth herein.

26.    Plaintiff seeks a declaration that Bartlett Cocke is an additional insured under one or more of the Policies issued by Travelers for the claims asserted against Bartlett Cocke in the Underlying Lawsuit.

27.    Plaintiff further seeks a declaration that Travelers has a co-primary duty to provide a full and complete defense to Bartlett Cocke in the Underlying Lawsuit. To the extent that Travelers alleges that its policy is excess, Plaintiff seeks a declaration that the Travelers' excess other insurance provision and the Amerisure excess other insurance provision are mutually repugnant and, as such, both of the excess other insurance provisions should be disregarded. In this respect, Plaintiff seeks a declaration that each insurer is obligated to fund 50% of Bartlett Cocke's defense from the claims asserted in the Underlying Lawsuit.

28.    Plaintiff further seeks a declaratory judgment that Travelers is obligated to reimburse Plaintiff for 50% of Bartlett Cocke's defense costs (including attorney's fees, expert

fees, court costs, and litigation expenses) that have been paid for by Plaintiff since the first tender date of November 13, 2018.

29.     Plaintiff further seeks from Defendant its attorney's fees incurred in pursuing this relief from Defendant, as well as costs of court.

30.     An actual controversy exists between the parties hereto pursuant to Chapter 37 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE, and this Court is vested with the power in the instant case to declare and adjudicate the rights and other legal relationships of the parties to this action with reference to issues raised herein.

## VIII.
## BREACH OF CONTRACT

31.     Plaintiff incorporates paragraphs 1-30 as if fully set forth herein.

32.     Defendant has breached its contractual duty to provide a full and complete defense to Bartlett Cocke in the Underlying Lawsuit, which has damaged Plaintiff and Bartlett Cocke.

33.     Accordingly, Plaintiff seeks damages for Defendant's breach of contract.

34.     Plaintiff specifically alleges that the Policies at issue unambiguously obligate the Defendant to defend Bartlett Cocke in the Underlying Lawsuit or, alternatively, that the Policies are ambiguous and all ambiguities are resolved in favor of coverage.

35.     Additionally, Plaintiff seeks its attorney's fees incurred in this matter from Defendant, along with costs of court and interest.

## IX.
## CHAPTER 542 PENALTIES AGAINST DEFENDANT

36.     Plaintiff incorporates paragraphs 1-35 as if fully set forth herein.

37.    Defendant has breached its contractual duty to provide a full and complete defense to Bartlett Cocke in the Underlying Lawsuit and, in the process, damaged Bartlett Cocke and Plaintiff, which is subrogated to Bartlett Cocke's rights and claims.

38.    Defendant, in breaching its contractual duty to defend, has also violated the Prompt Payment provision of Chapter 542 of the TEXAS INSURANCE CODE.

39.    As such, Plaintiff additionally seeks from Defendant the 18% penalty interest allowed under Chapter 542 for the breach of its contractual duty to defend and violation of its obligations under the TEXAS INSURANCE CODE.

40.    Additionally, Plaintiff seeks its attorney's fees incurred in its prosecution of this suit from Defendant, along with costs of court and interest.

## X.
## CONDITIONS PRECEDENT

41.    Plaintiff (or Bartlett Cocke) has fully performed any and all conditions precedent to full recovery in this lawsuit.

## XI.
## NOTICE OF INTENT TO UTILIZE DISCOVERY

42.    Plaintiff hereby gives notice of its intent to utilize items produced in discovery in the trial of this matter, and the authenticity of such items is self-proven per TEXAS RULE OF CIVIL PROCEDURE 193.7.

## XII.
## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this Court adjudicate and declare (a) that Bartlett Cocke is an additional insured under one or more Travelers policies issued to FT Woods; (b) that Travelers owes Bartlett Cocke a co-primary duty to defend pursuant to its policies and the pleadings in the Underlying Lawsuit; (c) that Defendant must reimburse

Plaintiff for 50% of all of the attorneys' fees and costs from the time of first tender and pay 50% of all future defense costs incurred on behalf of Bartlett Cocke through the conclusion of the Underlying Lawsuit. Plaintiff further prays that the Court award Plaintiff all of its court costs, reasonable and necessary attorney's fees and expenses, breach of contract damages, the 18% penalty under Chapter 542 of the TEXAS INSURANCE CODE, pre- and post-judgment interest, and such other and further relief to which Plaintiff may be entitled whether at law or in equity.

Respectfully submitted,

By _/s/ Julie A. Shehane_
  **JULIE A. SHEHANE**
  State Bar No. 24048794
  Julie.Shehane@cooperscully.com

**COOPER & SCULLY, P.C.**
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone:  (214) 712-9500
Facsimile:  (214) 712-9540

**ATTORNEY FOR PLAINTIFF
AMERISURE MUTUAL INSURANCE
COMPANY**

# EXHIBIT A



LUMP-SUM
SUBCONTRACT

Date: 5-6-06
Job No.: 05305
Subcontract No.: 03.03000.000.S

Contractor:  Bartlett Cocke, L.P.
2028 East Ben White, Suite 200
Austin, TX 78741
(512) 326-4223 – telephone number
(512) 326-3990 – facsimile number

Subcontractor:  FT Woods
PO Box 122,
Georgetown, TX 78626
(512) 930-2607 – telephone number
(512) 930-3748 – facsimile number

Project and  AISD Northeast Middle School
Location:  7414 Johnny Morris Road
Austin , TX 78724

Owner:  Austin Independent School District
1717 W. 6th Street Ste, 310
Austin, TX 78703

Contractor and subcontractor agree as follows:

SECTION 1:  General Contract

1.01      Contractor has entered into a General Contract with the Owner dated  ; for construction of the Project in accordance with the General Contract, the General and Supplemental Conditions thereto and the Construction Document Plans dated December 21, 2005 – Civil Drawings and Architectural Drawings dated December 23, 2005, Specifications dated December 27, 2005, and Addenda No. 1 dated February 1, 2006, 2 dated February 8, 2006, 3 dated February, 10, 2006, 4 dated February 14, 2006, 5 dated February 16, 2006 and Alternate 1 dated March 22, 2006 , prepared by Pfluger & Associates, LP; all of which are referred to herein as the "Contract Documents" and are incorporated as part of this Subcontract. The General Contract can be reviewed by Subcontractor at Contractor's principal place of business. Subcontractor is bound, responsible, obligated and liable to Contractor as the Contractor is bound, responsible, obligated and liable to the Owner under the General Contract. The term "Architect/Engineer" means the representative directing the Work for the Owner or any other person authorized by the General Contract to direct, approve or reject any matter or activity connected with the performance of the General Contract. The General Contract and this Subcontract shall be interpreted together and in harmony with one another. In the event that a conflict occurs or exists between the Contract documents and the terms of this Subcontract, the greater quantity or requirement shall control, regardless in which of the two documents it appears. Subcontractor must call any such conflict or discrepancy to Contractor's attention in writing prior to executing this Subcontract for a written decision, otherwise Subcontractor is bound by the provisions of this Subcontract. Subcontractor has carefully examined this Subcontract and all other documents relating to it. Subcontractor will not make any claim against Contractor based upon, or arising out of, any misunderstanding or misconception on its part with respect to the requirements of the General Contract or this Subcontract. Any information given, or statements made, to Subcontractor shall not reduce the Work to be performed by Subcontractor under this Subcontract. Subcontractor has fully examined all conditions that could affect its performance and no conditions exist which would affect the progress, performance or price of this Subcontract.  Subcontractor shall be bound by all decisions of the Owner or the Architect/Engineer to the same extent as the General Contractor is bound by them.

BARTLETT COCKE, L.P.

Page 2

Junior Cooks, L.P. Subcontract
Revised Contract Form 04/22/0_

SECTION 2:     Scope of Work

      2.01     The Work to be performed shall be all  Site & Building Concrete described in or reasonably inferable from the Contract Documents including, but not limited to the following:

Furnish all labor (overtime if required), material, tools, equipment, supervision, coordination, installation, and all other related work to insure complete working system in accordance with the Plans dated December 21, 2005 - Civil Drawings and Architectural Drawings dated December 23, 2005, Specifications, dated December 27, 2005, Addenda No. 1 dated February 1, 2006, 2 dated February 8, 2006, 3 dated February 10, 2006, 4 dated February 14, 2006, 5 dated February 16, 2006 and Alternate 1 dated March 22, 2006

**The following sections are included in the Scope of Work:**
**See attached "Subcontract Exhibit D"**

**The following Items are excluded from the Scope of Work:**

**See attached "Subcontract Exhibit D"**

Contract Total: Three million six thousand four hundred twenty dollars ($3,006,420.00)

2.02     Subcontractor shall furnish all material, labor, tools, equipment, machinery, utilities, necessary supervision and any other item or service required to perform the Work. All materials incorporated in the Work shall be new and of the best kind and grade for the exact purpose intended; and all workmanship shall be of the best quality and shall be performed by experienced workmen well qualified in their respective trades. All work included in the Subcontract shall be done under the direction of the Contractor and to the satisfaction of the Contractor, Owner and Architect/Engineer. The Work to be performed by Subcontractor includes that Work specifically set forth in this Subcontract as well as all other Work reasonably necessary to have a complete and functional project. Subcontractor shall provide, at its own expense, all working drawings, tests, samples, models, guarantees, insurance, delivery services and all other items necessary for the proper performance of this Subcontract and acceptance of the Work. Subcontractor shall pay for all inspections, fees, royalties, and license fees. Subcontractor shall make all necessary arrangements so as not to infringe any patents, trademarks or copyrights and shall hold Contractor, Owner and the Architect/Engineer harmless from any infringement claim or suit.

2.03     The Subcontractor shall prosecute the Work undertaken in a prompt and diligent manner whenever such Work, or any part of it, becomes available, or at such other time or times as the Contractor may direct, so as to promote the general progress of the entire Project, and shall not, by delay or otherwise, interfere with or hinder the work of Contractor or others.

2.04     Subcontractor shall be responsible for the proper fitting of its Work with that of all other work to be performed at the Project and for the coordination of the Subcontractor's operations with all other trades, subcontractors or material suppliers engaged upon the Project. The Subcontractor shall be responsible for all dimensions pertaining to the fitting of its Work with all surrounding work, and shall, to the extent its Work does not conform to the Drawings, Plans and Specifications, perform all cutting, fitting, adjusting and patching necessary to make its Work fit with that of other trades.

2.05     Upon written request by Contractor, the Subcontractor shall furnish to the Contractor such evidence as the Contractor may require relating to the Subcontractor's ability to fully perform this Agreement in the manner and within the time period required including, but not limited to, the names of all Subcontractor's subcontractors, suppliers and materialmen and all documentation deemed necessary by Contractor to verify payments to said subcontractors, suppliers and materialmen and to verify placement of all orders of material and contractual arrangements pertaining to said Work.

2.06     The Subcontractor shall notify the Contractor when portions of the Subcontractor's Work are ready for inspection. The Subcontractor shall at all times furnish the Contractor and its Representative adequate facilities for inspecting material at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment.

2.07     All required submittals shall be submitted by the Subcontractor to the Contractor for approval by the Architect and Owner according to Contractor's schedule. The approval by the Contractor, Owner, or Architect of any submittals of the Subcontractor shall not relieve it of liability for any deviations from the General Contract or this Agreement, unless specifically called to the Contractor's attention in writing, and if it is then so acknowledged by the Contractor, in writing.

2.08     Subcontractor shall be responsible for safety of its operations and its employees, and shall take all reasonable safety precautions with respect to the performance of its work. The Subcontractor shall comply with all safety and health laws of the State or Federal Government; and shall comply with all additional safety requirements of the Contract Documents and the policies and procedures of the Contractor. Subcontractor shall hold its own safety meeting and require its employees to attend. Subcontractor shall require the same of all sub-subcontractors.

2.09     The Subcontractor shall take reasonable precautions to properly protect its own Work and the work of other subcontractors from damage caused by operations or performance under this Subcontract. Any damages caused by the Subcontractor's operations or performance shall be remedied by the Subcontractor, and any damages to the Subcontractor's Work caused by the Contractor or one of the Contractor's other subcontractors, shall be remedied at the cost of the responsible party. The Contractor shall endeavor to assist the Subcontractor in recovery of losses or damages caused by the other subcontractors, but shall not be personally liable or responsible for such loss or cost. In the event that none of the parties are able to agree how the damages occurred, the party whose work was damaged shall be responsible for the repair of the damages to his work.

2.10     When the Contractor considers the Work, or a designated portion thereof, to be substantially complete, as that term is defined in the General Contract, Contractor shall prepare and submit to Subcontractor a list of items to be completed or corrected. Subcontractor shall commence work on said list within two (2) days after receipt of same and shall work continuously to complete and/or correct all items on said list so as to render Subcontractor's Work, or designated portion thereof, as being finally complete, as that term is defined in the General Contract, within thirty (30) days. If the work

required by said list is not initiated and/or completed within the time period provided above, such work may be performed by Contractor and all cost incurred shall be charged to Subcontractor's account and, at Contractor's option, shall be deducted from the Contract Price.

2.11    No substitutions shall be made in the Subcontractor's Work unless permitted in the General or Technical Specifications, and only then upon the Subcontractor's first receiving all approvals required for substitutions. The Subcontractor shall indemnify the Contractor for any increased cost incurred by the Contractor as a result of such substitutions, whether or not the Subcontractor has obtained approval thereof.

## SECTION 3:    Commencement and Scheduling the Work

3.01    Time is of the essence of this Subcontract. Subcontractor shall commence work without delay after receipt of notification from Contractor. All of the Work shall be completed within 426** calendar days after Contractor's notice to proceed, subject to adjustments in the schedule by the Contractor and extensions resulting from change orders revising the scope of the Work or delays caused by others or which are beyond the control of Subcontractor. Upon commencement of the Work, Subcontractor shall diligently and consistently cooperate with Contractor and other Subcontractors whose work or responsibilities might interfere with Subcontractor's work; and perform all work with all possible speed consistent with approved construction practices and in accordance with the intent of the Contract Documents. Subcontractor shall schedule and complete each stage of its Work in a timely manner so as to cause no delay in commencement of the work of other Contractors. Subcontractor shall take whatever precautions are necessary to properly coordinate and match the Work with the work of other trades (including but not limited to preparation of such coordination drawings or schedules as may be required by the Contractor or Contract Documents).

**    The Work will be in accordance with the attached construction schedule (Exhibit C) and periodic updates throughout the project and as directed by the Contractor's Superintendent.

3.02    Subcontractor shall fully acquaint himself with and fully abide by the applicable completion deadlines for the Work as provided in the Contractor's schedule, and shall use diligence in the completion of the Work in accordance with that schedule as may be modified from time to time.

3.03    The Subcontractor shall furnish to the Contractor, within two (2) weeks from the date hereof, a schedule of items, quantities, and costs, in a form satisfactory to the Contractor, to be used as a basis for computing progress payments and scheduling. The Subcontractor shall furnish immediately upon request all additional information required for development of Contractor's schedule.

3.04    Subcontractor shall comply with Contractor's schedule requirements as to start, completion and phasing of the Work and Subcontractor agrees to comply with all schedule changes.

3.05    The Subcontractor, before proceeding with any Work under this Agreement, will accurately check and verify all previous and surrounding work done by others and determine the correctness of same. The Subcontractor shall field measure all work relating to its Work. The failure of the Subcontractor to detect and disclose any existing discrepancies or nonconformity's and report same to the Contractor, in writing, before commencing its Work shall relieve the Contractor of any and all responsibility for same, and the Subcontractor shall be responsible and liable for all resulting damages, costs and expenses arising as a result of discrepancies and nonconformity's which should have been discovered by the Subcontractor.

3.06    The Contractor shall establish the principal access lines of the Project whereupon the Subcontractor shall lay out and be strictly responsible for the accuracy of the Subcontractor's Work and for any loss or damage to the Contractor or others by reason of the Subcontractor's failure to set out or perform its Work correctly. The Subcontractor shall exercise prudence so that actual final conditions and details shall result in alignment of finished surfaces.

## SECTION 4:    Contract Price and Payment Terms

4.01    As full and complete consideration for the performance of the Work by Subcontractor, Contractor shall pay to Subcontractor the sum of   Three million six thousand four hundred twenty dollars   ($3,006,420.00) subject to such additions and deductions for changes as may be agreed upon in writing (the "Contract Price"). No later than the 20th day of each month during the progress of the Work, Subcontractor shall submit to Contractor a detailed statement of the value of the labor and materials incorporated into the Work and materials suitably stored at the jobsite on such date and, upon approval by Owner and Contractor, Contractor will pay to Subcontractor 95% of the amount stated, less the aggregate of all previous payments, by the 20th day of the following month, or as soon thereafter as Contractor receives payment from

payment Locks, Ell SubContract
Revised Contract Form 04/22/04

Owner. In no event shall Contractor be required to make payments to Subcontractor to such an extent that the balance due to Subcontractor shall at any time be less than the amount of money necessary to complete the Work and pay all claims and charges and other obligations of Subcontractor.

4.02    The provisions of the Agreement stating the time of progress and final payments and the amount thereof are subject to the condition that the Contractor shall receive from the Owner progress or final payments in at least the amounts payable to the Subcontractor on account of Work done by the Subcontractor on the Project; otherwise the time when such payments shall be due Subcontractor shall be postponed until the Contractor has received same from the Owner. The Subcontractor acknowledges that he relies primarily for payment for Work performed on the credit and ability to pay of the Owner and not the Contractor. Therefore, Subcontractor agrees that payment by the Owner to the Contractor for Work performed by the Subcontractor shall be a condition precedent to any payment obligation of the Contractor to the Subcontractor.

4.03    The Contractor may deduct from any amounts due or to become due to the Subcontractor any sum or sums owed by the Subcontractor. In the event of any breach by the Subcontractor of any provision or obligation of this Agreement, or in the event of the assertion by other parties of any claim or lien against the Contractor, Owner or the Project arising out of the Subcontractor's performance of this Agreement, the Contractor shall have the right to retain out of any payments due or to become due to the Subcontractor an amount sufficient to completely protect the Contractor from any and all loss, damage and expense therefrom, until the situation has been satisfactorily remedied or adjusted by the Subcontractor. The Contractor's withholding of monies from the Subcontractor shall be interest free.

4.04    If approved in advance by Owner, Subcontractor's applications for payment may include materials and equipment not incorporated in the Work but delivered and suitably stored at the Project and, if approved in advance by Contractor and Owner, materials and equipment suitably stored at some other location agreed upon in writing. Payments for materials and equipment stored on or off the site shall be conditioned upon submission by the Subcontractor of bills of sale or such other documents required by the Contractor, Owner and Architect/Engineer so as to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Contractor's interests therein, including applicable insurance and transportation to the Project site.

4.05    Subcontractor warrants that title to all Work, materials and equipment covered by an Application for Payment will pass to the Owner either by incorporation in the construction or upon the receipt of payment by the Subcontractor, whichever occurs first, free and clear of all liens, claims, security interests and encumbrances; and that no Work, materials or equipment covered by an Application for Payment will have been acquired by the Subcontractor, or by any other person performing Work at the site or furnishing materials or equipment for the Project, subject to an agreement under which an interest therein or an encumbrance thereon is retained by a seller or otherwise imposed by the Subcontractor or such other person.

4.06    In the event any partial payment, invoice or estimate for which Subcontractor has received payment includes the value of any materials, equipment and other items not yet incorporated in the Work but intended for the Work, such items shall become the property of the Owner, but Subcontractor shall be solely responsible for any loss or damage thereto. Such material, equipment and items shall not be removed from the Project or where stored without the written consent of Contractor except for use on the Project.

4.07    No payment received by the Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by the Subcontractor to persons furnishing labor or material for use in performing the Subcontractor's Work.

4.08    The Contractor shall have the right (but not the obligation) at all times to contact the Subcontractor's subcontractors and suppliers of every tier to ensure that the same are being paid by the Subcontractor for labor and materials furnished for use in performing the Subcontractor's Work.

4.09    When required by the Contractor, and as a prerequisite to payment for Work for which payment is requested, the Subcontractor shall provide, in a form satisfactory to the Owner and the Contractor, partial lien or claim waivers and affidavits from the Subcontractor, and its sub-subcontractors and suppliers of every tier. Such waivers may be made conditional upon payment.

SECTION 5:    Completion. Final Payment

5.01    Upon final completion of the Work, Subcontractor shall submit to Contractor an affidavit that all bills for labor, materials, taxes, services and other cost of the Work have been paid, indemnifying Contractor and Owner from all such costs and releasing any further claims and liens by Subcontractor against Contractor and Owner. Payment or any partial payment may be withheld until Subcontractor furnishes satisfactory proof of payment of all bills for labor, materials,

taxes, services and other expenses in connection with the Work and all claims for changes or extra work have been settled. Until final completion of the Work and to the extent required by applicable law, all funds paid to Subcontractor shall be held in trust for application solely to payment of laborers, materialmen, fabricators, subcontractors and others furnishing elements of the Work.

    5.02    Prior to the Contractor's being obligated to make final payment and as a condition precedent of the Subcontractor's final Application for Payment, the Subcontractor shall submit to the Contractor:

        (1)    An Affidavit that all payrolls, bills for materials and equipment and other indebtedness connected with the Subcontractor's Work for which the Owner or his property or the Contractor or the Contractor's surety might in any way be liable, have been paid or otherwise satisfied and indemnifying Owner and Contractor therefrom;

        (2)    All warranties covering its work and/or satisfactory evidence of its ability to honor the warranties;

        (3)    Consent of surety to final payment, if required;

        (4)    Satisfaction of required close-out procedures; and

        (5)    Other data required by the Contractor or Owner, such as receipts, releases and waivers of liens to the extent and in such form as may be designated by the Contractor or Owner.

    5.03    To the extent the Contract Price is comprised of Unit Prices, the Contractor and Subcontractor shall, upon completion of all the Work, conduct and agree upon a final measurement of quantities of Work actually performed by the Subcontractor. Subcontractor shall then prepare and submit to Contractor a final Application for Payment in accordance with this Section 5 stating the balance of the total amount due to Subcontractor which has not already been paid by previous progress payments.

    5.04    Final payment shall constitute a waiver of all claims by the Subcontractor relating to Subcontractor's Work, but shall in no way relieve the Subcontractor of liability for the obligations assumed under this Agreement, or for faulty or defective work appearing prior to or after final payment.

## SECTION 6:    Contractor's Superintendent

    6.01    Contractor's superintendent and project manager will provide general administration of this Subcontract and the Work, but such general administration shall not relieve Subcontractor of its obligations. Contractor's superintendent will have authority to reject any portion of the Work which does not conform to the requirements of this Subcontract; and, whenever in his opinion he considers it necessary or advisable to insure the proper implementation of the intent of this Subcontract, he will have authority to require Subcontractor to stop the Work or any portion thereof.

## SECTION 7:    Changes, Claims and Delays

    7.01    Changes

        (A)    The Contractor may at any time by written order and without notice to the Subcontractor's sureties, make changes in, additions to or omissions from the Work to be performed under this Agreement, and the Subcontractor shall promptly proceed with the performance of this Agreement as so changed.  The Contract Price and time for performance of the Work, if applicable, shall be equitably adjusted on account of any such changes, subject to applicable provisions of the General Contract, and an appropriate Change Order shall be issued.

        (B)    Any claim by Subcontractor for adjustment of the Contract Price and time of performance of the Work resulting from such changes must be made in writing within ten (10) days from the date such changes are ordered. Any such written claims submitted by Subcontractor shall contain a detailed breakdown showing the difference in the value of the work, labor, services, and materials altered, added, omitted or changed by the change.

        (C)    Except as provided in subsection 7.01 (D), below, the following format will be used by the Subcontractor and Contractor to summarize the required adjustments to the Contract Price for written orders received by the Subcontractor, unless stated otherwise within the Contract Documents.

## ADDITIVE/DEDUCTIVE CHANGES

| | | |
|---|---|---|
| Labor | Line A | Amount |
| Material | Line B | Amount |
| Subtotal (A+B) | Line C | Amount |
| Sales Taxes (Not Required) | Line D | Amount |
| Subtotal (C+D) | Line E | Amount |
| Subcontractor's Overhead & Profit (% of E) | Line F | 15 % of Above |
| Payroll Taxes & Benefits (% of A) | Line G | % |
| Subtotal (E+F+G) | Line H | Amount |
| Sub-subcontractor Price(s) | Line I | Amount |
| Subcontractor's Overhead & Profit (% of I) | Line J | 5 % of Above |
| Subtotal (I+J) | Line K | Amount |
| Adjustment to Contract Price (H+K) | | Amount |

(D)     In the event Contractor and Subcontractor should be unable to agree upon an adjustment of the Contract Price in accordance with subsections 7.01(A) and 7.01(C), above, the decrease or increase in the Contract Price resulting from the change shall be determined in the following manner:

(1)     By unit prices agreed upon between Contractor and Subcontractor, or if Contractor and Subcontractor are unable to agree, then;

(2)     Subcontractor, provided he receives a written order signed by the Contractor or his authorized representative, shall be required to promptly proceed with the change in the Work involved. The cost of such work shall then be determined by the Contractor on the basis of the reasonable expenditures and savings incurred in performing the work attributable to the change, including, in the case of increase in the Contract Price, reasonable allowance for overhead and profit. In such event, the Subcontractor shall be required to keep and present, in such form as the Contractor may prescribe, an itemized accounting together with appropriate supporting data for inclusion into a Change Order. Costs shall be limited to the following: cost of materials, including sales tax and cost of delivery; cost of labor, including social security, old-age and unemployment insurance, and fringe benefits required by agreement or custom; unabsorbed overhead; worker's or workman's compensation insurance; bond premiums; reasonable rental value of equipment and machinery; and the additional costs of supervision and field office personnel directly attributable to the change. The amount of credit to be allowed by the Subcontractor to the Contractor for any deletion or change which results in a decrease in the Contract Price will be the amount of the actual cost of such decrease as confirmed by the Contractor. When both additions and credits covering related work or substitutions are involved in any one change, the allowance for overhead and profit shall be figured on the basis of the net increase, if any, with respect to that change.

(E)     The failure of the Subcontractor to immediately commence performance of any written change, when so directed by the Contractor, whether or not all terms have been agreed upon, may be deemed a material breach and the Subcontractor held in default of this Agreement.

(F)     There shall be no other monetary or time allowance, direct or indirect, to the Subcontractor other than what is specifically written in the Change Order, including, but not limited to, delays, suspensions, escalations, impact or other cost factors. The Subcontractor shall in no event be entitled to, nor shall it receive any compensation or allowance for any written change in an amount greater than that which the Contractor actually receives from the Owner, less a reasonable deduction for work performed by the Contractor or other subcontractors, as well as for the Contractor's profit and overhead.

(G)     No Change Order shall vary, abrogate, avoid, or otherwise affect the terms, conditions and provisions of this Agreement except as specifically set forth in the Change Order.

### 7.02    Delays

(A)    The Subcontractor acknowledges that the Contract Price is based on the fact that the Contractor is not liable to the Subcontractor, except as otherwise provided in subsection 7.02(B), below, for any damages or costs due to delays, accelerations, nonperformance, interference's with performances, suspensions or changes in the performance or sequence of the Subcontractor's Work.

(B)    Should the Subcontractor's performance of the Work, in whole or in part, be interfered with, delayed or suspended due to force majeure events beyond the Subcontractor's control, the Subcontractor shall be entitled to an extension of time in which to complete the Work so affected.

This right to obtain an extension of time shall be subject to Subcontractor's providing Contractor with written notice of any such interference, delay or suspension within forty-eight (48) hours of the event causing the interference, delay or suspension. In said event, Subcontractor shall be entitled to obtain an extension in the time of performance of its Work so affected to the extent Contractor is able to obtain a similar extension of time, if needed, from the Owner. In addition, if the General Contract entitles the Contractor to compensation for any such interference, delay or suspension and Contractor is able to obtain reimbursement from the Owner, Subcontractor shall be entitled to damages or additional compensation to the extent, and only to the extent, that such amounts are recovered from the Owner by the Contractor, on behalf of the Subcontractor. Subcontractor agrees that Contractor has no duty, obligation or liability to Subcontractor for any loss, cost or damages suffered by any such force majeure delay, interference or suspension, except to seek an extension of time from the Owner.

(C)    If Subcontractor makes a claim of any nature, including claims for extension of time, extra work, delays, or breach of contract, Subcontractor agrees to present such claim in writing, with full documentation, to Contractor within sufficient time for Contractor to evaluate such claim, determine whether, in the opinion of Contractor, such claim should be asserted against the Owner, and if so, to take the action required within the time limitations of the Contract Documents for asserting claims against the Owner. Where a time limitation is prescribed by the Contract Documents for making a claim of any nature, giving notice, taking an appeal, or any other action, Subcontractor agrees that such time is hereby shortened as respects such actions by Subcontractor against Contractor for the foregoing reasons. If Subcontractor's claim is asserted by Contractor against the Owner, Subcontractor agrees to be bound to Contractor to the same extent Contractor is bound to the Owner by the final decision relating to such claim, whether such decision is an administrative determination or a finding of a court or other tribunal of competent jurisdiction, and whether or not Subcontractor is a party to such proceeding. Contractor shall not be obligated to appeal from any administrative determination, or to prosecute in court or otherwise, any claim on behalf of Subcontractor without being fully indemnified, in a manner satisfactory to Contractor, against the cost and expense, including attorneys' fees, on account thereof; and Contractor may, even though it is so indemnified, abandon to Subcontractor any claim originating with Subcontractor by giving written notice to Subcontractor that Contractor will no longer prosecute such claim in the name of Contractor, but at Subcontractor's own cost and expense. Subcontractor agrees to exhaust all remedies which are available to it through Contractor prior to instituting a separate action in court or otherwise; and in the event a separate action is instituted prior to the exhaustion of such remedies, Subcontractor agrees to stay such action pending the Contractor's exhaustion of Subcontractor's remedies against the Owner. If Subcontractor's claim is prosecuted by Contractor against the Owner under the terms of the General Contract, or if Contractor defends a claim by the Owner which involves the work or obligations of Subcontractor, Subcontractor agrees to furnish all documents, statements, witnesses, and other information required by Contractor for such purpose, and to pay or reimburse Contractor for all expenses and cost, if any, incurred in connection therewith. It is expressly understood and agreed that as to any and all materials or services furnished or agreed to be furnished by Subcontractor, and as to any and all damages, if any, incurred by Subcontractor in connection with the Project, Contractor shall be liable to Subcontractor to the same extent that the Owner is liable to Contractor, but never to any greater extent than the Owner is liable to Contractor. No unresolved dispute shall interfere with the progress of construction, and Subcontractor shall proceed with its work as directed by Contractor.

(D)    If at any time a controversy should arise between Contractor and Subcontractor with respect to any matter in this Subcontract, and which Contractor determines is not a claim, dispute or controversy which should involve or be asserted against the Owner, the decision of Contractor relating to the subject of the controversy shall be followed by Subcontractor. If Subcontractor is not satisfied with such decision, and if the controversy cannot be settled amicably between Contractor and Subcontractor, the matter in dispute shall thereafter be decided by a state or federal court having jurisdiction over the subject matter in dispute and the parties. The venue of such action shall be in Bexar County, Texas. No such controversy or dispute shall interfere with the progress of construction, and Subcontractor shall proceed with its work as directed by Contractor.

(E)    Subcontractor agrees to be bound to the Contractor by the terms and conditions of the Contract Documents, and to assume toward the Contractor all of the obligations and responsibilities that the Contractor, by these

Revised Contract Form 04/22/04

documents, assumes to its the Owner. The relationship of the Contractor hereunder to the Subcontractor shall be the same as that of the Owner towards the Contractor under the General Contract.

(F)     No allowance of an extension of time shall, in any event, be made to the Subcontractor for delay by the Subcontractor in preparing drawings or in securing approval of the Architect thereto when such drawings are not properly prepared or when the Subcontractor by the exercise of reasonable diligence and judgment could have anticipated and avoided the delay.

(G)     If the General Contract provides for liquidated damages for delay beyond the completion date set forth in the General Contract, and they are so assessed, then the Contractor may assess same against the Subcontractor in proportion to the Subcontractor's share of the responsibility for such delay. However, the amount of such assessment shall not exceed the amount assessed against the Contractor.

(H)     The aggregate liability of the Contractor to Subcontractor pursuant to the scope of work of the Contract Documents, whether arising out of contract, tort, strict liability, statute or any other cause of action, shall not exceed an amount equal to the Contract Price stated herein.

## SECTION 8.     Subcontractor's Superintendent

8.01     Subcontractor shall appoint a competent superintendent who shall be in attendance at the jobsite on a regular basis and who shall have charge of the Work and authority to act for Subcontractor. Subcontractor shall advise Contractor in writing of the name, address, and telephone number of such superintendent and of any change in designation. The superintendent will report to the Contractor's superintendent on a regular basis while the Work is being performed.

## SECTION 9:     Mechanic's Liens or Claims

9.01     In the event that any mechanic's liens or claims are filed by anyone in relation to the labor and material of the Subcontractor, the Subcontractor agrees, within two (2) days after notice from the Contractor, to institute proceedings for the discharge of such mechanic's liens or claims and to have the same discharged within five (5) days of the date of said notice. In the event Subcontractor fails to comply with the foregoing, the Contractor shall have the right to exercise either or both of the following remedies:

(1)     The Contractor shall have all the rights against the Subcontractor set forth under Section 19 of this Agreement; and/or

(2)     The Contractor may cause such mechanic's liens or claims to be discharged and the expenses thereof, including any deposit by the Contractor and the amount of any obligation assumed by the Contractor by bond, indemnity or otherwise, as well as reasonable attorneys' fees and other costs incurred in connection therewith, are to be charges to and paid by the Subcontractor and, at the option of the Contractor, deducted from the Contract Price.

9.02     In the event the Subcontractor files an improper or invalid mechanic's lien against the Contractor, the Contractor may cause such mechanic's lien to be discharged, and the expenses thereof, together with the fees of the attorney for the Contractor in connection therewith, are to be charged to and paid by the Subcontractor, which payment, at Contractor's option, may be deducted from the Contract Price.

## SECTION 10:     Bonds

10.01     Contractor shall have the right to require Subcontractor to furnish a statutory payment bond and a performance bond issued by a corporate surety authorized to transact business in Texas approved by Contractor.

## SECTION 11:     Subcontractors

11.01     Subcontractor will not sublet any of the Work without the prior written consent of Contractor. Subcontractor agrees to bind every sub-subcontractor, and every sub-subcontractor shall agree to be bound by, the terms of this Subcontract. The subcontracting of all or any part of the Work by Subcontractor shall not relieve Subcontractor from any of the obligations or conditions of this Subcontract. As between the parties hereto, each sub-subcontractor shall be considered the agent of Subcontractor, and Subcontractor shall remain liable and responsible to Contractor as if no

Revised Contract Form 04/22/04

Subcontract had been made.

SECTION 12:      Labor Disputes

12.01     Subcontractor agrees to hire only such labor as will work harmoniously with the labor employed by the other contractors on the job. Should any dispute arise between the labor employed by Subcontractor and that of other contractors, it is agreed that Contractor shall decide the dispute and the Subcontractor and all other contractors shall be bound thereby, and shall perform their work in keeping with the decision. Any additional cost incurred by Contractor because of any matters mentioned in this paragraph will be borne by Subcontractor. Should Subcontractor cause a strike, work stoppage or slow down because of the labor employed by him and refuse, after request to remedy the situation, Contractor may cancel and terminate this Contract in the manner provided herein. Contractor shall decide all disputes that may arise between any two or more subcontractors as to the scope of their work, the order in which their work will be performed, as well as claims between subcontractors for damage claimed to have been done by one subcontractor to work already completed by another subcontractor, and such decision shall be conclusive on all parties.

SECTION 13     Warranties

13.01     Unless a greater warranty is required by the Contract Documents, the Subcontractor hereby guarantees the Work to be performed hereunder against defects in material and workmanship for a period of one (1) year from and after the date of the final payment hereunder, and Subcontractor shall promptly repair, at its own expense, any such defects upon receipt of notice thereof from Contractor. Subcontractor shall make available to Contractor and Owner all guarantees of manufacturers and suppliers which shall be in addition to the Subcontractor's guarantee. In the event that the Contract Documents require a greater or longer warranty or warranty period, Subcontractor shall be obligated to the Contractor to the same extent the Contractor is obligated to the Owner, its successors and/or assigns.

SECTION 14:     Permits and Licenses

14.01     All permits and licenses necessary for the prosecution of the Work shall be secured and paid for by Subcontractor. Subcontractor shall give all notices and comply with all laws, ordinances, rules or regulations of any governmental authority bearing on the conduct of the Work and perform all tests and inspections required by any authority having jurisdiction where the Work is performed. Subcontractor agrees to hold Contractor harmless from liability or penalty which might be imposed by reason of an asserted or established violation of any such laws, ordinances, rules or regulations.

SECTION 15:     Taxes

15.01     Subcontractor shall pay all sales, use, excise, gross income, occupational, and other taxes applicable to materials and supplies furnished and Work performed hereunder, and State and Federal Payroll Taxes, including contributions or taxes assessed against employees on wages earned, in connection with the Work. Subcontractor agrees to Indemnify Contractor from and against all liability in connection therewith and to make all reports required by the applicable governmental authority.

SECTION 16:     Indemnification

16.01     To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, the Architect and the Contractor and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, to the extent caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by him or anyone for whose acts he may be liable, regardless of whether it is caused in whole or in part, by the negligent act or omission of a party indemnified hereunder.  It is the express intent of Subcontractor that its obligation hereunder applies to the claims, damages, losses and expenses described above even if they result in whole or in part from the negligent act or omission of a party indemnified.  Such obligation shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnification which would otherwise exist as to any party or person described in this Section 16.

16.02     The Subcontractor specifically obligates itself to the Contractor and Owner in the following respects, to-wit: (1) to indemnify and defend them against and save them harmless from any and all claims, suits, liability, expenses or

Revised Contract Form 04/22/04

damages for any alleged or actual infringement or violation of any patent or patent right arising out of Subcontractor's performance under this Agreement; (2) to pay for all materials and equipment furnished and labor performed under this Agreement and to satisfy the Contractor and Owner thereupon whenever demand is made, and to indemnify and defend the Contractor and the Owner against and save them and the Project harmless from any and all claims, suits or liens therefor by others than the Subcontractor; and (3) to obtain and pay for all permits, licenses and official inspections made necessary by its Work, and to comply with all laws, ordinances and regulations bearing on the Work and the conduct thereof.

16.03    The Subcontractor shall indemnify Contractor and the Owner against, and save them harmless from, any and all loss, damage, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Agreement.

16.04    In any and all claims against the Owner, Architect, Contractor (including its affiliates, parents and subsidiaries) and other contractors or subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the indemnification obligation under this Section 16 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Worker's or Workman's Compensation Acts, disability benefit acts or other employee benefit acts.

16.05    Contractor and subcontractor have agreed that Subcontractor shall furnish all necessary equipment to perform subcontractor's work required by this agreement. However, the Contractor, in its sole discretion, may allow Subcontractor to use Contractor's equipment in connection with the "Project". In consideration for this license to use Contractor's equipment, Subcontractor indemnifies and holds Contractor harmless from any and all claims, demands, costs (including legal fees), damage to the equipment and lost time arising out of or from Subcontractor's use of the equipment. This indemnity and hold harmless covenant shall include, but not be limited to, all actions, claims, and demands founded either in negligence, products liability, failure to warn, failure to maintain, statutory or governmental regulation. IT IS THE INTENTION OF THE PARTIES THAT THIS COVENANT SHALL OPERATE TO INDEMNIFY CONTRACTOR FROM ITS OWN ACTS AND/OR OMISSIONS IN CONNECTION WITH THE OPERATION, USE OR MAINTENANCE OF THE EQUIPMENT.

16.06    WHERE AN INJURY, ECONOMIC LOSS, DEATH, DAMAGE OR OTHER LOSS OF AN AGENT, SERVANT OR EMPLOYEE OF THE SUBCONTRACTOR IS CAUSED BY, OR ALLEGED TO BE CAUSED BY, THE NEGLIGENCE OR FAULT OF THE OWNER OR CONTRACTOR IN FAILING TO PROVIDE A SAFE PLACE TO WORK OR IN FAILING TO WARN OR GUARD AGAINST CONDITIONS ON THE CONSTRUCTION SITE, OR FAILING TO SUPERVISE THE SUBCONTRACTOR, ITS AGENTS, EMPLOYEES, SUB-SUBCONTRACTORS AND INVITEES (EVEN THOUGH CAUSED WITHOUT NEGLIGENCE OR FAULT OF THE SUBCONTRACTOR), IT IS THE INTENTION OF THIS INDEMNITY AGREEMENT TO INDEMNIFY THE OWNER AND THE CONTRACTOR AND ALL OF THEIR AGENTS, SERVANTS AND EMPLOYEES FROM SUCH INJURY, ECONOMIC LOSS, DEATH, DAMAGE OR OTHER LOSS, INCLUDING ANY AND ALL EXPENSES OF DEFENSE AND INVESTIGATION (INCLUDING ATTORNEYS FEES).

SECTION 17:    Insurance

17.01    Subcontractor shall maintain in full force and effect, at its own expense, the following minimum insurance coverage (in the event that the specifications, plans or Owner requirements are greater, then those requirements shall supersede those listed below):

(A)    Statutory Worker's Compensation and Employer's Liability Insurance with minimum limits of not less than $500,000 Subcontractor shall require sub-subcontractors to provide Workmen's Compensation and Employer's Liability Insurance with the same minimum limits.

(B)    Commercial General Liability Insurance including Broad Form Property Damage Liability Coverage, with minimum limits as follows: $1,000,000 Each Occurrence, $2,000,000 Products and Completed Operations Aggregate/$2,000,000 General Aggregate.

The Commercial General Liability Policy will include the following coverage's where applicable:

(1)    Bodily Injury & Property Damage on an "Occurrence" Basis
(2)    Premises & Operations
(3)    Independent Contractors
(4)    Broad Form Blanket Contractual
(5)    Blanket XCU (Explosion, Collapse, Underground Damage)
(6)    Products/Completed Operations
(7)    Knowledge/Notice of Occurrence (to Owner)
(8)    Personal Injury Liability

Revised Contract Form 04/22/0.

(9)     Employees as Additional Insured
(10)    Host Liquor Law Liability
(11)    Incidental Malpractice
(12)    Non-Owned Watercraft (Under 25 Feet)
(13)    Broad Form Property Damage
(14)    Elevators

(C)     Commercial Automobile Insurance $500,000 combined single limit for all owned, non-owned, and hired vehicles.

All policies of insurance effecting any coverage shall contain an endorsement with the following wording (or similar wording acceptable to Contractor): "This Insurance Company hereby waives any and all rights of subrogation against Contractor which may arise by reason of any payment under this policy." A copy of the "Waiver of Subrogation Endorsement" shall be attached to each certificate for each policy.

Comprehensive or Commercial General Liability Insurance and other liability insurance may be arranged under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an Excess or Umbrella Liability Policy.

Subcontractor shall not commence Work at the Project until he has obtained all required insurance and until such insurance has been approved by Contractor. Approval of the insurance by Contractor shall not relieve or decrease the liability of Subcontractor hereunder. Certificates of insurance shall be filed with Contractor prior to commencing work. Failure to furnish either satisfactory insurance or required certificates within 10 days of notice to proceed shall not be considered cause for modification of any contractual time limits. The required insurance must be written by a company licensed to do business in Texas at the time the policy is issued. In addition, the company must be acceptable to Contractor. Subcontractor shall not cause any insurance to be canceled nor permit any insurance to lapse. All insurance policies shall include a clause to the effect that the policy shall not be canceled or reduced, restricted or limited until 30 days after Contractor has received written notice as evidenced by return receipt of registered or certified letter. Subcontractors shall incorporate all provisions of this Section 17 into their subcontracts so all sub-subcontractors have the above same coverage and provisions.

17.02    Subcontractor agrees to have Contractor named as an Additional Insured on any General Liability, Umbrella Liability, and Automobile Liability policies of insurance covering the Subcontractor's work and required by Section 17.01, above. Subcontractor shall furnish to the Contractor certificates of insurance, noncancelable except on thirty (30) days' written notice to the Contractor of default providing an opportunity to cure the default to Contractor within ten (10) days of receipt of the written notice of election by the Contractor.

17.03    The Subcontractor waives all rights against the Contractor and Owner for damages, including but not limited to the right of subrogation, caused by fire, theft, destruction or other peril or casualty loss except to the extent that such loss is covered by this Article or any other Property or Builder's Risk insurance applicable to the Work.

17.04    In the event Subcontractor fails or neglects to obtain or renew the required insurance and furnish to the Contractor the executed Certificate of Insurance form as evidence thereof, Contractor shall have (1) the right but not the obligation, to procure such insurance and reduce the Contract Price by the cost thereof; or (2) deem such failure or neglect on the part of the Subcontractor as a material breach of this Subcontract.

## SECTION 18:     Clean-up

18.01    Subcontractor shall at all times keep the Project and the Contractor's entire premises clean of rubbish and debris caused by the Subcontractor's operations. Daily clean up of all debris occasioned by the work performed by the Subcontractor and hauling of debris to a central location designated by the Contractor necessary to keep the work area clean shall be performed by the Subcontractor; provided, however, any trash, debris or liquid that poses a possible threat of fire or other safety concern shall be lawfully, properly and safely removed from the work area and Project by Subcontractor as directed by Contractor. If after twenty-four (24) hours' written notice by Contractor to Subcontractor, Subcontractor has not diligently proceeded with the required clean-up, then the Contractor has the right, but not the obligation, to proceed with the clean-up work at Subcontractor's cost and expense, and to deduct the cost from the Contract Price. Upon completion, Subcontractor shall also remove all of its tools, equipment and surplus materials. If Subcontractor does not perform such cleaning immediately upon request, Contractor may cause such cleaning to be done by others and charge the cost to Subcontractor.

SECTION 19:    Default

19.01    If the Subcontractor fails or refuses to proceed with or to properly perform his Work as directed by the Contractor or fails or refuses to properly perform or abide by any terms, covenants, conditions or provisions contained in this Agreement; or fails or refuses to obey all laws, ordinances, regulations or other codes applicable to the Work, the Contractor shall have the right to notify the Subcontractor of the Subcontractor's failure to comply. If the Contractor determines that the Subcontractor has not remedied or cured the default or defaults within two (2) days of Subcontractor's receipt of the notice, then the Contractor may, at its option, without releasing or waiving its rights and remedies against the Subcontractor or the Subcontractor's sureties and without prejudice to any other right it may be entitled to hereunder or by law, elect either or both of the following:

(1)    Terminate this Agreement and take possession of the Work and all materials, tools, equipment and appliances of the Subcontractor and finish the Subcontractor's Work by whatever means, method or agency which the Contractor may, in its sole discretion, choose; and/or

(2)    Take any steps the Contractor deems advisable to cure any deficiencies or defects in any labor, materials, equipment and services, and shall have a lien on and may take over all of Subcontractor's equipment, tools, appliances and materials and prosecute the Work to completion.

19.02    In the event that the Contractor deems either or both of the foregoing remedies necessary, the Subcontractor agrees that it shall not be entitled to receive any further payment of any portion of the Contract Price until after the Project shall have been completed. Moreover, all monies expended and all of the costs, losses, damages and extra expenses, including all management, administrative and other overhead and other direct and indirect expenses (including attorneys' fees) incurred by the Contractor incident to such completion, shall be deducted from the Contract Price. If such expenditures, together with the costs, losses, damages and extra expenses, exceed the unpaid balance of the Contract Price, the Subcontractor agrees to pay promptly to the Contractor, on demand, the full amount of such excess, including costs of collection, attorneys' fees and interest thereon at the rate of eighteen percent (18%) per annum until paid.

19.03    The Contractor's determination of the Subcontractor's default or defaults and the Contractor's decision as to the Subcontractor's failure to remedy and cure the default or defaults upon notification of their existence made by the Contractor in good faith under the belief that a default or defaults existed under the terms of this Agreement and that the Subcontractor failed to remedy and cure the default or defaults, shall be conclusive as to the Contractor's right to proceed as herein provided.

19.04    The liability of the Subcontractor hereunder shall extend to and include the full amount of any and all sums paid, expenses and losses incurred, damages sustained, and obligations assumed by the Contractor in good faith under the belief that such expenses, payments or assumptions were necessary or required, whether actually necessary or required or not, (1) in completing the Work and providing labor, materials, equipment, tools, supplies, transportation, services and other items therefor, or reletting the Work, and (2) in settlement, discharge or compromise of any claims, demands, suits and judgments pertaining to or arising out of the Work hereunder. A sworn itemized statement thereof or the checks or other evidence of payment shall be prima facie evidence of the fact and extent of the Subcontractor's liability.

19.05    If Subcontractor or its surety (if applicable) is adjudged a bankrupt, or makes a general assignment for the benefit of creditors, or if a receiver is appointed for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, such can impair or frustrate Subcontractor's performance of this Agreement. Accordingly, it is agreed that, upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its successor in interest adequate assurance of future performance in accordance with the terms and conditions hereof. Failure to comply with such request within ten (10) days of delivery of the request shall entitle Contractor to terminate this Agreement subject to the accompanying rights set forth in this Section 19. In all events, pending receipt of adequate assurance of performance and actual performance in accordance therewith, Contractor shall be entitled to proceed with the Work with its own forces or with other subcontractors on a time-and-material or other appropriate basis. Subcontractor shall be fully liable for all costs incurred by Contractor in this regard.

SECTION 20:    Termination for Convenience

20.01    Contractor may, by written notice to Subcontractor, terminate the whole or any part of the subcontract at its convenience. Such termination shall be effective upon Subcontractor's receipt of such notice. Upon termination under this Section 20, Subcontractor, as its sole and exclusive remedy, shall be entitled to be paid a portion of the Contract Price, calculated on the basis of the actual value of the work, for the work properly completed on the site by Subcontractor prior to termination, together with the direct close-out costs incurred by Subcontractor as a result of termination, less previous

payments to Subcontractor on account of work performed.

SECTION 21:   Governing Law

21.01   This Subcontract shall be construed and interpreted under the laws of the State of Texas.

SECTION 22:   Independent Contractor

22.01   Subcontractor shall perform the Work hereunder as an independent contractor and not as an agent or employee of Contractor.   Subcontractor shall be responsible for compliance with the Federal Equal Employment Opportunity Act with respect to its employees and with the provisions of the Occupational Safety and Health Act of 1970 as amended with respect to its operations, equipment and procedures on the jobsite.   In the event that the Subcontractor's violation of these or any other laws or regulations results in the imposition of fines, penalties or other sanctions, Subcontractor shall promptly pay such fines or penalties or comply with such sanctions.   If any such sanctions should affect the progress of the Project or the ability of other subcontractors to perform their work, Contractor may cancel this Subcontract as provided under Section 19.

SECTION 23: Assignment and Subcontractors

23.01   The Subcontractor shall not, in whole or in part, assign or sublet this Subcontract or the proceeds thereof without the prior written consent of Contractor.   Contractor shall have the right to assign this Subcontract to Owner.

23.02   Subcontractor hereby agrees to incorporate into any subcontracts or purchase orders it has with any other party, all those provisions required by law to be incorporated therein, and all those provisions of this Agreement which affect the rights of the Contractor.   This Agreement shall neither create a contractual relationship between Contractor and said subcontractors or suppliers nor between the Subcontractor and the Owner.

23.03   Subcontractor assigns to Contractor and its successors and assigns all interest in any subcontracts and purchase orders now existing or hereinafter entered into by Subcontractor for performance of any part of the Work which assignment will be effective upon acceptance by Contractor in writing and only as to those subcontracts and purchase orders which Contractor designates in said writing.   Contractor may accept such assignment at any time during the course of the Work prior to final completion.   All subcontracts and purchase orders shall provide that they are freely assignable by Subcontractor to Contractor.   Such assignment is part of the consideration to Contractor for entering into this Agreement with Subcontractor and may not be withdrawn prior to final completion.

SECTION 24:   Right of Offset

24.01   If the Subcontractor shall, at any time prior to the making of this Agreement, or thereafter, have entered into another agreement with the Contractor involving another project (other than the one subject to this Agreement), then the Contractor shall have the right to withhold any and all monies due or to become due pursuant to such other contractual agreement in the event of any default or threatened default in the performance of this Agreement, including, but not limited to, the payment of all labor and materials to be furnished in connection herewith.

SECTION 25:   Compliance with Laws, Ordinances and Regulations

25.01   All work, labor, services, equipment, tools, supplies and materials to be furnished, supplied or performed by the Subcontractor must strictly comply with all federal, state, local and municipal, as well as any and all other governing jurisdictions' and authorities' laws, rules, regulations, statutes, ordinances and directives (hereinafter designated as "Laws"), All work, labor, services, equipment, tools, supplies or materials, in addition to that specifically required by this Agreement, necessary to fully comply with the Laws will be furnished by the Subcontractor as part of this Agreement and without any additional compensation.   If the Subcontractor discovers or should have discovered any variance between this Agreement and any of the Laws, the Subcontractor shall be responsible to promptly notify the Contractor, in writing, and to make the necessary changes before proceeding with its Work.  **The Subcontractor agrees to indemnify and save the Contractor, Owner and Architect harmless from and against any and all claims, loss or expense caused or occasioned directly or indirectly by its failure to fully comply herewith.**

25.02   Subcontractor agrees that while performing its Work, it will not create, use, maintain or dispose of any

hazardous or substances in an unlawful or hazardous manner; and shall be solely responsible for the lawful, proper and safe handling, storage and removal of all hazardous wastes, chemicals and substances which are introduced to the site, or removed from the site, by Subcontractor's operations. The term "hazardous wastes, chemicals or substances" shall mean those materials and substances prohibited, proscribed or the use of which is controlled by any agency of the state or federal government having jurisdiction of such matters.

SECTION 26:   Document Review

26.01    Subcontractor acknowledges that he has carefully reviewed and examined this Agreement, the General Contract and all attachments, exhibits and addenda thereto. Subcontractor agrees that no conditions exist which would affect the progress, performance or price of this Agreement; that any and all prior ambiguities and discrepancies have previously been clarified and/or corrected and that it will not make any claim or demand upon Contractor based upon or arising out of any misunderstanding or misconception on its part of the provisions and requirements of those documents. However, in the event any ambiguity or discrepancy in the requirements to this Agreement should arise, the Subcontractor shall promptly submit the matter to the Contractor, in writing, or otherwise the Subcontractor will be held solely liable to make any change necessary to correct it. Any and all decisions made by the Owner or the Architect relative to any ambiguity or discrepancy which might arise shall be binding on the Subcontractor.

SECTION 27:   Disputes Procedure

27.01    In case of any dispute between the Subcontractor and Contractor, the Subcontractor agrees to be bound to the Contractor to the same extent that the Contractor is bound to the Owner by the terms of the General Contract and by any and all decisions or determinations made thereunder by the party or boards so authorized in the General Contract. The Subcontractor also agrees to be bound to the final decision of a court of competent jurisdiction, whether or not the Subcontractor is a party to such proceeding. If such a dispute is prosecuted or defended by the Contractor against the Owner under the terms of the General Contract or in court action, the Subcontractor agrees to furnish all documents, statements, witnesses and other information required by the Contractor for such purpose. It is expressly understood that as to any and all work done and agreed to be done by the Subcontractor and as to any and all materials, equipment or services furnished or agreed to be furnished by the Subcontractor, and as to any and all damages incurred by the Subcontractor in connection with this Agreement, the Contractor shall not be liable to the Subcontractor to any greater extent than the Owner is liable to and pays the Contractor for the use and benefit of the Subcontractor for such claims. No dispute shall interfere with the progress of the Work and the Subcontractor agrees to proceed with his work as directed, despite any disputes it my have with the Contract, the Owner, or other parties.

27.02    If at any time any controversy should arise between the Contractor and the Subcontractor with respect to any matter or thing involved in, related to or arising out of this Agreement, which controversy is not controlled or determined by Subparagraph 27.01, above, or other provisions of this Agreement, then that controversy shall be decided as follows:

(A)    The Subcontractor shall be conclusively bound and abide by the Contractor's written decision respecting the controversy, unless the Subcontractor shall commence arbitration proceedings as hereinafter provided within thirty (30) days following receipt of such written decision.

(B)    If the Subcontractor decides to appeal from the written decision of the Contractor, then the controversy shall be decided by arbitration in accordance with the then current Construction Industry Arbitration Rules of the American Arbitration Association, and the arbitration decision shall be final and binding on both parties, provided, however, that proceedings before the American Arbitration Association shall be commenced by the Subcontractor not later than thirty (30) days following the Contractor's written decision pursuant to subparagraph 27.02(A), above. If the Subcontractor does not file a demand for arbitration with the American Arbitration Association and Contractor within this thirty (30) day period, then the Contractor's written decision is final and binding.

(C)    This Agreement to arbitrate shall be specifically enforceable.

(D)    If arbitration is conducted by the Owner and the Contractor concerning, involving or relating to any dispute between the Contractor and the Subcontractor, then the Subcontractor agrees to a joint arbitration among the Owner, Contractor and Subcontractor as well as with any other parties thereto, pursuant to the conditions or rules specified by the General Contract between the Owner and Contractor.

SECTION 28:   Venue and Joint Claims

Revised Contract Form 04/22/04

28.01    Any dispute or claim arising out of this Agreement, or from a breach of this Agreement, and which is not resolved by the terms and provisions of this Agreement, shall be submitted to the appropriate judicial court within the County of Bexar, State of Texas, for decision. The Subcontractor agrees to participate, join in, and be bound by any proceeding, be it judicial, administrative, arbitration or other, which directly or indirectly relates to this Agreement or the Project and for which the Contractor demands, by written notice, that the Subcontractor participate.

28.02    Any claim or action by the Subcontractor must be commenced within two (2) years of the date the cause of action accrued, but in no event later than one (1) year after final completion of the Work and in no event after final payment to the Subcontractor. If any claim or dispute arises relating to this Agreement, the Subcontractor shall immediately make all of its books and records available to the Contractor for review and audit.

28.03    Subcontractor shall keep full and detailed accounts as may be necessary for proper financial management under this Agreement. The Contractor shall be afforded access to all the Subcontractor's records, books, correspondence, receipts, vouchers and similar data relating to this Agreement, and the Subcontractor shall preserve such records for a period of two (2) years, or for such longer period as may be required by law, after the final payment, Contractor's right of access and review shall be limited to those situations where (1) Contractor, for good cause, objects to payment of any Application for Payment submitted by Subcontractor, (2) where Contractor or Subcontractor have made a claim against the other or disputes have arisen between the parties hereto, (3) in the event Subcontractor shall be in default of this Agreement, (4) in the event this Agreement should be suspended, canceled or terminated as provided herein, (5) to verify quantities of Work to which Unit Prices apply, (6) to verify all costs pertaining to Work for which payment is to be made on a time-and-material basis, and (7) to the extent required by the General Contract.

## SECTION 29:    Merger Clause

29.01    This Agreement may not be changed, modified, altered or terminated orally and Contractor assumes no responsibility for any understanding or representations made by any of its officers or agents prior to the execution of this Subcontract, unless such understanding or representations by Contractor are expressly stated in this Agreement.

## SECTION 30:    Severability

30.01    If any term or provision of this Agreement is found to be invalid, it shall not affect the validity or enforcement of all remaining terms and provisions of this Agreement.

## SECTION 31:    Waiver

31.01    Except as may be specifically agreed in writing, the failure of Contractor to insist in any one or more instances upon the strict performance of any one or more provisions of this Agreement, or to exercise any right herein contained or provided by law, shall not be construed as a waiver or relinquishment of the performance of such provision or right(s) or of the right to subsequently demand strict performance or to exercise such right(s), and the rights shall continue unchanged and remain in full force and effect.

## SECTION 32: Damages

32.01    Subcontractor agrees that he can be adequately compensated by monetary damages for any breach of this Agreement which may be committed by Contractor and hereby agrees that no default, act, or omission of the Owner, Architect or Contractor, except for failure to make payments as required by this Agreement, shall constitute material breach of this Agreement entitling Subcontractor to cancel or rescind the provisions of this Subcontract or, except as otherwise provided herein, to suspend or abandon performance of all or any part of the Work.

## SECTION 33: Miscellaneous

33.01    Subcontractor agrees that if the Contract between Owner and Contractor is terminated by Owner for any reason, Subcontractor will, upon Owner's request, perform the balance of its work under this Subcontract for the account of Owner without any changes in price or other terms and conditions; provided that should such termination and request delay or interrupt Subcontractor's performance, any additional cost to Subcontractor and any changes in the work schedule shall be subject to negotiation between Owner and Subcontractor.

Revised Contract Form 04/22/0

33.02    Contractor and Subcontractor agree that each shall identify to the other in writing (after the execution of this agreement and prior to commencement of the Work on the Project site) the name and authority of any agent or other employee of the party to this agreement to execute, authorize or approve any change order or other agreement affecting time, price or the amendment, change, or other novation of any clause, covenant or condition of this Agreement.  Field personnel of either party not so identified in accordance with this section of this Agreement have no such authority to bind or otherwise contract on behalf of the party; and anyone relying upon a non designated person's authority do so at their own risk of the lack of authority.  Failure to designate any person in accordance with this section shall be deemed to appoint only the person whose name appears as the signatory on this subcontract document until such time as another person or persons are designated to the other party.

EXECUTED the day and year first above written.

CONTRACTOR:  BARTLETT COCKE, L.P.          SUBCONTRACTOR:

By: Bartlett Cocke Operations, Inc.        By: FT Woods
Its General Partner

By: _____              By: _____
Print Name: Randall J. Pawelek            Print Name: Tony Baglio
Title:   Vice-President of Operations     Title: Vice President
Date:    6.28.06                          Date:  5-5-C

**EXHIBIT "A"**
TO SUBCONTRACT

| | | | | |
|---|---|---|---|---|
| **Subcontractor:** | FT Woods<br>PO Box 122,<br>Georgetown, TX 78626 | **Date:** | | |
| **Project & Location:** | AISD Northeast Middle School<br>7414 Johnny Morris Road<br>Austin, TX 78724 | | **Subcontract No.:** 05305 - 03.03000.000.S | |
| BCLP Job No.: 05305 | Owner No.: #P05-0019-NEMS | | Architect No.: #05-07 | |

Notwithstanding anything herein to the contrary, the following clauses, covenants shall be incorporated to the main Subcontract.

**Contractor:**
Bartlett Cocke, L.P.
By: Bartlett Cocke Operations, Inc.
Its General Partner

John Dunn
Project Manager

cc:     Superintendent, BCLP
          Exhibit file
File/Job 05305 D: FT Woods

**Subcontractor:**
FT Woods

By: _____

Print Name: Tony Braglio

Title: Vice President

Date: 5-5-6

**EXHIBIT "B"**
TO SUBCONTRACT

| | | | |
|---|---|---|---|
| **Subcontractor:** | FT Woods<br>PO Box 122,<br>Georgetown, TX 78626 | **Date:** | |
| **Project & Location:** | AISD Northeast Middle School<br>7414 Johnny Morris Road<br>Austin, TX 78724 | | **Subcontract No.:** 05305 – 03.03000.000.S |
| BCLP Job No.: 05305 | Owner No.: #P05-0019-NEMS | | Architect No.: #05-07 |

Notwithstanding anything herein to the contrary, the following clauses, covenants shall be incorporated to the main Subcontract.

1. Safety Program. <u>Sign acknowledgement and compliance agreement.</u>
2. Alcohol and Drug Abuse Policy. <u>Sign subcontractor's acknowledgement of drug-free workplace policy.</u>
3. Partial Release and Waiver of Lien. To be signed and notarized with each pay request.

**Contractor:**
Bartlett Cocke, L.P.
By: Bartlett Cocke Operations, Inc.
Its General Partner

John Dunn
Project Manager

**Subcontractor:**
FT Woods

By: _____

Print Name: _____

Title: V. ce President

Date: 5-5-6

cc:     Superintendent, BCLP
        Exhibit file
File/Job 05305 D: FT Woods

## SAFETY PROGRAM

<u>All Contractors and their Personnel:</u>

1. Plan all work to attempt to prevent personal injury to employees and other contractor's employees, as well as damage to property or injury to the public.

2. Develop and use a system to detect and control accident exposures.

3. Provide personal protective equipment and machine guardings needed and enforce their use.

4. Establish a tool and equipment inspection program.

5. Promptly investigate all accidents and report as required by law.

6. Each subcontractor shall comply with all laws, rules and regulation relating to safety and health, including but not limited to: OSHA and Federal, State and local codes and ordinances.

7. Each subcontractor is to provide Bartlett Cocke, L.P.'s jobsite Safety Coordinator (usually BCLP Superintendent) with the name of the subcontractor's safety coordinator.

8. All persons employed on this job, or visitors on the jobsite, are required to wear hard hats.

9. Drug or alcohol abuse will not be tolerated. Drugs and alcohol are prohibited on the jobsite.

<u>Bartlett Cocke, L.P.:</u>

As General Contractor for this Project, Bartlett Cocke, L.P.'s Project Superintendent will:

1. Provide upon request, this state of policy.

2. Appoint himself or one of his employees as Job Safety Coordinator.

3. Safety Coordinator duties:
   a. Make periodic inspections of the job.
   b. Hold weekly safety meetings for BCLP employees.
   c. Participate in accident investigation and documentation.

4. Request Subcontractors provide minutes of periodic safety meetings to BCLP.

5. Cooperate with insurance company Risk Management representatives during on site inspections or accident investigations.

<u>Subcontractors:</u>

Each Subcontractor and Sub-Subcontractor is responsible for the prevention of accidents on his work or through his work. Each supervisor will:

1.  Set up their safety program.
2.  Cooperate with the Project Safety Coordinator.

3.  Comply with the required safety standards pertaining to this operation.

4.  Provide and insist on the use of "hard hats" by all employee and visitors.

5.  Require all personnel wear shirts, long pants and substantial leather shoes while on the jobsite. Tennis shoes, sandals and sneakers are prohibited.

6.  Cooperate fully in the investigation of accidents.

7.  Provide copies of any minutes of their periodic safety meetings to BCLP.

Recordkeeping Requirements:

All Subcontractors will adhere to the requirements set forth in the U.S. Dept. of Labor Publication; Record keeping Requirements under the Occupational Safety & Health Act. All employers have the responsibility to instruct their employees in the recognition and avoidance of unsafe conditions and the regulations applicable to their work environment, to control hazards or other exposure to illness or injuries.

## SUBCONTRACTOR'S ACKNOWLEDGEMENT OF
## PROJECT SAFETY PROGRAM

It is the object of Bartlett Cocke, L.P. to initiate a safety program for this project. All contractors, subcontractors, and sub-subcontractors should abide by the safety regulations as set forth in the attached form and by applicable federal, state and local laws.

This program is the basis from which safety problems, that arise during the construction of this project, can be addressed. We believe that this program, along with your additions that may be necessary, will help to minimize accidents.

We all realize that accident prevention is beneficial to all but the responsibility of each and every person on this job. Each subcontractor will be held responsible for the safe and healthful working conditions for their employees. Bartlett Cocke, L.P. expects the full co-operation of all companies and persons in carrying out this safety program.

## SAFETY PROGRAM
## ACKNOWLEDGEMENT & COMPLIANCE AGREEMENT

**TO:**   BARTLETT COCKE, L.P.

**JOB:**   AISD Northeast Middle School

I have read the Project Safety Program and will abide by and comply with the Project Safety Program. I will review this program with our designated on-site supervisor to insure that our company's field operations comply with the program.

Signed: Tom Bog

Printed Name: Tong Bagion

Title: Vice Porident

Company: FT Woods

Date: 5-5-6

## BARTLETT COCKE, L.P.
## ALCOHOL AND DRUG ABUSE POLICY

### Purpose

1.      Bartlett Cocke, L.P. is committed to maintaining a safe and productive work environment. The abuse of alcohol and drugs can impair employees performance and jeopardize the safety of employees and other persons. The purpose of this policy is to help ensure that the work environment remains free of alcohol and drug abuse.

### Prohibition

2.      The illegal manufacture, distribution, possession, sale, or use of alcohol and drugs is prohibited on Bartlett Cocke, L.P. property or at Bartlett Cocke, L.P. work locations. Employees shall cot use drugs or consume alcohol (or be under the influence of drugs or alcohol) while on duty. Employees shall not use illegal drugs on or off duty.  Violations of these policy may result in termination of employment.

3.      The normal use of over-the-counter medications and the legal use of prescription drugs, as ordered by a licensed physician, is not prohibited by this policy. Employees using over-the-counter medications or prescription drugs which may affect their ability to perform safely should notify their supervisor.

### Pre-employment Screening

4.      Prior to employment, all selected candidates are screened and tested for drugs. Candidates who test positive are not hired.

### Post-Accident Testing

5.      Employees involved in work-related accidents causing bodily injury or significant property damage shall be required to submit a screen for alcohol and/or drugs.

### Reasonable Suspicion Testing

6.      When there is reasonable suspicion that alcohol or drugs have been brought into the workplace, a thorough investigation will be conducted.

7.      When there is reasonable suspicion that employees are under the influence of alcohol or drugs, they are relieved of duties, taken to a medical facility, and screened for alcohol and drugs. Employment is suspended (with pay) until test results are received.  The refusal of employees to submit to screening is treated as insubordination and may result in termination of employment.

### Random or Across-the-Board Testing

8      Bartlett Cocke, L.P. may, in its sole discretion, decide to screen employees for the use of alcohol or drugs in violation of this policy without a determination of reasonable suspicion that the employee is under the influence of alcohol or drugs. Bartlett Cocke, L.P. may select employees at random for alcohol or drug screening.  Bartlett Cocke, L.P. may also conduct across-the-board alcohol or drug screening by designating certain job categories and screening all employees in the designated job categories. Bartlett Cocke, L.P. will take steps to ensure that any random or across-the-board alcohol or drug screening is conducted in a non-discriminatory manner.

## Employee Searches

9.      Bartlett Cocke, L.P. employees are subject to searches of their body, personal possession(s) brought into Bartlett Cocke, L.P. work areas and vehicle(s) brought onto Bartlett Cocke, L.P. property. By reporting for work, and by bringing their personal possessions and/or vehicle(s) to Bartlett Cocke, L.P., Bartlett Cocke, Inc. employees will have consented to a search by Bartlett Cocke, L.P. representatives of their body, personal possession(s) and/or vehicle(s).

10.     Bartlett Cocke, L.P. may conduct searches of employees' body, personal possession(s) and/or vehicle(s) when, in the sole opinion of Bartlett Cocke, L.P. management, illegal activity such as theft or illegal drug use is occurring or has occurred.

11.     Employees who refuse to consent to a search under the provisions of this policy are subject to discipline, up to and including termination of employment.

## Disciplinary Action

12.     Any employee who is found manufacturing, distributing, possessing, dispensing or selling drugs in violation of this policy or who test positive for alcohol or drugs will be discharged.

13.     Any employee who fails to notify Bartlett Cocke, L.P. of any conviction under criminal drug statutes for a workplace offense within five days of the conviction will be discharged.

## Definitions

14.     The following definitions apply to terms used in this policy:

> "Drug" means any controlled substance or dangerous drug, including inhalants as defined by State and Federal laws and regulations.

> "Reasonable Suspicion" means a suspicion that would be held by an ordinary and prudent person in the same circumstances as the individual who obtains information or evidence that a violation of this policy has occurred.

> "Under the influence" means having a level of alcohol or drugs in the body to the extent that it impairs employee performance or jeopardizes the safety of employees or other persons.

> "Test positive for drugs" means that a controlled substance has been detected by laboratory test in excess of the tolerance below:

| | | | |
|---|---|---|---|
| Amphetamines | 0.3 ug/ml | Methadone | 0.3 ug/ml |
| Barbiturates | 0.3 ug/ml | Methaqualone | 0.3 ug/ml |
| Benzodiazepines | 0.3 ug/ml | Opiates | 0.3 ug/ml |
| Cannabinoids (Marijuanna) | 50.0 ng/ml | Phencyclidine | 75.0 ug/ml |
| Cocaine | 0.3 ug/ml | Propoxyphene | 0.3 ug/ml |

> "Test positive for alcohol" means that alcohol has been detected in an amount of .04 or above by breathalizer exam or .10 by blood exam.

## Confidentiality

15. All of the Bartlett Cocke, L.P. employees will maintain complete confidentiality with regard to the results of any medical tests.

## Employee Assistance and Education

16.The abuse of drugs, alcohol and inhalants is recognized as a problem that affects the individual employee and Bartlett Cocke, L.P. and creates a need for assistance in obtaining information on available drug counseling, rehabilitation and treatment programs. A list of available treatment programs may be obtained from Bartlett Cocke, L.P.'s personnel department. Employees' requests for assistance will be kept in confidence and only on a need-to-know basis.

17.The requirements of this policy will be discussed periodically at weekly jobsite safety talks. A record of issues discussed and an attendance roster will be kept in the jobsite safety files. On Federal projects requiring monthly supervisor safety meetings, the Alcohol and Drug Abuse Policy will be one of the safety items discussed.

## SUBCONTRACTOR'S ACKNOWLEDGEMENT OF
## DRUG-FREE WORKPLACE POLICY

Bartlett Cocke, L.P. has adopted a Drug-Free Workplace Policy to promote and maintain safe, productive and drug-free work environments at all Bartlett Cocke jobsites. This policy prohibits the use, possession, sale, manufacture, distribution, dispensation, or being under the influence of drugs, alcohol or inhalants on the project worksite by any employees, subcontractor employees, agents, or other persons. The enforcement of this policy involves or may involve reasonable searches of personal property or vehicles while working or present at the worksite and the taking of urine and/or blood samples for drug testing and analysis.

As a subcontractor or supplier you agree, as a condition of the performance of your subcontract or purchase order, with Bartlett Cocke, L.P.'s Drug-Free Workplace Policy. Specifically, this requires the subcontractor to inform its employees that this policy is in effect, prior to the entry to or working on the Bartlett Cocke, L.P. jobsite. Violation of this policy by your employees will result in immediate removal from Bartlett Cocke, L.P. in the implementation and enforcement of this Drug-Free Workplace Policy. Specifically, this requires the subcontractor/supplier to inform its employees and its own subcontractors/suppliers:

> ➤ They are subject to this Drug-Free Workplace Policy.

> ➤ Compliance with the policy is a condition of employment at the Bartlett Cocke, L.P. jobsite,

> ➤ Violation of this policy will result in their immediate removal and suspension from the jobsite,

Please acknowledge your agreement to cooperate in the implementation and enforcement of this Drug-Free Workplace Policy by returning an executed copy of this document to Bartlett Cocke, L.P. with your executed subcontract or purchase order.

Signed: _Tony Baglioni_

Printed Name: _Tony Baglioni_

Title: _Vice President_

Company: FT Woods

Date: _5-5-6_

## PARTIAL RELEASE AND WAIVER OF LIEN

Whereas, the undersigned through its authorized representative, hereinafter referred to as subcontractor, has performed labor and furnished materials or done both pursuant to the undersigned's contract with Bartlett Cocke, L.P.  hereinafter called contractor, in connection with the construction or improvements owned by Austin Independent School District, hereinafter called Owner, for the project known and located below:

AISD Northeast Middle School
7414 Johnny Morris Road
Austin, TX 78724

Whereas as result of the foregoing $_____ is due and payable, exclusive of retainage, to subcontractor by contractor for the period from _____to _____, and;

Whereas, subcontractor in order to induce the contractor to release said funds, has been requested to acknowledge the receipt from the contractor of the payment of a portion of the contract price for the payment period and to release and waive any liens or claims of subcontractor, its suppliers, employees, materialmen and sub-subcontractors may have or assert against the owner and the property, exclusive of retainage, that have arisen by virtue of subcontractor's performance in connection with its agreement;

Now therefore in consideration and subject to the receipt of said funds:

1)    The subcontractor hereby waives and releases any and all of its liens, claims and demands, of every nature whatsoever which have arisen by virtue of such labor and materials having been performed or furnished by subcontractor, its employees, suppliers, materialmen and sub-subcontractors to the extent such monies have been paid; provided however, such waiver release and relinquishment shall not effect subcontractor's lien claims and rights, with respect to sums retained by contractor, as may be required by law or the agreement between contractor and subcontractor's lien claims and rights for sums that become due to subcontractor after the period referenced above;

2)    Subcontractor warrants and affirms that all labor and materials of its employees, suppliers, fabricators, materialmen and sub-subcontractors have been paid in full for the materials supplied and labor performed for the pay period covered by this instrument. Subcontractor expressly warrants and certifies to contractor that there is no person, entity or firm that has a valid claim which may be asserted against the contractor or the owner for materials or labor for the project;

3)    Subcontractor by its authorized agent _____, is authorized to make this affidavit and has personal knowledge of the information contained herein, and that he/she is aware of and makes the affidavit under the civil and criminal provisions of house bill 86, 59th Legislature, 1965, codified as Texas Property Code & 53.026, pertaining to sham contracts, false statements and interdependent contractual relationship in construction projects, and;

4)    Subcontractor has executed this instrument upon reliance of no one other than itself in order to induce the contractor to release monies to subcontractor and is fully aware and understand the significance and effect of this instrument.

EXECUTED this _____ day of _____, 200\_\_\_.

By: ET Woods
        Subcontractor (Company Name)

Signature: _____

Print Name: _____

Title: _____

STATE OF TEXAS   §
COUNTY OF _____       §
This instrument was sworn to and acknowledged before me on the date indicated above.

_____
Notary Public in and for the State of Texas
My Commission Expires: _____

**EXHIBIT "C"**
TO SUBCONTRACT

| | | |
|---|---|---|
| **Subcontractor:** | FT Woods        **Date:**<br>PO Box 122<br>Georgetown, TX 78626 | |
| **Project & Location:** | AISD Northeast Middle School<br>7414 Johnny Morris Road<br>Austin, TX 78724 | **Subcontract No.:** 05305 - 03.03000.000.S |
| BCLP Job No.:  05305 | Owner No.:  #P05-0019-NEMS | Architect No.:  #05-07 |

Notwithstanding anything herein to the contrary, the following clauses, covenants shall be incorporated to the main Subcontract.

See the attached estimated schedule for construction.

**Contractor:**
Bartlett Cocke, L.P.
By: Bartlett Cocke Operations, Inc.
Its General Partner

John Dunn
Project Manager


cc:     Superintendent, BCLP
        Exhibit file
File/Job 05305 D: FT Woods

**Subcontractor:**
FT Woods

By: _____
Print Name: Vice President
Title: York Beglin
Date: 5-5-6

**EXHIBIT "D"**
TO SUBCONTRACT

| | | | |
|---|---|---|---|
| Subcontractor: | FT Woods<br>PO Box 122<br>Georgetown, TX 78626 | Date: | |
| Project & Location: | AISD Northeast Middle School<br>7414 Johnny Morris Road<br>Austin, TX 78724 | Subcontract No.: | 05305 - 03.03000.000.S |
| BCLP Job No.: 05305 | Owner No.: #P05-0019-NEMS | Architect No.: #05-07 | |

Notwithstanding anything herein to the contrary, the following clauses, covenants shall be incorporated to the main Subcontract.

The following sections are included in the Scope of Work:

**See attached "Subcontract Exhibit D"**

The following items are included in the Scope of Work:

1. Compliance with the Contractor's project safety program, record-keeping and work rules.
2. Daily clean-up and removal of debris to a designated on-site receptacle as directed by superintendent. All materials on the job site must be stored on pallets or movable containers.
3. Adequate personnel and/or extended work hours to meet the project schedule requirements.
4. Because of the fast-track schedule, ALL submittals are due within two (2) weeks of contract date. All Material Safety Data Sheets (MSDS) information required by law to be submitted to Bartlett Cocke project office prior to commencement of work.
5. Attendance at Weekly Subcontractor meetings scheduled by the project superintendent is mandatory. Field supervisor representative in attendance shall be authorized to make binding project decisions.
6. Protection of other trades' work, materials and finishes. All materials shall meet or exceed performance criteria in Contract Documents.
7. All material handling, stocking and protection of stored material.
8. Furnish all labor, materials, tools, equipment, supervision, coordination, installation and any other related work required to complete the proposed portion of this project including accepted alternates.
9. Work associated with Addenda 1, 2, 3, 4, 5, accepted VE and Alternate 1.
10. Minimum quantity of ten (10) submittals is required for each item submitted. Subcontractor is responsible for cost of reproductions of all submittal data submitted up to ten (10) sets.
11. Provide and perform all requirements to comply with the Contractor's Accident Prevention Program, Bartlett Cocke Safety Program, Drug Free Policy, Documentation Policies and work rules.
12. Provide two (2) copies of lien and claim waivers, "Continuation Sheet" (G703), Application and Certificate for Payment" (G702) with each pay application.
13. Submit a Schedule of Values within one (1) week of the contract date to be broken down by area, including a line item for "Close out Requirements" and "Commissioning" with a dollar value associated with it. Each section of the S.O.V. must be broken out and valued accordingly to scope of work.
14. Transportation, storage and/or use of any alcoholic beverage, firearms or tobacco products are prohibited on school property. Use of AM/FM radios, tape decks etc. is prohibited on project site and in the building(s).
15. No physical and/or verbal interaction with faculty, students and/or visitors will be permitted. Compliance with school safety rules per Contract Documents.
16. Protect all erosion controls that have been placed as a part of the Storm Water Pollution Protection Plan. Report any problems to the superintendent upon discovery. Any controls that are removed to perform work must be replaced at the end of each day by Subcontractor performing removal.
17. The project superintendent has all rights and authority to remove and prohibit any violator from the project without written notice.
18. Project schedule has been reviewed and Subcontractor agrees to maintain and/or improve upon the

project schedule as directed. Phase construction and remobilization as required. Adequate personnel and/or extended work hours, phase construction and remobilization as required, to meet the project schedule requirements as interpreted by the Construction Manager.

19. All Subcontractors are required to hold weekly safety meetings and shall submit a copy of the weekly safety meeting reports and daily reports to the project superintendent and attend Construction Managers' weekly safety meetings, if requested and/or required.

20. Provide a full time, competent foreman/superintendent that can make schedule, manpower and material decisions on the project. If the foreman is not harmonious to the project, that foreman may be removed and replaced at the decision of the project superintendent. No foreman/superintendent can be changed, once established, without approval by Bartlett Cocke staff.

21. Subcontractor's management personnel shall attend a Pre-Construction Conference at a time and place to be determined by the Owner and Construction Manager.

22. All materials on job site must be stored on pallets, dunnage, or movable containers. Clean up and dispose of waste materials to designated on-site dumpsters on a daily basis, as directed by superintendent.

23. All transportation of personnel and parking of motor vehicles will be the sole responsibility of Subcontractor. Any parking issues on site will be at the discretion of the project superintendent.

24. All Subcontractors shall submit a copy of their daily report to the project superintendent on a daily basis. Provide qualified field supervisor to continually monitor Subcontractor work while his crew is working on site.

25. Coordination with other trades is part of this Subcontract.

26. Maintain all certifications required to complete scope of work per the manufacturers instructions and per the Contract Documents, including testing, calibration of systems and/or local authorities having jurisdiction.

27. Warranties, operation & maintenance manuals, attic stock, owner training and/or commissioning requirements per the Contract Documents. Construction Waste Management documentation as required by the Contract Documents.

28. All concrete work including structural, site and miscellaneous per sections 031516, 031819, 032100, 033000, 033100, 033923, 024660 of the Contract Documents, including layout from control, footing excavation, grouting base plates, pumping, saw cutting, curing, concrete stairs, concrete retainers and City approaches.

29. Drilled piers and reinforcing steel complete including embeds, anchor bolts, site headwalls and concrete retaining walls per Contract Documents.

30. Concrete electrical site light pole bases.

31. Monolithic concrete curb, gutter and paving per Contract Documents.

32. Subfab crawl space concrete reinforced walkway including formwork, joints, curing and clean-up of work.

33. Site concrete work to include basketball courts, transformer pads, equipment pads, stained/stamped ramps, bollards, sand and sidewalk work complete per Contract Documents.

34. Mechanical chiller equipment concrete.

35. Bonds.

The following items are excluded from the Scope of Work:

1. Sales Tax.
2. Segmental site retaining walls, waterproofing, precast concrete and utility concrete encasements.
3. Rock excavation and excavation spoil haul-off.
4. Site utility concrete at clean-outs, trench drains, area inlets and manholes.
5. Preparing subgrade, compaction and asphalt paving work.
6. Materials testing cast-in-place concrete work and permit fees.
7. Concrete thrust blocks, fence concrete, manholes, pull boxes and joint sealants.
8. Concrete staining, polishing and precast concrete work.
9. Housekeeping pads not indicated in Contract Documents.
10. Protection of stained concrete floors, hardeners and coatings.

| Contractor: | Subcontractor: |
|---|---|
| Bartlett Cocke, L.P. | FT Woods |
| By: Bartlett Cocke Operations, Inc. | |

Its General Partner

John Dunn
Project Manager


By: _____

Print Name: _Tony Broglio_

Title: _Vice President_

Date: _5-5-6_


cc:     Superintendent, BCLP
        Exhibit file
File/Job 05305 D: FT Woods

# EXHIBIT C

# LITCHFIELD
## CAVO LLP
Attorneys at Law

WRITER'S ADDRESS:
One Riverway
Suite 1000
Houston, TX 77056
713-418-2017
713-418-2001(fax)

Ellen G. Tagtmeier
Email: tagtmeier@litchfieldcavo.com

November 13, 2018

davidwilson@mehaffyweber.com
David V. Wilson
MehaffyWeber
One Allen Center
500 Dallas, Suite 1200
Houston, Texas 77002

Re:   **DEMAND FOR PERFORMANCE OF DEFENSE AND INDEMNITY OBLIGATIONS**

> Insured:              FT Woods Construction Services, Inc.
> Additional Insured:   Bartlett Cocke, LP
> Claimant:             Austin Independent School District

Lawsuit:   Cause No. D-1-GN-18-005872; *Austin Independent School District v. Pfluger Associates, LP., Et. Al.*; In the 261st Judicial District Court of Travis County, Texas.

To Whom It May Concern:

   This law firm represents Bartlett Cocke General Contractors ("Bartlett Cocke"). Austin Independent School District ("AISD") has sued Bartlett Cocke as a defendant in this lawsuit related to damages allegedly incurred by Plaintiff arising out of the performance of subcontract work performed by FT Woods Construction Services, Inc. ("FT Woods") for the construction of the Gus Garcia Middle School (n/k/a Gus Garcia Young Men's Leadership Academy) located at 7414 Johnny Morris Rd, Austin, Texas 78724 (the "Project").

   Plaintiff AISD is the owner of the Project. Bartlett Cocke was the construction manager for the Project. The prime/original contract is dated June 20, 2005. Bartlett Cocke subcontracted with FT Woods on June 28, 2006, to provide site and building concrete labor and materials and equipment for the Project, including but not limited to, drilled piers and site, structural and miscellaneous concrete work (the "Subcontract"). Construction on the Project was substantially completed on or about September 25, 2007.

Chicago ● Hartford ● Boston ● New York ● New Jersey ● Pittsburgh ● Philadelphia ● Houston
Los Angeles ● Fort Lauderdale ● Tampa ● Wisconsin ● West Virginia ● Salt Lake City ● Indiana ● St. Louis
Atlanta ● Providence ● Las Vegas ● Dallas-Fort Worth ● Louisiana

www.litchfieldcavo.com

**LITCHFIELD**
Attorneys at Law **CAVO** LLP

November 13, 2018
Page 2

Plaintiff alleges that there are construction defects which include the following:

- Substantial differential settlement (7" to 12") across expansion joints

- Broken vent lines due to heaving of mechanical room slab (resulting in abandonment of original water heater system in the kitchen)

- Broken or dislodged sewer pipes beneath building (resulting in raw sewage flowing and ponding in crawl space)

- Exterior doors that no longer open or close properly (including emergency exits)

- Windows with visible light around the edges of the assembly

- Pipes and conduit pushing against ductwork and concrete beams in basement areas

- Roof leaks at parapet caps

The scope of work of FT Woods is implicated in the Plaintiff's pleadings and expert reports.

Plaintiff sued Bartlett Cocke for breach of contract, negligence and breach of implied and express warranties. Plaintiff seeks to recover damages for actual and consequential damages, attorney's fees and interest in an amount not to exceed $30,000,000.00. Bartlett Cocke sued FT Woods Construction Services as a third party defendant for contractual indemnity, contribution, breach of contract, breach of express and implied warranties and negligence.

Enclosed please find the following:

1. Plaintiff's Original Petition
2. Plaintiff's First Supplemental Petition
3. Bartlett Cocke's Original Answer to Plaintiff's Original Petition
4. Bartlett Cocke's Third Party Petition against FT Woods
5. Subcontract Agreement between Bartlett Cocke and FT Woods
6. Certificate of Liability Insurance
7. Expert Report of PE Structural Consultants dated 8-31-16

Section 16 of the Subcontract specifically provides that FT Woods will indemnify Bartlett Cocke for AISD's claims related to FT Woods' scope of work. Specifically, the

**LITCHFIELD**
Attorneys at Law CAVO LLP

November 13, 2018
Page 3

indemnity and insurance language in the Subcontract provides as follows:

SECTION 16: Indemnification

16.01  To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, the Architect and the Contractor and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work Itself) including the loss of use resulting therefrom, to the extent caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by him or anyone for whose acts he may be liable, regardless of whether it is caused in whole or in part, by the negligent act or omission of a party indemnified hereunder. It is the express intent of Subcontractor that its obligation hereunder applies to the claims, damages, losses and expenses described above even if they result in whole or in part from *the* negligent act or omission of a party indemnified. Such obligation shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnification which would otherwise exist as to any party or person described in this Section 16.

16.02 The Subcontractor specifically obligates itself to the Contractor and Owner in the following respects, to-wit: (1) to indemnify and defend them against and save them harmless from any and all claims, suits, liability, expenses or damages for any alleged or actual infringement or violation of any patent or patent right arising out of Subcontractor's performance under this Agreement; (2) to pay for all materials and equipment furnished and work and labor performed under this Agreement and to satisfy the Contractor and Owner thereupon whenever demand is made, and to indemnify and defend the Contractor and the Owner against and save them and the Project harmless from any and all claims, suits or liens therefor by others than the Subcontractor; and (3) to obtain and pay for all permits, licenses and official inspections made necessary by its Work, and to comply with all laws, ordinances and regulations bearing on the Work and the conduct thereof.

16.03 The Subcontractor shall indemnify Contractor and the Owner against, and save them harmless from, any and all loss, damage, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Agreement.

16.04 In any and all claims against the Owner, Architect, Contractor (including its affiliates, parents and subsidiaries) and other contractors or subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the

**LITCHFIELD**
Attorneys at Law **CAVO** LLP

November 13, 2018
Page 4

indemnification obligation under this Section 16 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Worker's or Workman's Compensation Acts, disability benefit acts or other employee benefit acts.

16.05 Contractor and subcontractor have agreed that Subcontractor shall furnish all necessary equipment to perform subcontractor's work required by this agreement. However, the Contractor, in its sole discretion, may allow Subcontractor to use Contractor's equipment in connection with the "Project". In consideration for this license to use Contractor's equipment, Subcontractor indemnifies and holds Contractor harmless from any and all claims, demands, costs (including legal fees), damage to the equipment and lost time arising out of or from Subcontractor's use of the equipment. This indemnity and hold harmless covenant shall include, but not be limited to, all actions, claims, and demands founded either in negligence, products liability, failure to warn, failure to maintain, statutory or governmental regulation. IT IS THE INTENTION OF THE PARTIES THAT THIS COVENANT SHALL OPERATE TO INDEMNIFY CONTRACTOR FROM ITS OWN ACTS AND/OR OMISSIONS IN CONNECTION WITH THE .OPERATION, USE OR MAINTENANCE OF THE EQUIPMENT.

16.06 WHERE AN INJURY, ECONOMIC LOSS, DEATH, DAMAGE OR OTHER LOSS OF AN AGENT, SERVANT OR EMPLOYEE OF THE SUBCONTRACTOR IS CAUSED BY, OR ALLEGED TO BE CAUSED BY, THE NEGLIGENCE OR FAULT OF THE OWNER OR CONTRACTOR IN FAILING TO PROVIDE A SAFE PLACE TO WORK OR IN FAILING TO WARN OR GUARD AGAINST CONDITIONS ON THE CONSTRUCTION SITE, OR FAILING TO SUPERVISE THE SUBCONTRACTOR, ITS AGENTS, EMPLOYEES, SUB-SUBCONTRACTORS OR INVITEES (EVEN THOUGH CAUSED WITHOUT NEGLIGENCE OR FAULT OF THE SUBCONTRACTOR), IT IS THE INTENTION OF THIS INDEMNITY AGREEMENT TO INDEMNIFY THE OWNER AND THE CONTRACTOR AND ALL OF THEIR AGENTS, SERVANTS AND EMPLOYEES FROM SUCH INJURY, ECONOMIC LOSS, DEATH DAMAGE OR OTHER LOSS, INCLUDING ANY AND ALL EXPENSES OF DEFENSE AND INVESTIGATION (INCLUDING ATTORNEYS FEES).

SECTION 17: Insurance

17.01 Subcontractor shall maintain in full force and effect, at its own expense, the following minimum insurance coverage (in the event that the specifications, plans or Owner requirements are greater, then those requirements shall supersede those listed below):

     (A)    Statutory Worker's Compensation and Employer's Liability Insurance with minimum limits of not less than $500,000 Subcontractor shall require sub-subcontractors to provide Workmen's Compensation and Employer's Liability Insurance with the same minimum limits.

     (B)    Commercial General Liability Insurance including Broad Form

**LITCHFIELD**
Attorneys at law **CAVO** LLP

November 13, 2018
Page 5

Property Damage Liability Coverage, with minimum limits as follows: $1,000,000 Each Occurrence, $2,000,000 Products and Completed Operations Aggregate/$2,000,000 General Aggregate.

The Commercial General Liability Policy will include the following coverage's where applicable:

| | |
|---|---|
| (1) | Bodily Injury & Property Damage on an "Occurrence" Basis |
| (2) | Premises & Operations |
| (3) | Independent Contractors |
| (4) | Broad Form Blanket Contractual |
| (5) | Blanket XCU (Explosion, Collapse, Underground Damage) |
| (6) | Products/Completed Operations |
| (7) | Knowledge/Notice of Occurrence (to Owner) |
| (8) | Personal Injury Liability |
| (9) | Employees as Additional Insured |
| (10) | Host Liquor Law Liability |
| (11) | Incidental Malpractice |
| (12) | Non-Owned Watercraft (Under 25 Feet) |
| (13) | Broad Form Property Damage |
| (14) | Elevators |

(C)     Commercial Automobile Insurance $500,000 combined single limit for all owned, non-owned, and hired vehicles.

All policies of insurance effecting any coverage shall contain an endorsement with the following wording (or similar wording acceptable to Contractor): "This Insurance Company hereby waives any and all rights of subrogation against Contractor which may arise by reason of any payment under this policy." A copy of the "Waiver of Subrogation Endorsement" shall be attached to each certificate for each policy.

Comprehensive or Commercial General Liability Insurance and other liability insurance may be arranged under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an Excess or Umbrella Liability Policy.

Subcontractor shall not commence Work at the Project until he has obtained all required insurance and until such insurance has been approved by Contractor. Approval of the insurance by Contractor shall not relieve or decrease the liability of Subcontractor hereunder. Certificates of insurance shall be filed with Contractor prior to commencing work. Failure to furnish either satisfactory insurance or required certificates within 10 days of notice to proceed shall not be considered cause for modification of any contractual time limits. The required insurance must be written by a company licensed to do business in Texas at the time the policy is issued. In addition, the company must be acceptable to

**LITCHFIELD**

_Attorneys at Law_ **CAVO LLP**

November 13, 2018
Page 6

Contractor. Subcontractor shall not cause any insurance to be canceled nor permit any insurance to lapse. All insurance policies shall include a clause to the effect that the policy shall not be canceled or reduced, restricted or limited until 30 days after Contractor has received written notice as evidenced by return receipt of registered or certified letter. Subcontractors shall incorporate all provisions of this Section 17 into their subcontracts so all sub-subcontractors have the above same coverage and provisions.

17.02 Subcontractor agrees to have Contractor named as an Additional Insured on any General Liability, Umbrella Liability, and Automobile Liability policies of insurance covering the Subcontractor's work and required by Section 17.01, above. Subcontractor shall furnish to the Contractor certificates of insurance, noncancelable except on thirty (30) days' written notice to the Contractor of default providing an opportunity to cure the default to Contractor within ten (10) days of receipt of the written notice of election by the Contractor.

17.03 The Subcontractor waives all rights against the Contractor and Owner for damages, including but not limited to the right of subrogation, caused by fire, theft, destruction or other peril or casualty loss except to the extent that such loss is covered by this Article or any other Property or Builder's Risk insurance applicable to the Work.

17.04 In the event Subcontractor fails or neglects to obtain or renew the required insurance and furnish to the Contractor the executed Certificate of Insurance form as evidence thereof, Contractor shall have (1) the right but not the obligation, to procure such insurance and reduce the Contract Price by the cost thereof; or (2) deem such failure or neglect on the part of the Subcontractor as a material breach of this Subcontract.

This indemnification provision meets both the express negligence provisions and the conspicuous provisions established by the Texas Supreme Court for fair notice.

Bartlett Cocke demands that FT Woods and its insurers defend and indemnify Bartlett Cocke in this lawsuit and that FT Woods' insurers defend and cover the claims on behalf of Bartlett Cocke as an additional insured pursuant to the Subcontract and the terms of the insurance policies.

This demand includes, without limitation, payment of the attorney's fees, expert fees and legal expenses incurred by Bartlett Cocke to defend the claims made by Plaintiff against Bartlett Cocke in this lawsuit and to enforce FT Woods' defense and indemnity obligations. FT Woods will be responsible for any and all damages, losses or expenses incurred by Bartlett Cocke in the defense of the matters related to FT Woods' scope of work pursuant to the indemnification provisions of the Subcontract.

Should FT Woods fail to promptly accept this tender and defend and indemnify Bartlett Cocke in this lawsuit, Bartlett Cocke will make a claim for breach of contract against FT Woods

**LITCHFIELD**
Attorneys at Law **CAVO** LLP

November 13, 2018
Page 7

and will seek to recover all damages to which it is entitled under Texas law, including attorney's fees and costs pursuant to §38.001, *et. seq.* of the Texas Civil Practice & Remedies Code.

Please forward this tender to all of FT Woods' insurers from 2006 to the present date  and ask that these insurers assume the defense and indemnity of their additional insured, Bartlett Cocke.

Your prompt attention to this matter is requested, as is a prompt written response to this demand for defense and indemnity.

Sincerely,

**LITCHFIELD CAVO LLP**

*Ellen Tagtmeier*

Ellen G. Tagtmeier

Enclosures
cc:    Via Email
       Jerry Hoog, President and CEO
       Bartlett Cocke General Contractors

       Via Email
       Peter Russell, Construction Defect Specialist
       Amerisure Insurance Company
           (Claim No. 2096047)

       Via Certified Mail/RRR
       USI Southwest, Inc. Austin/CL
       7600-B N. Capital of Texas Highway. Suite 200
       Austin, Texas 78731

       Via Email: jmiller@unitedfiregroup.com
       Jennifer Miller
       United Fire Group
           (re: Claim # 4220108103)

       Via Email: JKAUFMA5@travelers.com
       Jeremy Kaufman
       Travelers

# EXHIBIT C

# LITCHFIELD
## CAVO LLP
Attorneys at Law

WRITER'S ADDRESS:
One Riverway
Suite 1000
Houston, TX 77056
713-418-2017
713-418-2001(fax)

Ellen G. Tagtmeier
Email: tagtmeier@litchfieldcavo.com

November 13, 2018

davidwilson@mehaffyweber.com
David V. Wilson
MehaffyWeber
One Allen Center
500 Dallas, Suite 1200
Houston, Texas 77002

Re: **DEMAND FOR PERFORMANCE OF DEFENSE AND INDEMNITY OBLIGATIONS**

|  |  |
|---|---|
| Insured: | FT Woods Construction Services, Inc. |
| Additional Insured: | Bartlett Cocke, LP |
| Claimant: | Austin Independent School District |

Lawsuit: Cause No. D-1-GN-18-005872; *Austin Independent School District v. Pfluger Associates, LP., Et. Al.*; In the 261st Judicial District Court of Travis County, Texas.

To Whom It May Concern:

This law firm represents Bartlett Cocke General Contractors ("Bartlett Cocke"). Austin Independent School District ("AISD") has sued Bartlett Cocke as a defendant in this lawsuit related to damages allegedly incurred by Plaintiff arising out of the performance of subcontract work performed by FT Woods Construction Services, Inc. ("FT Woods") for the construction of the Gus Garcia Middle School (n/k/a Gus Garcia Young Men's Leadership Academy) located at 7414 Johnny Morris Rd, Austin, Texas 78724 (the "Project").

Plaintiff AISD is the owner of the Project. Bartlett Cocke was the construction manager for the Project. The prime/original contract is dated June 20, 2005. Bartlett Cocke subcontracted with FT Woods on June 28, 2006, to provide site and building concrete labor and materials and equipment for the Project, including but not limited to, drilled piers and site, structural and miscellaneous concrete work (the "Subcontract"). Construction on the Project was substantially completed on or about September 25, 2007.

Chicago ● Hartford ● Boston ● New York ● New Jersey ● Pittsburgh ● Philadelphia ● Houston
Los Angeles ● Fort Lauderdale ● Tampa ● Wisconsin ● West Virginia ● Salt Lake City ● Indiana ● St. Louis
Atlanta ● Providence ● Las Vegas ● Dallas-Fort Worth ● Louisiana

**LITCHFIELD**
Attorneys at law **CAVO** LLP

November 13, 2018
Page 2

Plaintiff alleges that there are construction defects which include the following:

- Substantial differential settlement (7" to 12") across expansion joints

- Broken vent lines due to heaving of mechanical room slab (resulting in abandonment of original water heater system in the kitchen)
- Broken or dislodged sewer pipes beneath building (resulting in raw sewage flowing and ponding in crawl space)
- Exterior doors that no longer open or close properly (including emergency exits)
- Windows with visible light around the edges of the assembly
- Pipes and conduit pushing against ductwork and concrete beams in basement areas
- Roof leaks at parapet caps

The scope of work of FT Woods is implicated in the Plaintiff's pleadings and expert reports.

Plaintiff sued Bartlett Cocke for breach of contract, negligence and breach of implied and express warranties. Plaintiff seeks to recover damages for actual and consequential damages, attorney's fees and interest in an amount not to exceed $30,000,000.00. Bartlett Cocke sued FT Woods Construction Services as a third party defendant for contractual indemnity, contribution, breach of contract, breach of express and implied warranties and negligence.

Enclosed please find the following:

1. Plaintiff's Original Petition
2. Plaintiff's First Supplemental Petition
3. Bartlett Cocke's Original Answer to Plaintiff's Original Petition
4. Bartlett Cocke's Third Party Petition against FT Woods
5. Subcontract Agreement between Bartlett Cocke and FT Woods
6. Certificate of Liability Insurance
7. Expert Report of PE Structural Consultants dated 8-31-16

Section 16 of the Subcontract specifically provides that FT Woods will indemnify Bartlett Cocke for AISD's claims related to FT Woods' scope of work. Specifically, the

**LITCHFIELD**
Attorneys at Law **CAVO** LLP

November 13, 2018
Page 3

indemnity and insurance language in the Subcontract provides as follows:

SECTION 16: Indemnification

16.01 To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, the Architect and the Contractor and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work Itself) including the loss of use resulting therefrom, to the extent caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by him or anyone for whose acts he may be liable, regardless of whether it is caused in whole or in part, by the negligent act or omission of a party indemnified hereunder. It is the express intent of Subcontractor that its obligation hereunder applies to the claims, damages, losses and expenses described above even if they result in whole or in part from *the* negligent act or omission of a party indemnified. Such obligation shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnification which would otherwise exist as to any party or person described in this Section 16.

16.02 The Subcontractor specifically obligates itself to the Contractor and Owner in the following respects, to-wit: (1) to indemnify and defend them against and save them harmless from any and all claims, suits, liability, expenses or damages for any alleged or actual infringement or violation of any patent or patent right arising out of Subcontractor's performance under this Agreement; (2) to pay for all materials and equipment furnished and work and labor performed under this Agreement and to satisfy the Contractor and Owner thereupon whenever demand is made, and to indemnify and defend the Contractor and the Owner against and save them and the Project harmless from any and all claims, suits or liens therefor by others than the Subcontractor; and (3) to obtain and pay for all permits, licenses and official inspections made necessary by its Work, and to comply with all laws, ordinances and regulations bearing on the Work and the conduct thereof.

16.03 The Subcontractor shall indemnify Contractor and the Owner against, and save them harmless from, any and all loss, damage, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Agreement.

16.04 In any and all claims against the Owner, Architect, Contractor (including its affiliates, parents and subsidiaries) and other contractors or subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the

**LITCHFIELD**
Attorneys at Law **CAVO** LLP

November 13, 2018
Page 4

indemnification obligation under this Section 16 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Worker's or Workman's Compensation Acts, disability benefit acts or other employee benefit acts.

16.05 Contractor and subcontractor have agreed that Subcontractor shall furnish all necessary equipment to perform subcontractor's work required by this agreement. However, the Contractor, in its sole discretion, may allow Subcontractor to use Contractor's equipment in connection with the "Project". In consideration for this license to use Contractor's equipment, Subcontractor indemnifies and holds Contractor harmless from any and all claims, demands, costs (including legal fees), damage to the equipment and lost time arising out of or from Subcontractor's use of the equipment. This indemnity and hold harmless covenant shall include, but not be limited to, all actions, claims, and demands founded either in negligence, products liability, failure to warn, failure to maintain, statutory or governmental regulation. IT IS THE INTENTION OF THE PARTIES THAT THIS COVENANT SHALL OPERATE TO INDEMNIFY CONTRACTOR FROM ITS OWN ACTS AND/OR OMISSIONS IN CONNECTION WITH THE OPERATION, USE OR MAINTENANCE OF THE EQUIPMENT.

16.06 WHERE AN INJURY, ECONOMIC LOSS, DEATH, DAMAGE OR OTHER LOSS OF AN AGENT, SERVANT OR EMPLOYEE OF THE SUBCONTRACTOR IS CAUSED BY, OR ALLEGED TO BE CAUSED BY, THE NEGLIGENCE OR FAULT OF THE OWNER OR CONTRACTOR IN FAILING TO PROVIDE A SAFE PLACE TO WORK OR IN FAILING TO WARN OR GUARD AGAINST CONDITIONS ON THE CONSTRUCTION SITE, OR FAILING TO SUPERVISE THE SUBCONTRACTOR, ITS AGENTS, EMPLOYEES, SUB-SUBCONTRACTORS OR INVITEES (EVEN THOUGH CAUSED WITHOUT NEGLIGENCE OR FAULT OF THE SUBCONTRACTOR), IT IS THE INTENTION OF THIS INDEMNITY AGREEMENT TO INDEMNIFY THE OWNER AND THE CONTRACTOR AND ALL OF THEIR AGENTS, SERVANTS AND EMPLOYEES FROM SUCH INJURY, ECONOMIC LOSS, DEATH DAMAGE OR OTHER LOSS, INCLUDING ANY AND ALL EXPENSES OF DEFENSE AND INVESTIGATION (INCLUDING ATTORNEYS FEES).

SECTION 17: Insurance

17.01 Subcontractor shall maintain in full force and effect, at its own expense, the following minimum insurance coverage (in the event that the specifications, plans or Owner requirements are greater, then those requirements shall supersede those listed below):

(A)     Statutory Worker's Compensation and Employer's Liability Insurance with minimum limits of not less than $500,000 Subcontractor shall require sub-subcontractors to provide Workmen's Compensation and Employer's Liability Insurance with the same minimum limits.

(B)     Commercial General Liability Insurance including Broad Form

**LITCHFIELD**
Attorneys at Law **CAVO** LLP

November 13, 2018
Page 5

Property Damage Liability Coverage, with minimum limits as follows: $1,000,000 Each Occurrence, $2,000,000 Products and Completed Operations Aggregate/$2,000,000 General Aggregate.

The Commercial General Liability Policy will include the following coverage's where applicable:

|     |     |
| --- | --- |
| (1) | Bodily Injury & Property Damage on an "Occurrence" Basis |
| (2) | Premises & Operations |
| (3) | Independent Contractors |
| (4) | Broad Form Blanket Contractual |
| (5) | Blanket XCU (Explosion, Collapse, Underground Damage) |
| (6) | Products/Completed Operations |
| (7) | Knowledge/Notice of Occurrence (to Owner) |
| (8) | Personal Injury Liability |
| (9) | Employees as Additional Insured |
| (10) | Host Liquor Law Liability |
| (11) | Incidental Malpractice |
| (12) | Non-Owned Watercraft (Under 25 Feet) |
| (13) | Broad Form Property Damage |
| (14) | Elevators |

(C)     Commercial Automobile Insurance $500,000 combined single limit for all owned, non-owned, and hired vehicles.

All policies of insurance effecting any coverage shall contain an endorsement with the following wording (or similar wording acceptable to Contractor): 'This Insurance Company hereby waives any and all rights of subrogation against Contractor which may arise by reason of any payment under this policy." A copy of the "Waiver of Subrogation Endorsement" shall be attached to each certificate for each policy.

Comprehensive or Commercial General Liability Insurance and other liability insurance may be arranged under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an Excess or Umbrella Liability Policy.

Subcontractor shall not commence Work at the Project until he has obtained all required insurance and until such insurance has been approved by Contractor. Approval of the insurance by Contractor shall not relieve or decrease the liability of Subcontractor hereunder. Certificates of insurance shall be filed with Contractor prior to commencing work. Failure to furnish either satisfactory insurance or required certificates within 10 days of notice to proceed shall not be considered cause for modification of any contractual time limits. The required insurance must be written by a company licensed to do business in Texas at the time the policy is issued. In addition, the company must be acceptable to

**LITCHFIELD**
Attorneys at Law **CAVO** LLP

November 13, 2018
Page 6

Contractor. Subcontractor shall not cause any insurance to be canceled nor permit any insurance to lapse. All insurance policies shall include a clause to the effect that the policy shall not be canceled or reduced, restricted or limited until 30 days after Contractor has received written notice as evidenced by return receipt of registered or certified letter. Subcontractors shall incorporate all provisions of this Section 17 into their subcontracts so all sub-subcontractors have the above same coverage and provisions.

17.02 Subcontractor agrees to have Contractor named as an Additional Insured on any General Liability, Umbrella Liability, and Automobile Liability policies of insurance covering the Subcontractor's work and required by Section 17.01, above. Subcontractor shall furnish to the Contractor certificates of insurance, noncancelable except on thirty (30) days' written notice to the Contractor of default providing an opportunity to cure the default to Contractor within ten (10) days of receipt of the written notice of election by the Contractor.

17.03 The Subcontractor waives all rights against the Contractor and Owner for damages, including but not limited to the right of subrogation, caused by fire, theft, destruction or other peril or casualty loss except to the extent that such loss is covered by this Article or any other Property or Builder's Risk insurance applicable to the Work.

17.04 In the event Subcontractor fails or neglects to obtain or renew the required insurance and furnish to the Contractor the executed Certificate of Insurance form as evidence thereof, Contractor shall have (1) the right but not the obligation, to procure such insurance and reduce the Contract Price by the cost thereof; or (2) deem such failure or neglect on the part of the Subcontractor as a material breach of this Subcontract.

This indemnification provision meets both the express negligence provisions and the conspicuous provisions established by the Texas Supreme Court for fair notice.

Bartlett Cocke demands that FT Woods and its insurers defend and indemnify Bartlett Cocke in this lawsuit and that FT Woods' insurers defend and cover the claims on behalf of Bartlett Cocke as an additional insured pursuant to the Subcontract and the terms of the insurance policies.

This demand includes, without limitation, payment of the attorney's fees, expert fees and legal expenses incurred by Bartlett Cocke to defend the claims made by Plaintiff against Bartlett Cocke in this lawsuit and to enforce FT Woods' defense and indemnity obligations. FT Woods will be responsible for any and all damages, losses or expenses incurred by Bartlett Cocke in the defense of the matters related to FT Woods' scope of work pursuant to the indemnification provisions of the Subcontract.

Should FT Woods fail to promptly accept this tender and defend and indemnify Bartlett Cocke in this lawsuit, Bartlett Cocke will make a claim for breach of contract against FT Woods

**LITCHFIELD**
Attorneys at Law **CAVO** LLP

November 13, 2018
Page 7

and will seek to recover all damages to which it is entitled under Texas law, including attorney's fees and costs pursuant to §38.001, *et. seq.* of the Texas Civil Practice & Remedies Code.

Please forward this tender to all of FT Woods' insurers from 2006 to the present date  and ask that these insurers assume the defense and indemnity of their additional insured, Bartlett Cocke.

Your prompt attention to this matter is requested, as is a prompt written response to this demand for defense and indemnity.

Sincerely,

**LITCHFIELD CAVO LLP**

*Ellen Tagtmeier*

Ellen G. Tagtmeier

Enclosures
cc:   Via Email
      Jerry Hoog, President and CEO
      Bartlett Cocke General Contractors

      Via Email
      Peter Russell, Construction Defect Specialist
      Amerisure Insurance Company
         (Claim No. 2096047)

      Via Certified Mail/RRR
      USI Southwest, Inc. Austin/CL
      7600-B N. Capital of Texas Highway. Suite 200
      Austin, Texas 78731

      Via Email: jmiller@unitedfiregroup.com
      Jennifer Miller
      United Fire Group
         (re: Claim # 4220108103)

      Via Email: JKAUFMA5@travelers.com
      Jeremy Kaufman
      Travelers

# EXHIBIT D

2/20/2019 5:44 PM
**Velva L. Price**
**District Clerk**
**Travis County**
D-1-GN-18-005872
Nancy Ramirez

CAUSE NO. D-1-GN-18-005872

| | | |
|---|---|---|
| AUSTIN INDEPENDENT SCHOOL DISTRICT, Plaintiff, | § § § | IN THE DISTRICT COURT |
| | § | |
| v. | § § | |
| PFLUGER ASSOCIATES, L.P., PFLUGER DESIGN GROUP, L.L.C., JOSE I. GUERRA, INC., and BARTLETT COCKE GENERAL CONTRACTORS, F/K/A BARTLETT COCKE, L.P. and KLEINFELDER, INC., Defendants. | § § § § § § § § § | |
| | § | OF TRAVIS COUNTY, TEXAS, |
| PFLUGER ASSOCIATES, L.P. and PFLUGER DESIGN GROUP, L.L.C. Third- Party Plaintiffs | § § § § | |
| v. | § § | |
| LOPEZGARCIA GROUP, INC., AAN GARRETT-COLEMAN & ASSOCIATES, INC., FT WOODS CONSTRUCTION SERVICES, and HMG & ASSOCIATES, INC. Third-Party Defendants | § § § § § § | |
| | § | 261st JUDICIAL DISTRICT |

**PLAINTIFF'S FIRST AMENDED PETITION AND REQUEST FOR DISCLOSURE**

Plaintiff AUSTIN INDEPENDENT SCHOOL DISTRICT ("AISD") files this First Amended Petition and Request for Disclosure against Defendants PFLUGER ASSOCIATES, L.P. ("Pfluger"), PFLUGER DESIGN GROUP, L.L.C. ("PDG"), JOSE I. GUERRA, INC. ("Guerra"), BARTLETT COCKE GENERAL CONTRACTORS, F/K/A BARTLETT COCKE, L.P. ("Bartlett Cocke"), and KLEINFELDER, INC. ("Kleinfelder") (collectively referred to as the "Defendants").

## I.    PARTIES

1.    Plaintiff AISD is a public school district with its principal place of business in Travis County, Texas.

2.    Defendant Pfluger is a Texas limited liability company with its principal place of business in Austin, Travis County, Texas.  Pfluger has appeared in this matter.

3.    Defendant PDG is a Texas limited liability company with its principal place of business in Austin, Travis County, Texas.  PDG has appeared in this matter.

4.    Defendant Guerra is a Texas corporation with its principal place of business in Austin, Travis County, Texas.  Guerra has appeared in this matter.

5.    Defendant Bartlett Cocke is a Texas limited liability company with its principal place of business in San Antonio, Bexar County, Texas.  Bartlett Cocke has appeared in this matter.

6.    Defendant Kleinfelder is a California corporation doing business in the State of Texas.  Kleinfelder may be served with process through its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

## II.    DISCOVERY CONTROL PLAN

7.    AISD intends to conduct discovery under a Level 3 discovery control plan under Texas Rule of Civil Procedure 190.3.

## III.    JURISDICTION AND VENUE

8.    The relief sought is within the jurisdiction of this Court.  Venue is mandatory in Travis County, Texas under section 15.011 of the Texas Civil Practice and Remedies Code because AISD seeks recovery of damages to real property that is located in Travis County.  Venue is also

proper in Travis County, because all or a substantial part of the events or omissions giving rise to AISD's claims occurred in Travis County. TEX. CIV. PRAC. & REM. CODE §§ 15.002(a)(1).

9.      In accordance with Texas Rule of Civil Procedure 47, AISD avers that it seeks monetary relief over $1,000,000 and up to a maximum amount of $30 million in damages against the Defendants. Plaintiff reserves the right to supplement this information as discovery continues.

## IV.   FACTUAL BACKGROUND

10.     On or about June 6, 2005, AISD engaged Pfluger[1] to be the project architect for the design and construction of Gus Garcia Young Men's Leadership Academy located at 7414 Johnny Morris Road, Austin, Texas 78724 (the "School") by entering into an Owner/Architect Agreement (the "Architect Agreement"). On or about June 20, 2005, AISD engaged Bartlett Cocke to be the Construction Manager for the construction of the School (the "Construction Manager Agreement").

11.     As part of the design process and pursuant to the terms of the Architect Agreement, Pfluger was to provide professional architectural services necessary to design the School, including engaging the necessary engineering services, including civil, mechanical, electrical, and structural engineering services. In accordance with these obligations, Pfluger hired and retained a team of consultants that included civil engineers, structural engineers, and mechanical/electrical/ plumbing engineers. Pfluger hired Defendant Guerra, a licensed professional engineer, to serve as the structural engineer for the school.

12.     Kleinfelder was the geotechnical engineer for the project. Through its analysis, Kleinfelder determined that the soils underlying the School consisted in large part of expansive clay with a significant potential for vertical rise and made recommendations for two different

---

[1]      Defendant PDG is the general partner of Pfluger and is responsible for the debts and obligations of Pfluger in that capacity.

**PLAINTIFF'S FIRST AMENDED PETITION**                                                        **Page 3**

foundation types that would avoid damage due to the expansive clay's shrink-swell capacity. The first design was a "pier and beam" foundation that would utilize concrete piers to raise the building above the soil and thereby separate the foundation from the ground so that there would be no upward pressure from the expansive clay. Kleinfelder recommended that the piers be underreamed, or bell-shaped, to resist the uplift forces from the expansive clay, and that the bells were to be 2 to 2.5 times the diameter of the pier shaft. The minimum pier depths recommended by Kleinfelder were the deeper of (i) 25 feet below the finished floor slab elevation, or (ii) 20 feet below the existing ground surface.

13. After construction began, Kleinfelder contracted with AISD to measure the piers' depth and bell size. Under the agreement, Kleinfelder was required to ensure that the piers' depths and bell sizes met the specifications in the design documents created by Pfluger and Guerra.

14. The second foundation alternative recommended by Kleinfelder was slab on grade. However, to minimize the shrink/swell potential of the soil supporting the slab, Kleinfelder recommended a soil modification technique commonly referred to as "remove and replace," whereby a portion of the expansive clays are removed and replaced with low to non-expansive materials called "select fill." Specifically, Kleinfelder recommended that seven feet of the expansive clay be removed and replaced with a minimum of seven feet of select fill. Kleinfelder further recommended that any ground supported floor slab be isolated from any pier supported structures.

15. Recognizing that the flatwork (sidewalks, courtyards, etc.) adjacent to the foundation would be on clay that would shrink and swell more than the ground supported slab on the select fill, Kleinfelder further recommended that the removal and replacement of the clay with

select fill should extend laterally a minimum of five feet beyond the perimeter of the building and any attached improvements such as sidewalks and canopies.

16.     The School was ultimately designed so that most of the structure is supported by a pier and beam foundation, with three additional slabs, adjacent to the pier and beam structure, that support the School's mechanical and electrical systems (the "Equipment Pads"). Slab on grade foundations were also constructed for the electrical yards outside the School building (the "Electrical Yards").

17.     After the School was constructed, the soils underneath expanded and heaved resulting in substantial damage to the building and related structures. For example, the Equipment Pads have heaved several inches in places resulting not only in cracked foundations but also significant damage to the School's mechanical systems which have, in some cases, been rammed into the bottom of the pier supported structure. Additionally, the School's loading dock, which was constructed as a ground supported slab with grade beams, has suffered severe distress. The School Commons courtyard, which was also constructed as a ground supported slab, has experienced significant movement resulting in separations at construction joints, elevation differentials, and is now sloped toward the building. Likewise, the flatwork adjacent to the Equipment Pads and the pier-and-beam-supported structure have heaved or moved resulting in cracks, gaps, and doors becoming unopenable. The portion of the School supported by the pier and beam foundation has also experienced distress such as significant cracks in the floors and walls, separations at joints in the hollow core planks, and cracks in the concrete beams spanning between piers.

18.     Subsequent investigation by AISD revealed that the construction documents for the School prepared by Pfluger and Guerra failed to follow Kleinfelder's recommendations in that

they did not call for the removal and replacement of seven feet of the expansive clays soils under the constructed slabs. Laboratory analysis has confirmed that the clay soils under the slabs were not removed and replaced as recommended by Kleinfelder, resulting in significant damage and distress to the School.

19.     In addition, Pfluger and Guerra failed to design the underreamed piers so that they extended to the depths recommended by Kleinfelder. Bartlett Cocke failed to construct the bell portion of the underreamed piers in accordance with the recommendations of Kleinfelder, or as specified in Guerra's design documents. Finally, Kleinfelder failed to ensure that the pier bells met the requirements of Guerra's design documents. The design deficiency and construction defects relating to the piers have resulted in significant damage and distress to the School.

## V. CAUSES OF ACTION

### A.    Negligence

20.     Defendant Pfluger owed duties of care to AISD commensurate with what an architect of ordinary prudence in that particular field would or would not have done under the same or similar circumstances. Pfluger further agreed to (and certified that it did) exercise its best professional judgment and reasonable care consistent with the practice of architecture in the State of Texas in executing the construction documents for the School as is required under 19 TEX. ADMIN. CODE § 61.1026. Pfluger failed to exercise reasonable care and act in accordance with industry architectural standards when it failed to follow the recommendations in Kleinfelder's geotechnical engineering report in its design of the School and when it failed to recognize the problems that would result from the failure to follow those recommendations. Pfluger further failed to properly supervise Guerra in connection with Guerra's provision of the structural engineering services for the design and construction of the of School.

21.     Defendant Guerra owed duties of care to AISD commensurate with what a professional of ordinary prudence in that particular field would or would not have done under the same or similar circumstances.  Through the actions described above, Guerra failed to exercise reasonable care and act in accordance with industry standards by not following the recommendations in Kleinfelder's geotechnical engineering report when performing the structural engineering services for the School, including but not limited to designing and preparing the structural drawings for the project.

22.     Defendant Kleinfelder owed duties of care to AISD commensurate with what a professional of ordinary prudence in that particular field would or would not have done under the same or similar circumstances.  Through the actions described above, Kleinfelder failed to exercise reasonable care and act in accordance with industry standards by not ensuring that the building's piers were constructed consistent with both Kleinfelder's own geotechnical engineering report and Guerra's design documents when overseeing the construction of the piers.

23.     **Exhibit A** attached hereto is provided pursuant to Texas Civil Practice and Remedies Code section 150.002 and is an affidavit signed by John V. Nyfeler, FAIA.  Mr. Nyfeler is an architect licensed by the State of Texas.  He has a Bachelor of Architecture degree from the University of Texas.  In his affidavit, which is fully incorporated herein by reference, Mr. Nyfeler has identified negligent acts, errors and/or omissions and breaches of contract, warranty and professional duties by Pfluger.

24.     **Exhibits B and C** attached hereto are provided pursuant to Texas Civil Practice and Remedies Code section 150.002 and are affidavits signed by Dean R. Read, P.E.  Mr. Read is a professional engineer licensed by the States of Texas, New Mexico, Louisiana, Mississippi, Oklahoma, Alabama, Arkansas, Florida and Colorado.  He has a Bachelor of Science in

Architectural Engineering degree and a Master of Science in Civil Engineering degree from the University of Texas. In his affidavits, which are fully incorporated herein by reference, Mr. Read has identified negligent acts, errors and/or omissions and breaches of contract, warranty and professional duties by both Guerra and Kleinfelder.

25. In addition, Bartlett Cocke breached the standard of care for general contractors in failing to properly construct the School piers and the dowel installations at the pavement joints at the School.

26. Defendants' negligence and breaches of duty have proximately caused substantial damages to AISD in an amount within the jurisdictional limits of this Court which AISD seeks to recover.

**B.    Breach of Implied Warranty**

27. Defendants impliedly warranted that their work related to the design and construction of the School would be of good and workmanlike quality. Because the work and services provided were not performed in a good and workmanlike manner, various deficiencies and construction defects caused damages to the School. As a proximate result of the Defendants' breach of warranty, AISD has suffered damages in an amount within the jurisdictional limits of this Court for which it now sues.

**C.    Breach of Contract and Express Warranty**

28. Defendant Pfluger contracted with AISD to provide design services consistent with architectural industry standards. Further, Pfluger contracted with AISD to design and coordinate the construction of the schools in a matter consistent with industry standards such that the school would be: (1) designed free of, and without any, design defects; and (2) constructed free of and without any construction defects. Pfluger also agreed to use the best professional judgment and

reasonable care consistent with the practice of architecture. Pfluger further agreed to indemnify AISD for any damage or destruction to the property that arose from or was connected with any act of negligence on the part of Pfluger (and Pfluger's consultants, including Guerra) or any breach of Pfluger's obligations under the Agreement. Pfluger breached the Agreement, because the School was not designed and constructed in accordance with industry standards and was not designed and constructed free of, and without, design or construction defects. AISD has suffered substantial damages resulting from Pfluger's breaches of its contractual duties. All conditions precedent have been performed or have occurred.

29.     Bartlett Cocke contracted with AISD to provide construction manager services in accordance with high professional standards free from negligence, and that all work performed by Bartlett Cocke would be free from defects in material and labor, and in accordance with the design specifications of the School. Bartlett Cocke breached the Construction Manager Agreement because the School was not constructed in accordance with industry standards and was not constructed free of, and without construction defects nor was it constructed in accordance with the design specifications of the School. AISD has suffered substantial damages resulting from Bartlett Cocke's breaches of its contractual duties. All conditions precedent have been performed or have occurred.

30.     Kleinfelder contracted with AISD to ensure that the piers were constructed consistent with Guerra's design documents. In doing so, Kleinfelder agreed and warranted that it would perform all tasks necessary and appropriate to provide complete engineering professional services in performing its duties under the contract. Furthermore, Kleinfelder agreed to indemnify AISD for any damages caused by Kleinfelder's breach of the agreement. AISD has suffered

substantial damages resulting from Kleinfelder's breaches of its contractual duties. All conditions precedent have been performed or have occurred.

**D.     Attorneys' Fees and Costs**

31.     AISD seeks to recover its reasonable and necessary attorneys' fees and costs under Texas Civil Practice and Remedies Code 38.001.

## VI.     JURY DEMAND

32.     AISD requests a trial by jury.

## VII.     REQUEST FOR DISCLOSURE

33.     Pursuant to Texas Rule of Civil Procedure 194 Plaintiff requests that all parties disclose the information or material described in Rule 194.2(a) – (l).

## VIII.     PRAYER

Plaintiff AISD requests that the Defendants be cited to appear and answer herein, and that upon trial of this matter AISD have and recover from Defendants all actual and consequential damages sought herein, together with reasonable and necessary attorney's fees, costs of court, pre-judgment and post-judgment interest, and such other and further relief to which AISD may show itself to be justly entitled, whether at law or in equity.

Respectfully submitted,

**FRITZ, BYRNE, HEAD & GILSTRAP, PLLC**
221 West Sixth Street, Suite 960
Austin, Texas 78701
Telephone: (512) 476-2020
Telecopy: (512) 477-5267

BY:     /s/ Lessie C. Gilstrap
        Lessie C. Gilstrap
        State Bar No. 24012630
        Email: lgilstrap@fbhg.law
        Dale L. Roberts
        State Bar No. 24001155
        Email: droberts@fbhg.law

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2019, the foregoing was served upon the following parties via the court's electronic filing system and email:

Matthew B. Cano
Benjamin, Vana, Martinez, Biggs, LLC
950 West Bank Drive, Suite 205
Austin, Texas 78746
mcano@benlawsa.com

*Attorneys for Defendant Jose I. Guerra, Inc.*

Jessica Mangrum
Heather M. Beam
Thompson Coe Cousins & Irons, LLP
701 Brazos, Suite 1500
Austin, Texas 78701
jmangrum@thompsoncoe.com
hbeam@thompsoncoe.com

*Attorneys for Defendant/ Third Party Plaintiff
Pfluger Entities*

Ellen Gerson Tagtmeier
Litchfield Cavo, LLP
One Riverway, Suite 1000
Houston, Texas 77056
tagtmeier@litchfieldcavo.com

*Attorneys for Defendant Bartlett Cocke*

Brett W. Schouest
Josué J. Galván
DYKEMA GOSSETT PLLC
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
bschouest@dykema.com
jgalvan@dykema.com

*Attorneys for Third Party Defendant
Aaron Garrett-Coleman & Associates, Inc.*

Michael R. Absmeier
Marshal J. Hoda
1100 Louisiana, Suite 5300
Houston, Texas 77002
mabsmeier@gibbsbruns.com
mhoda@gibbsbruns.com

*Attorneys for Third Party Defendant
LopezGarcia Group, Inc*

Michael Gerstle
Crystal Smith
4408 Spicewood Springs Rd., #104
Houston, Texas 77002
michael.gerstle@gmsattorneys.com
crystal.smith@gmsattorneys.com

*Attorneys for Third Party Defendant
HMG & Associates, Inc.*

David V. Wilson II
Kyle D. Weynand
500 Dallas, Suite 1200
Houston, Texas 77002
davidwilson@mehaffyweber.com
kyleweynand@mehaffyweber.com

*Attorneys for Third Party Defendant
F.T. Woods Construct Services, Inc.*

/s/ Lessie C. Gilstrap
Lessie C. Gilstrap

## CERTIFICATE OF MERIT

On this day, John V. Nyfeler personally appeared and subscribed as true under penalty of perjury as follows:

### A. Summary of this Certificate of Merit

1. This is a Certificate of Merit intended to set forth all matters required to comply with Chapter 150.002 of the Texas Civil Practices and Remedies Code. Section B sets forth the background, competency and qualifications of the author, John V. Nyfeler, architect. Section C sets forth a summary of the project at issue, located in Austin, Texas. Section D sets forth some of the responsibilities and duties that, Pfluger Associates Architects (hereinafter Pfluger) owed Austin Independent School District (hereinafter Owner) with respect to the Project at issue. Section E and F identify some of Pfluger's design defects and delays, and Pfluger's failure to meet the standard of care of an architect in Texas. Section G contains this Certificate's conclusions.

### B. Background, Competency and Qualifications of John V. Nyfeler, FAIA, architect.

2. My name is John V. Nyfeler, and I am a resident of Travis County, Texas. I am over the age of 21 years, have never been convicted of a felony or crime or moral turpitude, and am otherwise competent to make this affidavit. I have personal knowledge of the matters stated herein, and the contents of this affidavit are true and correct.

3. I have been retained by Fritz Byrne Head & Gilstrap, Attorneys at Law to review problems associated with the design of a middle school building now known as Gus Garcia Young Men's Leadership Academy in Austin, Texas (hereinafter Project), a project which was designed by Pfluger and other consultants under Pfluger's direction.

4. In rendering the opinions expressed herein, I have relied upon facts and data either known personally to me or of a type reasonably relied upon by experts in my field.

5. I am an Active Status registered architect in the State of Texas. I am registered with the Texas Board of Architectural Examiners. The license I hold (3963) is the same license as that held by the architects at Pfluger.

## EXHIBIT A

6. I obtained a Bachelor of Architecture degree from the University of Texas at Austin in 1958. I have consistently maintained the State of Texas requirements and the American Institute of Architects requirement for annual continuing education both for maintenance of active membership status in the AIA and for professional registration as an architect in Texas.

7. I have been working as an architect, construction manager, developer, energy conservation, and project manager in the profession since 1970 and continue to do so to the present. My experience as a practicing architect is described in the resume attached as Exhibit A.

8. Currently, I am President of The Nyfeler Organization, Inc., as a single practitioner of architecture in Austin, and am actively engaged in providing architecture services as set out in Texas Occupations Code, 1051.001. (7). As described in my attached resume I have over 48 years of experience in the practice of architecture, construction management, interior design, and energy management. My work experience has included institutional and commercial projects with some emphasis on K-12 and higher education facilities, public and school libraries, office and retail.

9. I am a member of the American Institute of Architects and have served in leadership positions on the local, regional and national levels including a three-year term on the National Board of AIA. In 2001, I was elected to the AIA College of Fellows.

10. I have personal knowledge of and am familiar with the professional standard of care and the generally accepted standards of delivery of architectural services in Texas that apply to architects in the time period during which the design and construction of the Project was accomplished. I have provided professional architect services and project and construction services on a range of project types. I am knowledgeable in the area of architecture practice practiced by Pfluger as it relates to this Project.

11. I have reviewed the Owner/Architect Agreement (the Contract), construction documents in various discipline areas, correspondence, photographs, schedules, change documentation and other contemporaneous Project materials and documents provided to me. I have also interviewed representatives of the Project and other witnesses in this matter. I have visited the Project and examined its condition. In addition to the sources of information described above, I affirm that the opinions and testimony I express in this Certificate of Merit are based on my knowledge, skill, experience, education, training and practice as a professional architect.

## C. Summary of the Project

12. In 2005, the Owner entered into an Owner/Architect agreement (Agreement) with Pfluger in which Pfluger was to provide to the Owner, the reasonable and necessary Architect/Engineer services for the Project.

13. Also in 2005, the Owner engaged the services of Kleinfelder, Inc. (Kleinfelder) to prepare the Geotechnical Investigation, AISD Northeast Middle School, Austin, Texas (Report). The purpose of the report was to:

> "Explore the subsurface materials and conditions present at...site location...classify the soils and evaluate the strength and volume change characteristics of the subsurface materials and...provide limited and specific geological design and construction criteria for the proposed facility."

The Report contained recommendations for design of those slab-supported structures designed by either or both the architect and its structural engineering sub-consultant. The Report recommendations including removal of as much as seven feet of highly expansive underlying native soil under slab supported structures and replacement of the removed soil with select fill material having significantly less expansive qualities. Pfluger and its structural engineering sub-consultant failed to design the Project in accordance with the Report recommendations. The construction documents prepared by Pfluger and its engineering sub-consultant did not show the removal and replacement of the highly expansive soil. Consequently the contractor built the Project as shown on the defective construction documents. The result is the Project has experienced the predicted expansion of the underlying highly expansive native soils which has resulted in severe damage and physical distress to the Project.

14. The Owner's delivery of the Report to Pfluger was the Owner's direction to the Pfluger to prepare the design and construction documents in accordance with the recommendations contained in the Report. The Report was a part of the Project design criteria provided by the Owner to the Pfluger. Pfluger and its engineering and design sub-consultants failed to follow the recommendations contained in the Report.

15. The Owner contracted with Pfluger to provide professional architect services necessary to design the Project, including the necessary engineering design, including mechanical, electrical, and structural and landscape architect services and other necessary design disciplines. Pfluger's services included the services necessary to confirm code compliance, and to furnish necessary drawings and specifications for the Owner to use in contracting the Project.

16. Pfluger represented to the Owner that it possessed the experience and expertise necessary to perform the architect services required for the Project. Based on these representations and other factors, the Owner awarded the architect services contract to Pfluger.

**D. Responsibilities and Duties of Pfluger.**

17. The main focus of this Certificate of Merit is on the responsibilities and duties of Pfluger.

18. The Agreement between the Owner and Pfluger states that Pfluger's overall work, including structural engineering design, should be prepared as follows:

> *"Quality of Services: All services* (including sub-consultant services) *performed under this Agreement shall be performed in accordance with professional standards, in a competent manner and in compliance with applicable laws and the terms of the Agreement.* My added parenthetical phrase]

Accordingly, the Owner has the right to expect Pfluger to deliver all services, including engineering and other sub-consultant services in accordance with the standard of care of their respective design disciplines.

**E. Pfluger Failed to Meet the Standard of Care Due to Design Defects and Errors and Omissions**

19. Under the professional standard of care Pfluger was obligated to act with reasonable care and competence and to apply the technical knowledge and skill which is ordinarily applied by reasonably prudent architects practicing under similar circumstances and conditions.

20. Pfluger's failure to follow the recommendations of the Report in the delivery of its services is a primary failure to meet the required standard of care of an architect. Other specific failures include design of grade-supported construction without proper accommodation for anticipated soil movement, failure to detail the construction work as recommended in the Report, failure to respond appropriately to questions of the contractor, failure to design the landscaping and irrigation system as recommended in the Report, falsely certifying the Project as meeting the requirements of the Texas Education Agency, failing to call attention to the instances of failures in the laboratory test reports, failure to direct the contractor to take corrective measures to correct known defects in the contractor's work and the failure to recommend that the Owner authorize to verify that the Architect's plans and specifications are compatible with the conclusions and recommendations of the Report.

21. Additional failures of Pfluger to perform to the required standard of care include:

    a. Failure to follow the Owner's design criteria. The Owner provided Pfluger with the Report that sets out the method for designing the foundation of the building. The construction documents prepared by Pfluger failed to conform to the design recommendations in the Report.

    b. Failure to properly design grade supported structures. The Owner provided Pfluger with the Report that sets out the method for designing grade supported structures. Pfluger failed to conform to the design recommendations of the Report.

    c. Failure to detail the work correctly. The Owner provided Pfluger with the Report that sets out the method for connection of sidewalk reinforcing to adjacent foundations. Pfluger failed to follow the recommendations of the Report.

    d. Failure to respond appropriately to RFI's. Pfluger failed to correctly respond to Requests for information from the Contractor regarding the contractor's questions about sub-surface support of slabs on grade.

    e. Failure in Landscaping and Irrigation design. The Owner provided Pfluger with the Report that sets out recommendations for the design of the landscaping and irrigations system. Pfluger failed to follow the recommendations of the Report.

    f. False certification of Project Compliance. Pfluger falsely certified that the Project complied with the requirements of the Texas Education Agency and the design recommendations of the Report.

    g. Failure in Construction Contract Administration. Pfluger failed to appropriately respond to testing laboratory reports showing construction work that failed to meet the construction documents,

    h. Failure to Recommend Available Quality Control. The Report includes an offer by Kleinfelder to review Pfluger's construction documents before construction started to determine if Pfluger's construction documents complied with the Report. Pfluger failed to accept this necessary and reasonable quality control procedure.

22. Pfluger failed to recognize that its structural engineering sub-consultant did not follow the recommendations of the Report.

23. Pfluger failed to recognize that its Landscape Architect sub-consultant did not follow the recommendations of the Report.

**F. Other Pfluger Failures.**

24. Further investigation may reveal other problems with the design, construction documents and Construction Contract Administration services performed by Pfluger.

## G. Conclusion

25. It is my professional opinion based on the foregoing that Pfluger's failures were not in accordance with the professional standard of care of an architect and were in violation of Pfluger's contractual responsibilities, which has caused or has contributed to and will continue to cause or contribute to severe damage and distress to the Project including, but not limited to walls, floors, ceilings, door openings, finishes, plumbing, electrical, HVAC piping and ductwork, equipment and other elements.

26. The opinions expressed in this certificate are based upon information provided to me to date. If additional relevant documents or information are provided to me, I reserve the right, based on further investigation to amend or add to these conclusions.

Further, affiant sayeth not.

Pursuant to Chapter 132 of the Texas Civil Practice and Remedies Code. John V. Nyfeler declares as follows:

My name is John V, Nyfeler, my date of birth is December 21, 1935, and my address is 1805 B Adriane Drive, Austin, Texas 78721, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on the 26th day of September, 2018.

John V. Nyfeler, FAIA

**JOHN V. NYFELER, FAIA**
*Curriculum Vitae*

P. O. Box 4479
Austin, Texas 78765-4479
512.923.8623

## I. EMPLOYMENT

**The Nyfeler Organization, Inc.**, Austin                    2010-Present

President

Individual Architectural consulting practice focused on regulatory approval process, dispute resolution and general consultation on the design process, project management, marketing and construction process. The architectural practice conforms to the Texas Occupations Code.

**Aguirre Roden, Inc.**, Austin and Dallas                    1999-2010

Senior Vice-President

Director of Architecture and Sector leader of general architectural practice in the Austin office of Aguirre Roden, Inc., a Dallas based architect, engineer, program management and construction firm. The firm focused on the practice of architecture and engineering in design of projects for higher education, transportation, historic preservation, public libraries, hospitality, recreation and master planning. Nyfeler joined his prior firm with Aguirre Corporation in 1999 to become the Austin office of the Aguirre firm. In this assignment Nyfeler regularly was engaged in dispute resolution matters related to design and construction. The Austin Sector of Aguirre Roden ranged from eight to fifteen persons. In addition to a general practice of architecture, Nyfeler's work included architectural design, coordination of consultants, contract documentation and construction contract administration responsibilities. His work included an emphasis on representation of clients before boards and commissions for regulatory approvals and oversight of all design services of the Sector. Responsibilities included development of annual budgets and the monitoring and control of sector profitability.

**The Nyfeler Organization, Inc.**, Austin                    1985-1999

President

Nyfeler conducted a General Practice of Architecture in Austin for public and private sector clients including architectural design services for higher education, K-12 public education, office, retail, athletics and recreation, banking and medical services. The design firm was regularly employed by public sector clients for municipal, county and State work and by Independent School Districts. The focus of the firm's practice was in office development for user/owners and shopping centers and multiple locations for national retailers. In the practice, on occasion, because of his broad background in the design and construction process, Nyfeler was engaged to provide opinions in dispute resolution matters. In addition to his responsibilities for architectural design, construction documentation and construction contract administration his work included a focus on the construction administration services provided to clients. Nyfeler was also responsible for the annual budgeting and managing the profitability of the practice.

**Exhibit A**

**O'Brien, O'Brien, Nyfeler, Callaway,** Dallas and Austin                1981-1985

Vice-President

Nyfeler was engaged in a general practice of architecture in Dallas and Austin with a focus on design of retail stores, shopping centers, office buildings, municipal work. Nyfeler's responsibilities led to the expansion of the Dallas firm and the creation of a branch office in Austin. In addition to a general architectural design practice, his work included marketing and new business development for the firm and management of the construction administration phase services provided to clients. Creation of a new Austin office for the firm involved successful marketing outreach, office leasing, client development, banking and insurance relationships, and development of relationships with engineering consulting specialists.

**Neiman-Marcus,** Dallas                                    1980-1981

Manager, New Store Construction

As Owner's representative for new store construction, Nyfeler was responsible for a $250 million capital expansion program with new stores in San Diego, San Francisco, Fort Lauderdale, Oakbrook and Las Vegas, and responsible for the work of five Project Managers. Nyfeler's work included development, monitoring and control of capital budget, coordination of the architect/engineer design team, programming with the merchants and reporting to the executive management of the store system. The responsibilities included transitioning the merchant following the purchase by Carter-Hawley-Hale Stores. The work included the solicitation, negotiation and contracting for the construction of the projects and the acquisition of the regulatory approvals for store development.

**Herman Blum Consulting Engineers, Inc.,** Dallas                1975-1979

Director of Special Services, Marketing Director

The initial assignment with the Blum firm was for energy management services and management of the specialized engineering and design services including lighting design, chemical engineering, automation, acoustics and industrial noise control, and solar engineering. The work involved organizing, directing, monitoring and controlling the budget and profitability of the special services (not line function mechanical and electrical) engineering services. Following the successful management of the special services section of the engineering firm and the sale of professional services, Nyfeler's responsibilities were expanded to Marketing Director for the entire firm.

The National Marketing Director for the Blum firm included sales for all disciplines for public and private sector clients with an emphasis on retail stores, shopping centers, office buildings, higher education, and international engineering projects. In this time period the firm undertook design work on projects in the Middle East especially in Iran during the time the Imperial Government was in place prior to the revolution. The pattern of engineering design work included manufacturing, data processing, military installations, banks, and government buildings.

**Development Dynamics, Inc.**, Dallas                                1970-1974

Executive Vice President, President

Practice in a Construction Management firm, pioneering the industry as an out growth of a traditional architectural practice.    A $7 million annual gross sales record in a firm that was providing management of the construction process, bonded, hard bid general contracting operating as a team member with the architect/engineering design staff. Nyfeler was responsible for annual budgeting, marketing, and construction operations.  The work was performed for the parent company, Southwestern Dynamics and for other private sector clients.  The work of the firm was principally multi family housing, office buildings, destination resort condominiums in the ski resort areas of Colorado and on the  Texas Gulf coast.

Nyfeler in the first two years served as Executive VP and the last three as President.  The firm provided construction management services, (now often called Project Management services) for the T-Bar-M tennis resort for facilities in New Braunfels, Waco, Abilene, and Lubbock.  Responsibilities included coordination of programming, design review activities, regulatory approvals, and construction. The firm was a subsidiary of Southwestern Dynamics, Inc., a Real Estate Development conglomerate that went out of business in the economic decline of the 1970's.

**Woodward, Cape and Partners, Inc.**, Dallas                        1965-1970

Vice President

Nyfeler was engaged in the traditional practice of architecture in Dallas and the Central United States region.  The practice served public and private sector clients for project types including office buildings, retail centers and stores, K-12 school work, multi-family housing, churches and health care facilities.  Primary responsibilities included construction contract administration and the Owner's representative for a 42,000 SF commercial office building for the parent company.    The background in technical design allowed Nyfeler to coordinate the services of the engineering sub-consultants of the firm.  During this employment he successfully passed the Architect's Registration Examination and became a registered architect.

**Grayson Gill, Inc.**, Dallas                                       1963-1965

Architect Intern

Project representative on a team of three full time construction contract administrators on the fifty-story Republic National Bank Tower in downtown Dallas.  Nyfeler's work focused on the construction work of building envelope and the electrical and mechanical systems in the building.  Primary responsibilities include record keeping, attending weekly project meetings, monitoring curtain wall installation and testing procedures for HVAC and electrical and vertical transportation systems.  Final closeout procedures and documentation and commissioning through proof-of-capacity were a part of the job duties.

**Herman Blum Consulting Engineers, Inc.**, Austin                   1958-1963

Design Draftsman

As a new university graduate at a lull in the economy first employment was with a mechanical and electrical engineering consulting firm performing electrical and mechanical design work support under the supervision of a registered professional engineer for several project types including schools, churches, office buildings, military installations, multi-family and single family residences.  The small size of the office allowed for assignments in construction administration and observation of the construction work in progress.

**Summer Work**                                        1950-1958

Summer work over four years included construction related employment including apprentice electrician, truck driver, masonry laborer, natural gas transmission maintenance, map drawing, REA lineman's helper and construction laborer.

## II.    ACADEMIC RECORD

**The School of Architecture, The University of Texas at Austin**

**Degree:**  Bachelor of Architecture, 1958

**Organizations:**
- Sphinx Club, Architecture Honorary Society
- Tau Sigma Delta, National Honorary Society for Architecture and Allied Arts
- Tejas Club, Social and Service Club

**Prizes and Honors:**
- Sphinx Prize, Outstanding Junior Student
- Featherlite Design Competition, 1957, The University of Texas Competition, Third Prize, State of Texas Competition, Second Prize.
- President, Tau Sigma Delta, (1957-'58)
- Class Representative to Architecture Student Council (1957-'58)

**Post Graduate Study:**

- College of Engineering, The University of Texas at Austin (1961-'62), no degree, thermodynamics and electric power distribution
- Braniff Graduate School of Business Management, University of Dallas, Irving, Texas, (1980-'82), no degree, marketing management, organization theory and practice, finance

**Continuing Education:**

Mandatory Continuing Education Programs for:
- Architectural Registration, State of Texas
- Membership in The American Institute of Architects

23rd Annual Construction Law Conference of The State Bar of Texas, 2010
24th Annual Construction Law Conference of The State Bar of Texas, 2011
25th Annual Construction Law Conference of the State Bar of Texas, 2012
26th Annual Construction Law Conference of the State Bar of Texas, 2013
27th Annual Construction Law Conference of the State Bar of Texas, 2014
28th Annual Construction Law Conference of the State Bar of Texas, 2015
The Basic Course in Texas Construction Law, Houston, Texas, October, 2010

## III.   PROFESSIONAL REGISTRATION

**Current Active registrations:**

Registered Architect, State of Texas, No. 3963
Registered Interior Designer, State of Texas, No. 2068

Certificate Holder, National Council of Architectural Registration Boards, (NCARB) No. 9787.

Registration history includes inactive architectural registrations in sixteen other states.

## IV.   CERTIFICATIONS

**Texas Accessibility Academy,** Certificate holder from Texas Department of Licensing and Regulation, the State Agency charged with the responsibility of enforcing the Texas Accessibility Standards. The Certificate is issued following a 40 hour, one week classroom course on the application of the State standards. The course work covered the removal of architectural barriers in new and existing buildings and the environment in the design and construction process. Attended Academy and completed course on June 26 thru June 28, 2013 for the TAS, 2012 revised standards.

**American College of Forensic Examiners,** Certification in Homeland Security, Level CHS-III, a certificate demonstrating successful completion of a course of study and written examination on the design of buildings and the environment for physical security of life and property.

**College of Fellows,** The American Institute of Architects, a designation and a level of membership in the National professional organization representing individual achievement and significant national contributions to the profession and society.

**Safety & Security Consultant,** State of Texas, Registered consultant for school safety and security. Having met all the prerequisites and requirements, issued by the School Safety Center of the Texas Education Agency, for a registry of persons providing design for safety and security services to school districts and institutions of higher education.

**LEED-AP,** Accredited Professional, designated by the United States Green Building Council in the Leadership in Energy and Environmental Design (LEED) program following a course of study and passing of the National Examination.

## V.   PROFESSIONAL AFFILIATIONS

- Member, National Board of Directors, American Institute of Architects (2012-2014 completed term)
- Member, American Institute of Architects, National level (former Board Member)
- Member, American Institute of Architects, Austin Chapter, Past President
- Member, American Institute of Architect, (Texas Society of Architects) State level, Past President
- Member, State Bar of Texas, Construction Law Section, (Non-Attorney status)
- Member, International Code Council (ICC)
- Member, American College of Forensic Examiners Institute
- National Fire Protection Association
- Chair, Austin Regional/Urban Design Assistance Team (RUDAT), (1990-2000)
- Member, Preservation Austin
- Leadership Austin, Class of 1989-90
- Member, International Code Council (ICC)
- Member, Institute for Civility in Government

## VI.   HONORS

- 2014 American Institute of Architects, Upjohn Fellow Medal
- 2014 Texas Society of Architects, Medal for Lifetime Achievement
- 2011 AIA Austin, Goldwin Goldsmith, FAIA Award
- 2000 AIA Austin, John V. Nyfeler, FAIA Community Service Award
- 1998 AIA Austin, Executive Director's Award

- 1998 City of Austin, Mayor's Commendation, Leadership in Austin's Promise – The Alliance for Youth
- 1993 Caritas United Church Welfare Services, Outstanding Service Award
- 1987 City of Austin, Parks and Recreation Department, Service Award, Renovation of Republic Square Park

## VII.  TEACHING and SPEAKING ENGAGEMENTS

### The University of Texas at Austin, School of Architecture

Periodic assignments in lecture, jury, design review, mentoring and marketing presentations for:
- Public Library Design, programming and design
- Brochure and Portfolio critique
- Semester long student mentoring program
- Professional practice
- Construction management
- Career Guidance and Counseling

Career Counseling, Spring Semester 2011, Bachelor and Master Degree Candidates

### The University of New Hampshire (The New England Center for Continuing Education)

Faculty member for a required course on Hospital Survey Training (Contracted by the United States Department of Health, Education and Welfare); a four week course including instruction in hospital fire safety and physical facilities for compliance with DHEW regulations.  The course was designed for continuing education for pharmacists, hospital administrators, RN's and sanitarians.

### Illuminating Engineering Society of North America (IESNA)

Faculty member of the course on Advanced Lighting Design given to professional electrical engineers, architects and lighting designers.  The special area of expertise was in emphatic and aesthetic design.

### Construction Specifications Institute

Instruction in compliance with the US Occupational Safety and Health Act, (OSHA), of 1970 with course work designed for architects, engineers, construction contractors and technical specifications writers.

### American Institute of Architects

In the Dallas and Austin Chapters of AIA over forty years, coursework for intern architects and registered architects on subject matter including construction management, professional practice and urban planning.

### AIA Austin Summer School, 2013

Panel member for seminar on the Architect's role in Urban Planning and in the Bond Program Elements in the City of Austin Bond Program, 2013.

## VIII. PUBLIC SERVICE APPOINTMENTS

**Building Code Court of Adjustments and Appeals,** City of Irving (1978-1983)

Judicial Panelist hearing and deciding on cases brought for resolution related to the application of the Municipal Building Code. Decisions when appealed went to the State District Court. Two consecutive terms appointed by the Mayor and City Council.

**Environmental Board,** City of Austin (1987-1993)

Advisory Board Member appointed by the Mayor and City Council. Two consecutive terms. Responsible for hearing and reaching recommendation on matters of the application of the Municipal Codes and Ordinances related to the protection of the natural and built environment; air, water and vegetation. Recommendations forwarded to City Council.

**Downtown Commission,** City of Austin (1993-1997)

Advisory Board member appointed by the Mayor and City Council. One term. Responsible for hearing and reaching recommendation on matters of the application of the Municipal Codes and Ordinances related to the continued development in the downtown of the City of Austin.

Sphere of activity related to traffic, utilities, density, height limitations, Capitol view corridors, signage, landscape, land use, and compatibility standards. Recommendations forwarded to City Council.

**Downtown Austin Alliance,** City of Austin (1993-Present)

Public Improvement District, Board member for two consecutive active Board terms, current Advisory Board member. Chair for two terms of the Security and Maintenance Committee with responsibility for maintaining working relationship with City Community Court trying class C misdemeanors, Austin Police Department, Downtown Social Service Providers, business owners, and downtown residents.

**Dean's Advisory Council, The School of Architecture,** The University of Texas at Austin (2003-Present)

Member, Executive Committee, two consecutive terms. Responsible for the activities of the Board in support of Higher Education at the University, fundraising for the School of Architecture's component of the 2014 Capital Campaign of $ 3 Billion, support of the academic work of the faculty, student scholarship support and maintaining Friends of Architecture organization.

Past Chair, Nominating Committee. Responsible for identification of additional nominees for membership to the Advisory Council. Vetting candidates for interest, resources, diversity, geographic location and academic background.

**Front Steps** (1999-2009)

Board Member of the Social Service Provider in support of the homeless population in Austin, Operator of the ARCH (Austin Resource Center for the Homeless), providing Board guidance to the emergency shelter, meal provision, health care and a range of social services directly and by referral, participating in the annual homeless population census, Art from the Streets program and

coordination with the Downtown Austin Alliance and City Agencies and Departments. Responsible for reviewing and approving annual budget and oversight and control of maintenance of the budget.

**ECHO** (Ending Community Homelessness Organization) (2006-2008)

President of this Coordinating body for multiple private sector and public sector agencies dedicated to provision of social services to the homeless population in Austin. Structured to maintain relationships among related organizations, avoidance of overlap, covering gaps in services and being a voice for the overarching social needs. Presenter of the Austin Plan to end Homelessness at the statewide conference of Service Providers in Houston 2003. Responsible for fundraising and maintenance of budget with support from City provided staff.

**Texas Architectural Foundation**, Board Member and Vice President (2008-2013)

Professional Charitable Organization dedicated to fund raising for college/university scholarships for students in all eight Schools of Architecture in the State of Texas and the promotion of sustainability in the design of the built environment in Texas. Management of this $7,500,000 fund balance in over fifty separate scholarship funds, selection of scholarship recipients and distribution of funds twice each academic year. Establishment and execution of investment policy.

**Austin Foundation for Architecture** (2006-2011)

Board Member of this Professional Charitable Organization dedicated to fundraising for the introduction of architecture curriculum in the classroom at elementary school level in the Austin and Round Rock Independent School Districts. Establishment of and execution of investment policy. Supporting scholarships to emerging leadership for participation in Leadership Austin. Supporting related organizations and programs that endorse and support sustainability in the design and development of the community.

**Austin Choral Union** (1993-1998)

Board Member and President of the Board of the pre-eminent choral music organization under the direction of the late Morris Beachy, PhD. Responsible for fund raising, being the public voice and coordination with other performing arts organizations. The assignment included oversight of budget, production of compact disk records for public sale, ticket sales and advertisement.

**Trustee, Central Presbyterian Church**, Austin (2011-2013)

Nyfeler served with two other Trustees for the Church congregation structured as a Texas corporation, conducting business as a Trustee as may be required for sale of property, insurance matters and corporate actions.

## IX.    ARCHITECTURAL MENTORING

**The University of Texas at Austin, School of Architecture**, a series of semester long mentoring assignments with third year students in architecture or urban planning including shadowing, design review, counseling and portfolio development.

**Partnership Forum, The American Institute of Architects**, Austin Chapter, a program in which the mentor architect meets bi-weekly through a period of one year with six emerging professionals who are preparing or have recently formed their own practice covering issues which will be encountered by the practitioner. Provided mentoring for two, one year classes.

**Eanes Independent School District**, in a program in which the Junior or Senior level student undertakes a semester long period of four hours per week in the office of the architect; a structured

program including weekly reporting by both the student and the mentor, a weekly review by the student's high school teacher and final juried portfolio.

**Texas Society of Architects, 2013-14 Mentorship Program,** Leader of a two year program providing mentoring of emerging professionals for guidance and training, open to those individuals on a career path to licensure, for mentoring beyond the office setting.

## X.    REGULATORY APPROVALS

Periodic presentations to local and State regulatory bodies for approval of permits, variances, waivers and project status determinations including:

- Historic Landmark Commission, City of Austin
- Planning Commission, City of Austin
- Texas Historical Commission, State of Texas
- State Preservation Board, State of Texas
- City Council, City of Austin
- City Council, City of Huntsville
- Texas Commission on Jail Standards, State of Texas
- City Council, City of Buda
- Travis County Commissioners' Court
- Cameron County Commissioners' Court
- Austin Independent School District
- Texas Juneteenth Commission, State of Texas (for recognition of emancipation day in Texas)
- San Marcos Consolidated Independent School District
- Joint Commission on Architect/Engineer Practice Acts, State of Texas
- Texas State University System

## XI.   REPRESENTATIVE DESIGN PROJECTS

Nyfeler has had a continuous practice of architecture from 1970 through the present and has been and active participant in design of a wide range of project types and sizes.

1.  The following is a general sampling of representative design projects

- Texas Association of Broadcasters, State Headquarters Building, Austin
- Frontier Bank Building, Elgin
- Carrizalez-Rucker Detention Center, Cameron County, Brownsville
- Travis County Sheriff's Department Offices, Austin
- Travis County Sheriff's Academy, Del Valle Correctional Facility, Austin
- Highway 183A Toll Road, Vertical Construction, Austin
- The University Co-Op Book Store (Law School), Austin
- Landmark Office Building, Austin
- Elgin Public Library, Elgin
- Lincoln Village Shopping Center, Austin
- Horizon Bank (Compass), Austin
- Wachovia Banks, Austin, San Antonio and Houston
- American Credit Union, Austin
- Great West Savings Bank, Austin
- Fayette Library, Archive and History Museum, LaGrange
- Travis Elementary School Library, San Marcos CISD, San Marcos
- San Marcos High School Library, San Marcos CISD, San Marcos
- North East Austin Health Clinic, Austin/Travis County Health Department
- Options Health and Wellness Center, Scott & White Hospital, Temple
- Optimum Health Institute, Austin

- Schlotzsky's (Lamar Blvd.), Austin
- Walgreen's stores in Austin (3) and Cedar Park (1)
- Admirals' Club, American Airlines, Robert Mueller Airport, Austin
- Eagle Point Community Center, Pflugerville
- Austin Bergstrom International Airport Terminal Renovations, Austin
- Corpus Christi International Airport Terminal Renovations, Corpus Christi
- South Austin Transit Center (Capital Metro), Austin
- Multi-modal Transit Center, Lufkin
- Risen Savior Lutheran Church, Austin
- Historic Connelly-Yerwood Residence Restoration, Austin

## XII. DISPUTE RESOLUTION

**Services:** In providing architectural services for the resolution of disputes regarding design and construction issues the following support services have, on occasion, been included:



- Forensic investigations
- Opinion witness
- Report writing
- Testimony
- Arbitration proceedings
- Litigation proceedings
- Testimony at trial
- Support related to the design professions and construction

**Content:** Matters at issue have included.

- Foundation failure
- Application of the Geotechnical Report
- Construction defects
- Personal injury
- Design defects
- Wrongful death claims
- Water penetration
- Storm damage
- Zoning issues
- Historic zoning classification
- Professional registration issues



## AFFIDAVIT OF DEAN R. READ, JR.

BEFORE ME, the undersigned authority, on this day personally appeared Dean R. Read, Jr. who being by me first duly sworn, on oath deposed and said the following:

1.     "My name is Dean R. Read, Jr.  I am over the age of eighteen years and have never been convicted of a felony or a crime involving moral turpitude.  I am of sound mind and fully competent to make this Affidavit.  I have personal knowledge of the facts contained herein, all of which are true and correct.

2.     I am a Professional Engineer licensed to practice in Texas (P.E. #93533) since June 2004 and I am actively engaged in the practice of geotechnical and structural engineering (specifically the design, analysis and investigation of residential and commercial foundations on expansive soils).  I am also a Professional Engineer licensed to practice in the Commonwealth of Northern Mariana Islands, New Mexico, Oklahoma, Arkansas, Louisiana, Mississippi, Alabama, Florida and Colorado.

3.     In addition to being an owner and President of MLAW Forensics, Inc. (Texas Engineering Firm F-2955), I am also an owner, President and Chief Software Programmer of Geostructural Tool Kit, Inc. (GTK) (Texas Engineering Firm F-15912).    Through GTK, I developed the engineering software titled PTISlab and VOLFLO that are used throughout the United States.  PTISlab is used to analyze and design foundations on expansive soils while VOLFLO is used to predict the shrink and swell magnitude of expansive soils.

---

## EXHIBIT B

4.      I have a Bachelor of Science degree in Architectural Engineering and a Master of Science in Engineering (Structural) from the University of Texas at Austin.   As part of my continuing professional development requirements for engineering licensure, I have presented and attended numerous seminars and training sessions regarding expansive soils and the design, analysis and investigation of residential and commercial structures on expansive soils.

5.      Based on my knowledge, skill, experience, education, training and professional practice regarding expansive soils and the design, analysis and investigation of foundations on expansive soils, I am knowledgeable, familiar with and competent to testify on the standard of care that geotechnical and structural engineers of ordinary knowledge and skill should employ in the development of geotechnical engineering recommendations and the design of a foundations on expansive soils in Texas, including but not limited to Central Texas.

6.      I have been retained to evaluate the geotechnical and foundation aspects of Gus Garcia Young Men's Leadership Academy' (SCHOOL) design, construction and performance.   The SCHOOL is located at 7414 Johnny Morris Rd in Austin, TX 78724.

7.      Subsequent to construction, distress was observed to finishing materials and mechanical systems at the SCHOOL.  This distress is consistent with that being caused by foundation movement.   Distress some elements, such as the equipment and walls at the electrical and mechanical yards was occurring during construction.

8.      My opinions regarding the geotechnical and foundation aspects of the SCHOOL are based on my education, expertise, documents made available to me and site inspections.  I reserve the right to modify my opinions if additional information becomes available.  Attached as Exhibit

"A" is true and correct detailed information about my credentials.

9.      A review of available documents indicate that L. Lemar Porter, P.E. of Jose I. Guerra, Inc. (Guerra) was the Structural Engineer of Record for the SCHOOL. I hold the same Professional Engineering license in Texas as Mr. Porter. Throughout my professional career, I have performed structural engineering services similar to those provided by Guerra for the SCHOOL.

10.      Due to the highly expansive soils at the site, Kleinfelder, the Geotechnical Engineer of Record for the SCHOOL, provided foundation recommendations for two different types of foundations. These foundations types are as follows:

>   **Underreamed drilled pier foundation with a structural slab:** This type of foundation is commonly referred to as a "pier and beam" foundation. With this type of foundation, all horizontal foundation elements (such as beams, pier caps and slabs) are isolated from the expansive clays with a void. As such when the expansive clays swell, no upward pressures are applied to the horizontal foundation elements. The only elements in contact with the expansive clays are the sides of the piers and beams.

>   **Underreamed drilled pier foundation with a ground supported floor slab:** While the piers and beams with this option are the same as above, rather than the slab being structural and suspended above the clay soils, the slab is supported on grade. To minimize the shrink / swell potential of the expansive soils supporting the slab, Kleinfelder recommended a soil modification technique commonly referred to as "remove and replace". With remove and replace, a portion of the expansive soils are removed and replaced with low to non-expansive materials. The low to non-expansive

materials are referred to as select fill. Kleinfelder recommended that 7 feet of expansive clay be remove and replaced with a minimum of 7 feet of select fill. Kleinfelder further recommended that the ground supported floor slabs be isolated from the primary pier supported structure.

11.     While the majority of the foundation was designed as a pier foundation with a structural slab, several areas (such as the mechanical and electrical yards and the loading dock) were designed by Guerra to be ground supported slabs on select fill.

12.     Taking advantage of the sloping site, three electrical and mechanical yards were constructed underneath the rear portion of the pier and beam foundation. The Guerra foundation plans indicate the foundations for these yards were designed as ground supported slabs. Detail 2 on Sheet S4.4 indicates these yards were designed as 5 inch thick ground supported slab with a 24" deep perimeter beam (with no void). While this detail indicates the slab is supported on select fill, it does not state the depth of select fill required. Further, the Guerra plans and Project Specifications do not indicate that the soil modification recommendations by Kleinfelder were required. As part of MLAW Forensics' evaluation, soil borings were placed in each mechanical yard. These borings confirmed that no select fill consistent with Kleinfelder's soil modification recommendations was placed beneath the mechanical and electrical yard pads.

Due to being supported on expansive clays without the soil modifications to reduce the swell potential as recommended by Kleinfelder, the foundations for the electrical and mechanical yards have experienced significant differential movement relative to the pier and beam foundation above. This upward movement has resulted in damage to equipment and the concrete masonry unit (CMU) wall between the electrical and mechanical portions of the yards. Since the mechanical yard foundations

are moving upward more than the pier and beam foundation above, some of the equipment is being compressed between the two foundations.

13.     The Guerra foundation plans indicate that the loading dock was also designed as a ground supported foundation (with no void). Guerra's plan (S2.1D) and details (5, 6, 7 and 8 on S4.2, 11 on S4.3 and 4 and 5 on S4.4) provide information regarding the design and construction of the loading dock. While some of the details (7 and 8 on S4.2) indicate the ground supported foundation was to be constructed on select fill, the amount of fill is not specified nor was it indicated that the soil modifications recommended by Kleinfelder was required. The Guerra design of the loading dock further deviated from Kleinfelder's recommendations in that the ground supported foundation is not isolated from the primary pier support structure. Detail 11 on S4.3 shows the ground supported foundation being doweled to the primary pier structure. Further, details 4 and 5 on S4.4 say the ground supported grade beams were to be integrated with the pier caps.

Due to being supported on expansive clays without the soil modifications to reduce the swell potential as recommended by Kleinfelder, the loading dock has experienced differential movement relative to the pier and beam foundation. This differential movement has resulted in significant cracking of the CMU privacy wall, a door operation issue and altered the drainage of the concrete surface.

14.     The Commons Courtyard is a large exterior area located at the rear of the building. A roof canopy, supported by drilled piers, covers a large portion of the courtyard. While the Guerra plans include details for the roof canopy and drilled piers, no details regarding the construction of the Courtyard's concrete slab were provided on the Guerra plans. The Architectural plans indicate the Courtyard's concrete slab was designed as a sidewalk. As such, the Commons Courtyard was constructed as a ground supported slab.

Kleinfelder recommended that soil modification for ground supported slabs extend beyond attached improvements such as sidewalks and canopies. The construction documents violate these recommendations. Considering Kleinfelder provided sufficient information to the Design Professionals warning that differential movement between ground supported slabs and the pier supported foundation should be anticipated, the Commons Courtyard should have been constructed as part of the primary pier supported foundation or as a ground supported slab with the soil modification recommended by Kleinfelder.

As part of MLAW Forensics' evaluation, a soil boring was placed in the Commons Courtyard. This boring confirmed that the concrete slab was ground supported and that no select fill was placed beneath the Commons Courtyard ground supported slab which is inconsistent with Kleinfelder's recommendation.

Due to swelling of the underlying clay, the Commons Courtyard ground supported slab has experienced significant movement resulting in separations, elevation differentials, door operation issues and a reverse slope towards the building. This reverse slope has further resulted in water penetrations into the building envelope.

15. The Art Patio is an exterior space off the rear of the building. This space is surrounded by a 6 foot tall masonry wall and low height retaining wall. Similar to the Commons Courtyard, the Guerra plans provided no details regarding the construction of the Art Patio's concrete slab. The Architectural plans indicate the Art Patio's concrete slab was designed as a sidewalk. As such, the Art Patio was constructed as a ground supported slab.

As previously discussed, Kleinfelder recommended that soil modification for ground supported slabs

extend beyond attached improvements such as sidewalks and canopies. The construction documents violate these recommendations. Considering Kleinfelder provided sufficient information to the Design Professionals warning that differential movement between ground supported slab and the pier supported foundation should be anticipated, the Art Patio should have been constructed as part of the primary pier supported foundation or as a ground supported slab with the soil modification recommended by Kleinfelder.

Due to swelling of the underlying clays, the Art Patio ground supported slab has experienced significant movement resulting in separations, elevation differentials and a reverse slope towards the building.

16.     Guerra and Mr. Porter failed to meet the Standard of Care of a Structural Engineer by not following the recommendations in the Kleinfelder geotechnical report in relation to the design of the ground supported slabs adjacent to or under the primary pier supported foundation. This failure has directly led to damage and distress at the SCHOOL. As a result of their failure, Guerra and Mr. Porter committed at least one negligent act, error or omission. It is my opinion that damage to the SCHOOL has been incurred as a result of Guerra's and Porter's negligence."

9-19-18

Further the affiant sayeth not.

Dean R. Read, Jr., P.E.

STATE OF TEXAS
DEAN READ
93533
LICENSED
PROFESSIONAL ENGINEER

SUBSCRIBED AND SWORN TO before me this _19_ day of _September_, 2018.

KAILA JEAN FRIEDLINE
Notary ID #131686825
My Commission Expires
August 16, 2022

Notary Public, State of Texas

Unofficial Copy Travis County District Clerk Velva L.

## DEAN R. READ, P.E.
## Structural / Geotechnical / Civil / Architectural Engineer
12885 Research Boulevard, Suite 209A
Austin, Texas 78750
C (512) 431-2181
F (512) 651-0098
DRRead@MLAWForensics.com

**Professional Registrations**

*State of Texas - Professional Engineer No. 93533, 2004*

*Commonwealth of the Northern Mariana Islands - Professional Engineer No. 383, 2008*

*State of New Mexico - Professional Engineer No. 19277, 2009*

*State of Louisiana - Professional Engineer No. 34998, 2009*

*State of Mississippi - Professional Engineer No. 19452, 2009*

*State of Oklahoma - Professional Engineer No. 24503, 2010*

*State of Alabama – Professional Engineer No. 31667, 2010*

*State of Arkansas – Professional Engineer No. 14592, 2011*

*State of Florida – Professional Engineer No. 75774, 2013*

*State of Colorado – Professional Engineer No. 47500, 2013*

**Academic Background**

*Master of Science in Civil Engineering* (1998)
    University of Texas at Austin, Department of Structural Engineering

*Bachelor of Science in Architectural Engineering* (1992)
    University of Texas at Austin

Attendance at numerous seminars and technical continuing education courses in the areas of geotechnical, structural and foundation engineering

**Experience**

May 2001 – Present – *Owner, President, Engineer*, MLAW Forensics, Inc.  Active in new designs, forensic investigations, remedial designs and providing expert testimony. Areas of competence and expertise include (but are not limited to):
- geotechnical engineering (emphasis on the behavior, prediction and design recommendations for expansive soils and their impact on new and existing foundations, pavements, pools and retaining walls)

1

Exhibit A

- structural engineering (including foundation and superstructure design and investigation for residential and commercial structures)
- pavement, earthwork and compaction (including investigation and design)
- drainage (including investigation and design)
- building envelope water penetrations (including investigation and design)

1996 – Present – **Owner, Director, President and Chief Software Programmer,** Geostructural Tool Kit, Inc. Developed PTISlab and VOLFLO, programming used throughout the United States for the design and analysis of foundations on expansive and compressible soils.

1994 – 2014 – **Engineer,** MLAW Consultants & Engineers. Designed, analyzed and investigated foundations, structures, framing, retaining walls, pools and drainage for residential and commercial projects. Developed geotechnical recommendations (with emphasis on expansive clays) for new and remedial construction. Performed investigations of building envelope water penetration issues. In addition, performed forensic investigations, designed remedial treatments and provided expert testimony.

1993 - 1994 **Teaching Assistant**, University of Texas at Austin, Structural Engineering Department. Instructed undergraduate civil engineering students in Structural Analysis and C programming on PC, Macintosh, and UNIX platforms

1993 - 1994 **Hydrologic Technician**, United States Geological Survey, Water Resource Division. Developed basin characteristic database for Texas Flood Frequency Model using Arc/Info GIS on UNIX and Primos platforms

1993 - **Research Assistant**, University of Texas at Austin, Structural Engineering Department. Performed statistical analysis of the properties of all W-shape steel members produced for American projects during 1992 (Funded by American Iron and Steel Institute)

1984 - 1986 **Draftsman / Construction Assistant**, Doyle Watson Homes; Round Rock, Texas. Drew construction plans for custom and spec homes. Assisted in construction of commercial and residential projects

**Professional Committees**

Post-Tensioning Institute – Slab-On-Ground Committee (DC-10) – Vice Chair
Post-Tensioning Institute – SOG Structural Sub-Committee (DC-10.A) - Member
Post-Tensioning Institute – SOG Geotechnical Sub-Committee (DC-10.B) - Member
American Society of Civil Engineers – Design of Residential Structures on Expansive Soils - Member

**Publications**

"Support Parameters for Slabs on Ground on Expansive Clay with Vegetation Considerations," Conference Proceedings, American Society of Civil Engineers, Houston, Texas, October 2001 with Kirby Meyer

"Case Studies of Fifty Slabs on Ground on Expansive Clay and Implications for Future Design," Conference Proceedings, Texas Section American Society of Civil Engineers, Arlington, Texas, Spring 2002 with Kirby Meyer

2

"Slab on Ground Design: It's the Law", Conference Proceedings, Texas Section American Society of Civil Engineers, Austin, Texas, Spring 2010, with Kirby T. Meyer, P.E. and Richard J. Bowman, P.E.

"Soils, Earthwork, and Foundations – A Practical Approach", International Code Council, 2016, with Kirby T. Meyer, P.E.

## Presenter - Continuing Education Courses and Seminars

"Design and Construction of Slab-On-Ground Foundations" – Co-Presenter, Structural Engineers Association of Southern Nevada (SEASoN) Meeting; Las Vegas, Nevada, October 2001

"Geotechnical Analysis of Expansive Soil using Computer Program VOLFLO Win 1.0" – Co-Presenter, Building Professional Institute (BPI); Arlington, Texas, May 2002

"Un-Saturated Soil Mechanics and VOLFLO" – Co-Presenter, Foundation Performance Association (FPA) Meeting; Houston, Texas, March 2003.

"Application of Structural Procedure for Expansive Soils" – Presenter, Post-Tensioning Institute's Design of Post-Tensioned Foundations Using the New 3rd Edition of PTI's Design of Post-Tensioned Slabs-On-Ground Seminar; Phoenix AZ; Dallas, TX; Denver, CO; Garden Grove, CA; Sacramento, CA, 2005

"Application of Expansive Soil Geotechnical Procedure" – Presenter, Post-Tensioning Institute's Design of Post-Tensioned Foundations Using the New 3rd Edition of PTI's Design of Post-Tensioned Slabs-On-Ground Seminar; Phoenix AZ; Dallas, TX; Denver, CO; Garden Grove, CA; Sacramento, CA, 2005

"Ask the Experts: Slab-On-Ground Design and Construction" – Panel Member, Post-Tensioning Institute's Annual Technical Conference; Reno, Nevada, 2006

"Application of Geotechnical and Structural Procedures for Expansive Soil Using PTI 3rd Edition Manual" – Presenter, Foundation Performance Association Conference; Houston, Texas, September 2005

"New Developments in Geotechnical & Structural Design of Residential Foundations" - Co-Presenter, Texas Section – American Society of Civil Engineers; Austin, Texas, Spring 2005

"Geotechnical & Structural Design of Residential and Light Commercial Foundations", Co-Presenter, Continuing Professional Development Seminar, Texas Section – ASCE; El Paso, Texas, Fall 2005

"IRC and IBC Provisions for Slab-On-Ground Foundations on Expansive Soils" – Presenter, Structural Engineers Association of Texas – San Antonio Branch meeting; San Antonio, Texas, June 2006

"Updates to the Geotechnical Procedure in Version 3.1…(and 3.2)" – Presenter, Post-Tensioning Institute's Annual Technical Conference; St. Louis, MO, May 2008

"Theory and Development of the Post-Tensioning Institute's (PTI) Soil Support Parameters as References in the 2006 International Building Code" – Presenter, California Geotechnical Engineers Association – Pomona, CA, Sacramento, CA, August 2008

"Modeling Vegetation (and other) Effects Using VOLFLO Software" – Presenter, Foundation Performance Association Workshop, Houston, Texas, June 2009

3

"Slab-on-Ground Foundation Design Using PTI 3rd Edition" – Presenter, Texas Section – ASCE Continuing Professional Development Seminar, Austin, Texas, Spring 2010

"Panel Discussion - PT Slab-on-Ground Design & Construction" – Panel Member, Post-Tensioning Institute's Annual Technical Conference; Fort Worth, Texas, May 2010

"Shallow Foundation Design, Construction, and Repair" – Co-Presenter, HalfMoon Seminars, Austin, Texas, May 2010

"Geotechnical Parameters and Site Condition Impact on Foundation Design / Performance" – Presenter, Building Professional Institute, May 2014

**Affiliations, Professional & Community Activities**

American Concrete Institute, Austin Branch - Member

American Society of Civil Engineers - Member

National Society of Professional Engineers - Member

The Masonry Society - Member

Foundation Performance Association - Member

Post-Tensioning Institute – Fellow

Texas Exes – Life Member

American Institute of Steel Construction, Inc. - Member

Last Revised 1-12-17

4

## AFFIDAVIT OF DEAN R. READ, JR.

BEFORE ME, the undersigned authority, on this day personally appeared Dean R. Read, Jr. who being by me first duly sworn, on oath deposed and said the following:

1.     "My name is Dean R. Read, Jr.  I am over the age of eighteen years and have never been convicted of a felony or a crime involving moral turpitude.  I am of sound mind and fully competent to make this Affidavit.  I have personal knowledge of the facts contained herein, all of which are true and correct.

2.     I am a Professional Engineer licensed to practice in Texas (P.E. #93533) since June 2004 and I am actively engaged in the practice of geotechnical and structural engineering (specifically the design, analysis and investigation of residential and commercial foundations on expansive soils).  Further, I am actively engaged in the practice of construction observations and material testing.  I am also a Professional Engineer licensed to practice in the Commonwealth of Northern Mariana Islands, New Mexico, Oklahoma, Arkansas, Louisiana, Mississippi, Alabama, Florida and Colorado.

3.     In addition to being an owner and President of MLAW Forensics, Inc. (Texas Engineering Firm F-15955), I am also an owner, President and Chief Software Programmer of Geostructural Tool Kit, Inc. (GTK) (Texas Engineering Firm F-15912).   Through GTK, I developed the engineering software titled PTISlab and VOLFLO that are used throughout the United States. PTISlab is used to analyze and design foundations on expansive soils while VOLFLO is

**EXHIBIT C**

used to predict the shrink and swell magnitude of expansive soils.

4.      I have a Bachelor of Science degree in Architectural Engineering and a Master of Science in Engineering (Structural) from the University of Texas at Austin.   As part of my continuing professional development requirements for engineering licensure, I have presented and attended numerous seminars and training sessions regarding expansive soils and the design, analysis and investigation of residential and commercial structures on expansive soils.

5.      Based on my knowledge, skill, experience, education, training and professional practice regarding expansive soils and construction observations and material testing, I am knowledgeable, familiar with and competent to testify on the standard of care that geotechnical engineers of ordinary knowledge and skill should employ regarding construction observations and material testing at sites with expansive soils in Texas, including but not limited to Central Texas.

6.      I have been retained to evaluate the geotechnical and foundation aspects of Gus Garcia Young Men's Leadership Academy's (SCHOOL) design, construction and performance.   The SCHOOL is located at 7414 Johnny Morris Rd in Austin, TX 78724. Information about our ongoing investigation can be found in our previous reports dated March 1, 2018 and August 10, 2018 and Affidavit dated September 19, 2018.

7.      Subsequent to construction, distress was observed to finishing materials and mechanical systems at the SCHOOL. This distress is consistent with that being caused by foundation movement. Distress to some elements, such as the equipment and walls at the electrical and mechanical yards, was occurring during construction.

8.      My opinions regarding the geotechnical and foundation aspects of the SCHOOL are

based on my education, expertise, documents made available to me and site inspections. I reserve the right to modify my opinions if additional information becomes available. Attached as Exhibit "A" is true and correct detailed information about my credentials.

9.      A review of available documents indicate that Kleinfelder performed construction observations and material testing for the SCHOOL. I hold the same Professional Engineering license in Texas as Kleinfelder's engineers.

10.      Specifically, Kleinfelder observed the construction of the majority, if not all, of the drilled underreamed piers for the SCHOOL. Throughout my professional career, I have performed construction observations and material testing services (specifically observation of pier construction) similar to those provided by Kleinfelder for the SCHOOL.

11.      Due to the highly expansive soils at the site, Jose I. Guerra, Inc. (Guerra), the Structural Engineer of Record for the SCHOOL, designed the primary structure to be supported on drilled and underreamed concrete piers. An underream (commonly referred to as a bell) is a widened area at the bottom of the pier intended to resist the uplift forces from the expansive clays.

12.      As part of MAW Forensics' evaluation into the cause of the foundation movement and distress at the SCHOOL, two piers were excavated full depth. The excavated piers were at gridlines R-14 and 19.6. These piers were selected because floor surface surveys indicated the foundation may have moved upwards at or near these locations, distress was present in the general area of the piers and they were accessible. Accessibility greatly limited the potential piers that could be excavated.

13.      At Pier R-14, the exposed portion of the underream was measured to extend between

19½ and 21¼ inches beyond the face of the approximately 24 inch diameter pier shaft. Extrapolating the measurement to the unexcavated side of the pier, the underream diameter was determined to be at least 63 inches. This is slightly greater than the 60 inch diameter underream required by Guerra plans. The June 28, 2006 Underream Drilled Shaft Report by Kleinfelder (Bates #: Bartlett Cocke 000024) indicates that the pier at R-14 was constructed with a 60 inch diameter underream and that the hole was "Clean & Plumb". This report indicates that the technician was R. Sifuentes and was signed by Justin Jones of Kleinfelder. Mr. Jones does not appear to have been a Professional Engineer at the time the report was signed.

14.     At Pier J-19.6, the exposed portion of the underream was measured to extend between 9 and 9 3/8 inches beyond the face of the approximately 24 inch diameter pier shaft. Extrapolating the measurement to the unexcavated side of the pier, the underream diameter was determined to be between 42 inches and 42.75 inches. This is less than the 60 inch diameter underream required by Guerra plans. The June 15, 2006 Underream Drilled Shaft Report by Kleinfelder (Bates #: Bartlett Cocke 000009) indicates that the pier at J-19.6 was constructed with a 60 inch diameter underream and that the hole was "Clean & Plumb". This report indicates that the technicians were R. Sifuentes and B. Siler and was signed by Justin Jones of Kleinfelder. Mr. Jones does not appear to have been a Professional Engineer at the time the report was signed.

15.     Kleinfelder's Underream Drilled Shaft Reports were distributed to Austin I.S.D., Bartlett Cocke, LP and Pfluger & Associates.

        The failure of Kleinfelder to properly confirm and accurately report the underream diameter at Pier J-19.6 contributed to Bartlett Cocke (or their subcontractor) constructing the pier with an underream out of compliance with the Guerra plans. The resisting surface of the as-

constructed underream has approximately 41% of the resisting surface of the as-designed underream. This is a significant construction defect and is considered a contributing factor to the foundation movement.

17.    The primary pier supported structure has experienced movement resulting in unacceptable distress to the building.  Based on the pier excavations, the primary cause of this movement is the failure to properly construct the underreams of the piers.  Based on the performance of the building, it more likely than not that a large number of piers have insufficient underream size.

18.    Kleinfelder failed to meet the Standard of Care of an Engineer performing construction observations and material testing by approving and not noting at least one pier with too small of underream.  This failure has contributed to damage and distress at the SCHOOL.  Because of their failure, Kleinfelder committed at least one negligent act, error or omission.  It is my opinion that damage to the SCHOOL has been incurred in part as a result of Kleinfelder's negligence."

Further the affiant sayeth not.

_____
Dean R. Read, Jr., P.E.

SUBSCRIBED AND SWORN TO before me this _18_ day of _February_, 2019.

Notary Public, State of Texas

# EXHIBIT E



# LITCHFIELD
ATTORNEYS AT LAW **CAVO** LLP

**WRITER'S ADDRESS:**
One Riverway | Suite 1000
Houston, TX 77056
D 713-418-2017
F 713-418-2001

Ellen G. Tagtmeier
Email: Tagtmeier@LitchfieldCavo.com

December 27, 2019

kyleweynand@mehaffyweber.com
Kyle D. Weynand
MehaffyWeber
One Allen Center
Houston, Texas 77002

RE:    **RENEWED DEMAND FOR PERFORMANCE OF DEFENSE AND
INDEMNITY OBLIGATIONS (ORIGINAL DEMAND MADE ON
NOVEMBER 13, 2018)**

Insured:           FT Woods Construction Services, Inc.
Additional Insured:  Bartlett Cocke, LP
Claimant:          Austin Independent School District

Lawsuit:   Cause No. D-1-GN-18-005872; *Austin Independent School District v.
Pfluger Associates, LP., Et. Al.*; In the 261ˢᵗ Judicial District Court of
Travis County, Texas

Dear Kyle:

As you know, this law firm represents Bartlett Cocke General Contractors ("Bartlett
Cocke") in the referenced matter. Austin Independent School District ("AISD") has sued
Bartlett Cocke as a defendant in this lawsuit related to damages allegedly incurred by Plaintiff
arising out of the performance of subcontract work performed by FT Woods Construction
Services, Inc. ("FT Woods") for the construction of the Gus Garcia Middle School (n/k/a Gus
Garcia Young Men's Leadership Academy) located at 7414 Johnny Morris Rd, Austin, Texas
78724 (the "Project").

Plaintiff AISD is the owner of the Project. Bartlett Cocke was the construction manager
for the Project. The prime/original contract is dated June 20, 2005. Bartlett Cocke subcontracted
with FT Woods on June 28, 2006, to provide site and building concrete labor and materials and
equipment for the Project, including but not limited to, drilled piers and site, structural and
miscellaneous concrete work (the "Subcontract"). Construction on the Project was
substantially completed on or about September 25, 2007.

Atlanta | Boston area | Chicago | Dallas-Fort Worth | Fort Lauderdale | Hartford area | Houston | Indiana
Las Vegas | Los Angeles area | Louisiana | Milwaukee | New Jersey | New York | Philadelphia | Phoenix
Pittsburgh | Providence | Salt Lake City | St. Louis | Tampa | West Virginia

www.LitchfieldCavo.com



December 27, 2019
Page 2

Plaintiff alleges that there are construction defects which include the following:

- Substantial differential settlement (7" to 12") across expansion joints

- Broken vent lines due to heaving of mechanical room slab (resulting in abandonment of original water heater system in the kitchen)

- Broken or dislodged sewer pipes beneath building (resulting in raw sewage flowing and ponding in crawl space)

- Exterior doors that no longer open or close properly (including emergency exits)
- Windows with visible light around the edges of the assembly

- Pipes and conduit pushing against ductwork and concrete beams in basement areas

- Roof leaks at parapet caps

The scope of work of FT Woods is implicated in the Plaintiff's pleadings and expert reports.

Plaintiff sued Bartlett Cocke for breach of contract, negligence and breach of implied and express warranties. Plaintiff seeks to recover damages for actual and consequential damages, attorney's fees and interest in an amount not to exceed $30,000,000.00. Bartlett Cocke sued FT Woods Construction Services as a third party defendant for contractual indemnity, contribution, breach of contract, breach of express and implied warranties and negligence.

Enclosed please find the following:

1. Plaintiff's First Amended Petition
2. Bartlett Cocke's Third Party Petition against FT Woods
3. Subcontract Agreement between Bartlett Cocke and FT Woods

Section 16 of the Subcontract specifically provides that FT Woods will indemnify Bartlett Cocke for AISD's claims related to FT Woods' scope of work. Specifically, the indemnity and insurance language in the Subcontract provides as follows:

SECTION 16: Indemnification

16.01    To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, the Architect and the Contractor and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of the Subcontractor's Work under this



Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work Itself) including the loss of use resulting therefrom, to the extent caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by him or anyone for whose acts he may be liable, regardless of whether it is caused in whole or in part, by the negligent act or omission of a party indemnified hereunder. It is the express intent of Subcontractor that its obligation hereunder applies to the claims, damages, losses and expenses described above even if they result in whole or in part from *the* negligent act or omission of a party indemnified. Such obligation shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnification which would otherwise exist as to any party or person described in this Section 16.

16.02 The Subcontractor specifically obligates itself to the Contractor and Owner in the following respects, to-wit: (1) to indemnify and defend them against and save them

harmless from any and all claims, suits, liability, expenses or damages for any alleged or actual infringement or violation of any patent or patent right arising out of Subcontractor's performance under this Agreement; (2) to pay for all materials and equipment furnished and work and labor performed under this Agreement and to satisfy the Contractor and Owner thereupon whenever demand is made, and to indemnify and defend the Contractor and the Owner against and save them and the Project harmless from any and all claims, suits or liens therefor by others than the Subcontractor; and (3) to obtain and pay for all permits, licenses and official inspections made necessary by its Work, and to comply with all laws, ordinances and regulations bearing on the Work and the conduct thereof.

16.03 The Subcontractor shall indemnify Contractor and the Owner against, and save them harmless from, any and all loss, damage, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Agreement.

16.04 In any and all claims against the Owner, Architect, Contractor (including its affiliates, parents and subsidiaries) and other contractors or subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the indemnification obligation under this Section 16 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Worker's or Workman's Compensation Acts, disability benefit acts or other employee benefit acts.

16.05 Contractor and subcontractor have agreed that Subcontractor shall furnish all necessary equipment to perform subcontractor's work required by this agreement. However, the



December 27, 2019
Page 4

Contractor, in its sole discretion, may allow Subcontractor to use Contractor's equipment in connection with the "Project". In consideration for this license to use Contractor's equipment, Subcontractor indemnifies and holds Contractor harmless from any and all claims, demands, costs (including legal fees), damage to the equipment and lost time arising out of or from Subcontractor's use of the equipment. This indemnity and hold harmless covenant shall include, but not be limited to, all actions, claims, and demands founded either in negligence, products liability, failure to warn, failure to maintain, statutory or governmental regulation. IT IS THE INTENTION OF THE PARTIES THAT THIS COVENANT SHALL OPERATE TO INDEMNIFY CONTRACTOR FROM ITS OWN ACTS AND/OR OMISSIONS IN CONNECTION WITH THE OPERATION, USE OR MAINTENANCE OF THE EQUIPMENT.

16.06 WHERE AN INJURY, ECONOMIC LOSS, DEATH, DAMAGE OR OTHER LOSS OF AN AGENT, SERVANT OR EMPLOYEE OF THE SUBCONTRACTOR IS CAUSED BY, OR ALLEGED TO BE CAUSED BY, THE NEGLIGENCE OR FAULT OF THE OWNER OR CONTRACTOR IN FAILING TO PROVIDE A SAFE PLACE TO WORK OR IN FAILING TO WARN OR GUARD AGAINST CONDITIONS ON THE CONSTRUCTION SITE, OR FAILING TO SUPERVISE THE SUBCONTRACTOR, ITS AGENTS, EMPLOYEES, SUB-SUBCONTRACTORS OR INVITEES (EVEN THOUGH CAUSED WITHOUT NEGLIGENCE OR FAULT OF THE SUBCONTRACTOR), IT IS THE INTENTION OF THIS INDEMNITY AGREEMENT TO INDEMNIFY THE OWNER AND THE CONTRACTOR AND ALL OF THEIR AGENTS, SERVANTS AND EMPLOYEES FROM SUCH INJURY, ECONOMIC LOSS, DEATH DAMAGE OR OTHER LOSS, INCLUDING ANY AND ALL EXPENSES OF DEFENSE AND INVESTIGATION (INCLUDING ATTORNEYS FEES).

SECTION 17: Insurance

17.01 Subcontractor shall maintain in full force and effect, at its own expense, the following minimum insurance coverage (in the event that the specifications, plans or Owner requirements are greater, then those requirements shall supersede those listed below):

(A)     Statutory Worker's Compensation and Employer's Liability Insurance with minimum limits of not less than $500,000 Subcontractor shall require sub-subcontractors to provide Workmen's Compensation and Employer's Liability Insurance with the same minimum limits.

(B)     Commercial General Liability Insurance including Broad Form Property Damage Liability Coverage, with minimum limits as follows: $1,000,000 Each Occurrence, $2,000,000 Products and Completed Operations Aggregate/$2,000,000 General Aggregate.

The Commercial General Liability Policy will include the following coverage's where applicable:

(1)     Bodily Injury & Property Damage on an "Occurrence" Basis

# LITCHFIELD
ATTORNEYS AT LAW CAVO LLP

December 27, 2019
Page 5

|      |                                                          |
|------|----------------------------------------------------------|
| (2)  | Premises & Operations                                    |
| (3)  | Independent Contractors                                  |
| (4)  | Broad Form Blanket Contractual                           |
| (5)  | Blanket XCU (Explosion, Collapse, Underground Damage)    |
| (6)  | Products/Completed Operations                            |
| (7)  | Knowledge/Notice of Occurrence (to Owner)                |
| (8)  | Personal Injury Liability                                |
| (9)  | Employees as Additional Insured                          |
| (10) | Host Liquor Law Liability                                |
| (11) | Incidental Malpractice                                   |
| (12) | Non-Owned Watercraft (Under 25 Feet)                     |
| (13) | Broad Form Property Damage                               |
| (14) | Elevators                                                |

(C)     Commercial Automobile Insurance $500,000 combined single limit for all owned, non-owned, and hired vehicles.

All policies of insurance effecting any coverage shall contain an endorsement with the following wording (or similar wording acceptable to Contractor): 'This Insurance Company hereby waives any and all rights of subrogation against Contractor which may arise by reason of any payment under this policy." A copy of the "Waiver of Subrogation Endorsement" shall be attached to each certificate for each policy.

Comprehensive or Commercial General Liability Insurance and other liability insurance may be arranged under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an Excess or Umbrella Liability Policy.

Subcontractor shall not commence Work at the Project until he has obtained all required insurance and until such insurance has been approved by Contractor. Approval of the insurance by Contractor shall not relieve or decrease the liability of Subcontractor hereunder. Certificates of insurance shall be filed with Contractor prior to commencing work. Failure to furnish either satisfactory insurance or required certificates within 10 days of notice to proceed shall not be considered cause for modification of any contractual time limits. The required insurance must be written by a company licensed to do business in Texas at the time the policy is issued. In addition, the company must be acceptable to Contractor. Subcontractor shall not cause any insurance to be canceled nor permit any insurance to lapse. All insurance policies shall include a clause to the effect that the policy shall not be canceled or reduced, restricted or limited until 30 days after Contractor has received written notice as evidenced by return receipt of registered or certified letter. Subcontractors shall incorporate all provisions of this Section 17 into their subcontracts so all sub-subcontractors have the above same coverage and provisions.



December 27, 2019
Page 6

17.02 Subcontractor agrees to have Contractor named as an Additional Insured on any General Liability, Umbrella Liability, and Automobile Liability policies of insurance covering the Subcontractor's work and required by Section 17.01, above. Subcontractor shall furnish to the Contractor certificates of insurance, noncancelable except on thirty (30) days' written notice to the Contractor of default providing an opportunity to cure the default to Contractor within ten (10) days of receipt of the written notice of election by the Contractor.

17.03 The Subcontractor waives all rights against the Contractor and Owner for damages, including but not limited to the right of subrogation, caused by fire, theft, destruction or other peril or casualty loss except to the extent that such loss is covered by this Article or any other Property or Builder's Risk insurance applicable to the Work.

17.04 In the event Subcontractor fails or neglects to obtain or renew the required insurance and furnish to the Contractor the executed Certificate of Insurance form as evidence thereof, Contractor shall have (1) the right but not the obligation, to procure such insurance and reduce the Contract Price by the cost thereof; or (2) deem such failure or neglect on the part of the Subcontractor as a material breach of this Subcontract.

This indemnification provision meets both the express negligence provisions and the conspicuous provisions established by the Texas Supreme Court for fair notice.

Bartlett Cocke again demands that FT Woods and its insurers defend and indemnify Bartlett Cocke in this lawsuit and that FT Woods' insurers defend and cover the claims on behalf of Bartlett Cocke as an additional insured pursuant to the Subcontract and the terms of the insurance policies.

This demand includes, without limitation, payment of the attorney's fees, expert fees and legal expenses incurred by Bartlett Cocke to defend the claims made by Plaintiff against Bartlett Cocke in this lawsuit and to enforce FT Woods' defense and indemnity obligations. FT Woods will be responsible for any and all damages, losses or expenses incurred by Bartlett Cocke in the defense of the matters related to FT Woods' scope of work pursuant to the indemnification provisions of the Subcontract.

Should FT Woods fail to promptly accept this tender and defend and indemnify Bartlett Cocke in this lawsuit, Bartlett Cocke will make a claim for breach of contract against FT Woods and will seek to recover all damages to which it is entitled under Texas law, including attorney's fees and costs pursuant to §38.001, *et. seq.* of the Texas Civil Practice & Remedies Code.

Please forward this tender to all of FT Woods' insurers from 2006 to the present date and ask that these insurers assume the defense and indemnity of their additional insured, Bartlett Cocke.



December 27, 2019
Page 7

       Your prompt attention to this matter is requested, as is a prompt written response to this demand for defense and indemnity.

Sincerely,

**LITCHFIELD CAVO LLP**

*Ellen Tagtmeier*
Ellen G. Tagtmeier

Enclosures
cc:    <u>Via Email</u>
       Jerry Hoog, President and CEO
       Bartlett Cocke General Contractors

       <u>Via Email</u>
       William Goodman
       Allianz Resolution Management
         (Claim No. 2096047)

       <u>Via Certified Mail/RRR</u>
       USI Southwest, Inc. Austin/CL
       7600-B N. Capital of Texas Highway. Suite 200
       Austin, Texas 78731

       <u>Via Email: jmiller@unitedfiregroup.com</u>
       Jennifer Miller
       United Fire Group
         (re: Claim # 4220108103)

       <u>Via Email: JKAUFMA5@travelers.com</u>
       Jeremy Kaufman
       Travelers

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Theressa Washington on behalf of Julie Shehane
Bar No. 24048794
theressa.washington@cooperscully.com
Envelope ID: 51150329
Status as of 3/8/2021 1:06 PM CST

Associated Case Party: Amerisure Mutual Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Julie A.Shehane | | Julie.Shehane@cooperscully.com | 3/4/2021 11:19:02 AM | SENT |
| Theressa Washington | | theressa.washington@cooperscully.com | 3/4/2021 11:19:02 AM | SENT |

3/22/2021 1:31 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-21-000954**
**Candra Santos**

## AFFIDAVIT OF SERVICE

**State of Texas**                    **County of Travis**                    250th Judicial District Court

Case Number: D-1-GN-21-000954

Plaintiff:
**AMERISURE MUTUAL INSURANCE
COMPANY**

vs.

Defendant:
**THE TRAVELERS LLOYDS INSURANCE
COMPANY**

Received these papers on the 17th day of March, 2021 at 10:00 am to be served on **TRAVELERS LLOYDS INSURANCE COMPANY care of its Registered Agent, CORPORATION SERVICE COMPANY, 211 E. 7th Street, Suite 620, Austin, Travis County, TX 78701**.

I, Vivian Smith, being duly sworn, depose and say that on the **17th day of March, 2021** at **10:40 am, I:**

hand delivered a true copy of this **Citation together with Amerisure Mutual Insurance Company's Original Petition and attached Exhibits to TRAVELERS LLOYDS INSURANCE COMPANY care of its Registered Agent, CORPORATION SERVICE COMPANY,** by and through its designated agent, **SAMANTHA GUERRA**, at the address of: **211 E. 7th Street, Suite 620, Austin, Travis County, TX 78701,** having first endorsed upon such copy of such process the date of delivery.

I certify that I am approved by the Judicial Branch Certification Commission, Misc. Docket No. 05-9122 under rule 103, 501, and 501.2 of the TRCP to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas. I am competent to make this oath; I am not less than 18 years of age, I am not a party to the above-referenced cause. I have not been convicted of a felony or a crime of moral turpitude, and I am not interested in the outcome of the above-referenced cause.

Subscribed and Sworn to before me on the 17th day of
March, 2021 by the affiant who is personally known to
me.

_____
NOTARY PUBLIC

_____
**Vivian Smith**
PSC-12617, Exp. 5/31/2022

Our Job Serial Number: THP-2021001130
Ref: 0760125

Copyright ©1992-2021 Database Services, Inc. - Process Server's Toolbox V8.1z



**C I T A T I O N**

**T H E   S T A T E   O F   T E X A S**

**CAUSE NO. D-1-GN-21-000954**

AMERISURE MUTUAL INSURANCE COMPANY,

, Plaintiff

vs.

THE TRAVELERS LLOYDS INSURANCE COMPANY

, Defendant

TO:   TRAVELERS LLOYDS INSURANCE COMPANY
        BY SERVING THROUGH ITS REGISTERED AGENT
        CORPORATION SERVICE COMPANY
        211 EAST 7TH ST STE 620
        AUSTIN, TEXAS 78701

Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED. You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the <u>AMERISURE MUTUAL INSURANCE COMPANY'S ORIGINAL PETITION</u> of the <u>PLAINTIFF</u> in the above styled and numbered cause, which was filed on <u>MARCH 4, 2021</u> in the <u>250TH JUDICIAL DISTRICT COURT</u> of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, <u>March 09, 2021</u>.

REQUESTED BY:
JULIE ANN SHEHANE
900 JACKSON ST STE 100
DALLAS, TX 75202-4452
BUSINESS PHONE: (214) 712-9500   FAX: (214) 712-9540

Velva L. Price
Travis County District Clerk
Travis County Courthouse
1000 Guadalupe, P.O. Box 679003 (78767)
Austin, TX 78701

PREPARED BY: VICTORIA BENAVIDES

– – – – – – – – – – **R E T U R N** – – – – – – – – – –

Came to hand on the _____ day of _____, _____ at _____ o'clock ____M., and executed at
_____ within the County of _____ on the _____ day of
_____, _____, at _____ o'clock ____M.,

by delivering to the within named _____, each in person, a true copy of this citation
together with the <u>AMERISURE MUTUAL INSURANCE COMPANY'S ORIGINAL PETITION</u> accompanying pleading, having first attached such copy of
such citation to such copy of pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

Sworn to and subscribed before me this the

_____ day of _____, _____.

_____
Notary Public, THE STATE OF TEXAS

_____
Sheriff / Constable / Authorized Person

By: _____

_____
Printed Name of Server

_____ County, Texas

D-1-GN-21-000954                         SERVICE FEE NOT PAID                         P01 - 000104055

4/12/2021 4:30 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-21-000954**
**Adrian Rodriguez**

CAUSE NO. D-1-GN-21-000954

| | | |
|---|---|---|
| AMERISURE MUTUAL INSURANCE COMPANY, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| THE TRAVELERS LLOYDS INSURANCE COMPANY, | § § | |
| *Defendant* | § | 250th JUDICIAL DISTRICT |

---

### THE TRAVELERS LLOYDS INSURANCE COMPANY'S
### ORIGINAL ANSWER TO PLAINTIFF'S ORIGINAL PETITION

---

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now, Defendant, THE TRAVELERS LLOYDS INSURANCE COMPANY ("Travelers"), and files this, its Original Answer to Plaintiff's Original Petition, and in support of same, shows unto the Court as follows:

### I.
### GENERAL DENIAL

1.      Pursuant to Texas Rule of Civil Procedure 92, Travelers generally denies the material allegations contained in Plaintiff's Original Petition, including any supplemental or amended petition, and demands strict proof by a preponderance of evidence, or other applicable legal standard, on all of Plaintiff's allegations, if Plaintiff can do so.  Travelers also denies any material allegations in any amendments or supplements by Plaintiff.

### II.
### SPECIAL DENIALS AND AFFIRMATIVE DEFENSES

2.      Travelers specially denies that it can be liable under Chapter 542 of the Texas Insurance Code.  There is no "first party claim" here by a policyholder against its own insurer so the Prompt Payment provisions of Chapter 542 of the Texas Insurance Code are not applicable.

1

Thus, the relief sought by Plaintiff under Chapter 542 of the Texas Insurance Code cannot be awarded under any circumstances.  Further, said Defendant did not receive the type of written notice required in a "first party claim" as contemplated by Chapter 542 of the Texas Insurance Code.

3.      Travelers issued Commercial Insurance with Commercial General Liability Coverage Part policies to FT Woods Construction Services, Inc. as Named Insured for consecutive, annual policy periods beginning September 2, 2005 through September 2, 2013 (the "Travelers policies") under policy numbers DT-CO-5459B845-TLC-05; DT-CO-5459B845-TLC-06; DT-CO-5459B845-TCL-07;   DT-CO-5459B845-TLC-08;   DT-CO-5459B845-TLC-09;   DT-CO 5459B845-TLC-10; DT-CO-5459B845-TLC-11; and DT CO 5459B845-TLC-12 (collectively, the "Policies"). The Policies were and are subject to their insuring terms, conditions, provisions, limitations, endorsements, exclusions, and definitions.  The Policies are the best evidence of their terms, conditions, provisions, limitations, coverages, exclusions, and endorsements, and to the extent that any allegation or claim herein is in conflict with any such term, condition, provision, limitation, coverage, exclusion, or endorsement, such allegation or claim is denied.

4.      Travelers pleads the terms, conditions, provisions, limitations, exclusions, and endorsements of the Policies as if copied fully herein.

5.      Under the terms of the Policies CG 00 01 10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A. Bodily Injury And Property Damage Liability, 1. Insuring Agreement, "[Travelers] will pay those sums the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies"; "[Travelers] will have the right and duty to defend the insured against any 'suit' seeking those

damages"; and "[n]o other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B."

6.      Under the terms of the Policies CG 00 01 10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A. Bodily Injury And Property Damage Liability, 1. Insuring Agreement, "[t]his insurance applies to ... 'property damage' only if: (1) [t]he ... 'property damage' is caused by an 'occurrence'...; (2) [t]he ... 'property damage' occurs during the policy period; and (3) [p]rior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no 'employee' authorized by you to give or receive notice of an 'occurrence' or claim, knew that the ... 'property damage' had occurred, in whole or in part."

7.      Under the terms of the Policies CG 00 01 10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A. Bodily Injury And Property Damage Liability, 1. Insuring Agreement, "'property damage' will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any 'employee' authorized by you to give or receive notice of an 'occurrence' or claim: (1) [r]eports all, or any part, of the ... 'property damage' to [Travelers] or any other insurer; (2) [r]eceives a written or verbal demand or claim for damages because of the ...'property damage'; or (3) [b]ecomes aware by any other means that '... 'property damage' has occurred or has begun to occur."

8.      The Policies CG 00 01 10 01 Commercial General Liability Coverage Form provides that, "[t]hroughout this policy, the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy" and "[t]he word 'insured' means any person or organization qualifying as such under Section II – Who Is An Insured."

9.      FT Woods Construction Services, Inc. is shown as a Named Insured and designated as a Corporation in the Declarations of the Policies, and FT Woods Construction Services, Inc. is an organization qualifying as an insured under Section II – Who Is An Insured, Paragraph 1., of the Policies' CG 00 01 10 01 Commercial General Liability Coverage Form.

10.     Bartlett Cocke, L.P. and Bartlett Cocke General Contractors, LLC are not shown as Named Insureds in the Declarations and do not qualify as Named Insureds under the Policies.

11.     CG D2 46 10 02 Blanket Additional Insured (Contractors) contained in the 2005/2006 Policy provides:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

**BLANKET ADDITIONAL INSURED (CONTRACTORS)**

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY – CONTRACTORS COVERAGE PART

1.  **WHO IS AN INSURED** – (Section II) is amended to include any person or organization you are required to include as an additional insured on this policy by a written contract or written agreement in effect during this policy period and signed and executed by you prior to the loss for which coverage is sought. The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization. The person or organization is only an additional insured with respect to liability caused by "your work" for that additional insured.

2.  The insurance provided to the additional insured is limited as follows:
    a)  In the event that the limits of liability stated in the policy exceed the limits of liability required by a written contract or written agreement in effect during this policy period and signed and executed by you prior to the loss for which coverage is sought, the insurance provided by this endorsement shall be limited to the limits of liability required by such contract or agreement. This endorsement shall not increase the limits stated in Section Ill – LIMITS OF INSURANCE.

    b)  The insurance provided to the additional insured does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of an architect's, engineer's or surveyor's rendering of or failure to render any professional services including:

4

    **I.** The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

    **II.** Supervisory or inspection activities performed as part of any related architectural or engineering activities.

  **c)** This insurance does not apply to "bodily injury" or "property damage" caused by "your work" included in the "products-completed operations hazard" unless you are required to provide such coverage for the additional insured by a written contract or written agreement in effect during this policy period and signed and executed by you prior to the loss for which coverage is sought and then only for the period of time required by such contract or agreement and in no event beyond the expiration date of the policy.

**3.** Subpart (1)(a) of the Pollution exclusion under Paragraph 2., Exclusions of Bodily Injury and Property Damage Liability Coverage (Section I – Coverages) does not apply to you if the "bodily injury" or "property damage" arises out of "your work" performed on premises which are owned or rented by the additional insured at the time "your work" is performed.

**4.** Any coverage provided by this endorsement to an additional insured shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis unless a written contract or written agreement in effect during this policy period and signed and executed by you prior to the loss for which coverage is sought specifically requires that this insurance apply on a primary or non-contributory basis. When this insurance is primary and there is other insurance available to the additional insured from any source, we will share with that other insurance by the method described in the policy.

**5.** As a condition of coverage, each additional insured must:

  **a.)** Give us prompt written notice of any "occurrence" or offense which may result in a claim and prompt written notice of "suit".

  **b.)** Immediately forward all legal papers to us, cooperate in the investigation or settlement of the claim or defense against the "suit," and otherwise comply with policy conditions.

  **c.)** Tender the defense and indemnity of any claim or "suit" to any other insurer which also insures against a loss we cover under this endorsement. This includes, but is not limited to, any insurer which has issued a policy of insurance in which the additional insured qualifies as an insured. For purposes of this requirement, the term "insures against" refers to any self-insurance and to any insurer which issued a policy of insurance that may provide coverage for the loss, regardless of whether the additional insured has actually requested that the insurer provide the additional insured with a defense and/or indemnity under that policy of insurance.

  **d.)** Agree to make available any other insurance that the additional insured has for a loss we cover under this endorsement.

5

12.     CG D2 46 08 05 Blanket Additional Insured (Contractors) contained in the 2006/2007 Policy, the 2007/2008 Policy, the 2008/2009 Policy, the 2009/2010 Policy, and the 2010/2011 Policy effective from September 2, 2010 until May 2, 2011 pursuant to the 2010/2011 Policy's IL T0 07 07 09 87 Change Endorsement Number 0001 provides:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BLANKET ADDITIONAL INSURED (CONTRACTORS)**

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

1. **WHO IS AN INSURED** – (Section II) is amended to include any person or organization that you agree in a "written contract requiring insurance" to include as an additional insured on this Coverage Part, but:
   **a)**  Only with respect to liability for "bodily injury", "property damage" or "personal injury"; and
   **b)**  If, and only to the extent that, the injury or damage is caused by acts or omissions of you or your subcontractor in the performance of "your work" to which the "written contract requiring insurance" applies. The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.
2. The insurance provided to the additional insured by this endorsement is limited as follows:
   **a)**  In the event that the Limits of Insurance of this Coverage Part shown in the Declarations exceed the limits of liability required by the "written contract requiring insurance", the insurance provided to the additional insured shall be limited to the limits of liability required by that "written contract requiring insurance". This endorsement shall not increase the limits of insurance described in Section **III** – Limits Of Insurance.
   **b)**  The insurance provided to the additional insured does not apply to "bodily injury", "property damage" or "personal injury" arising out of the rendering of, or failure to render, any professional architectural, engineering or surveying services, including:
   **i.**  The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders or change orders, or the preparing, approving, or failing to prepare or approve, drawings and specifications; and
   **ii.**  Supervisory, inspection, architectural or engineering activities.
   **c)**  The insurance provided to the additional insured does not apply to "bodily injury" or "property damage" caused by "your work" and included in the "products-completed operations hazard" unless the "written contract requiring insurance" specifically requires you to provide such coverage for that additional insured, and then the insurance provided to the additional insured applies only to such "bodily injury" or "property damage" that occurs before the end of the period of time for which the "written contract

requiring insurance" requires you to provide such coverage or the end of the policy period, whichever is earlier.

**3.** The insurance provided to the additional insured by this endorsement is excess over any valid and collectible "other insurance", whether primary, excess, contingent or on any other basis, that is available to the additional insured for a loss we cover under this endorsement. However, if the "written contract requiring insurance" specifically requires that this insurance apply on a primary basis or a primary and non-contributory basis, this insurance is primary to "other insurance" available to the additional insured which covers that person or organization as a named insured for such loss, and we will not share with that "other insurance". But the insurance provided to the additional insured by this endorsement still is excess over any valid and collectible "other insurance", whether primary, excess, contingent or on any other basis, that is available to the additional insured when that person or organization is an additional insured under such "other insurance".

**4.** As a condition of coverage provided to the additional insured by this endorsement:

**a)** The additional insured must give us written notice as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, such notice should include:

**i.** How, when and where the "occurrence" or offense took place;

**ii.** The names and addresses of any injured persons and witnesses; and

**iii.** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b)** If a claim is made or "suit" is brought against the additional insured, the additional insured must:

**i.** Immediately record the specifics of the claim or "suit" and the date received; and

**ii.** Notify us as soon as practicable.

The additional insured must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c)** The additional insured must immediately send us copies of all legal papers received in connection with the claim or "suit", cooperate with us in the investigation or settlement of the claim or defense against the "suit", and otherwise comply with all policy conditions.

**d)** The additional insured must tender the defense and indemnity of any claim or "suit" to any provider of "other insurance" which would cover the additional insured for a loss we cover under this endorsement. However, this condition does not affect whether the insurance provided to the additional insured by this endorsement is primary to "other insurance" available to the additional insured which covers that person or organization as a named insured as described in paragraph **3.** above.

**5.** The following definition is added to SECTION V. – DEFINITIONS:

"Written contract requiring insurance" means that part of any written contract or agreement under which you are required to include a person or organization as an additional insured on this Coverage Part, provided that the "bodily injury" and "property damage" occurs and the "personal injury" is caused by an offense committed:

**a.** After the signing and execution of the contract or agreement by you;

**b.** While that part of the contract or agreement is in effect; and

**c.** Before the end of the policy period.

7

13.     CG D6 04 05 10 Blanket Additional Insured (Contractors) contained in the 2010/2011 Policy effective from May 2, 2011 through September 2, 2011 pursuant to the 2010/2011 Policy's IL T0 07 07 09 87 Change Endorsement Number 0001, the 2011/2012 Policy and the 2012/2013 Policy provides:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BLANKET ADDITIONAL INSURED (CONTRACTORS)**

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

1.  **WHO IS AN INSURED** – (Section II) is amended to include any person or organization that you agree in a "written contract requiring insurance" to include as an additional insured on this Coverage Part. However, the person or organization is only an additional insured with respect to liability for "bodily injury", "property damage" or "personal injury" and as described in Paragraph **a)**, **b)** or **c)** below, whichever applies:
    ...
    **c)**  If neither Paragraph **a)** nor **b)** above applies:
        **i.**   The person or organization is an additional insured only if, and to the extent that, the injury or damage is caused by acts or omissions of you or your subcontractor in the performance of "your work" to which the "written contract requiring insurance" applies; and
        **ii.**  The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.
2.  The insurance provided to the additional insured by this endorsement is limited as follows:
    **a)**  In the event that the Limits of Insurance of this Coverage Part shown in the Declarations exceed the limits of liability required by the "written contract requiring insurance", the insurance provided to the additional insured shall be limited to the limits of liability required by that "written contract requiring insurance". This endorsement shall not increase the limits of insurance described in Section **III** – Limits Of Insurance.
    **b)**  The insurance provided to the additional insured does not apply to "bodily injury", "property damage" or "personal injury" arising out of the rendering of, or failure to render, any professional architectural, engineering or surveying services, including:
        **i.**   The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders or change orders, or

the preparing, approving, or failing to prepare or approve, drawings and specifications; and

   **ii.** Supervisory, inspection, architectural or engineering activities.

**c)** The insurance provided to the additional insured does not apply to "bodily injury" or "property damage" caused by "your work" and included in the "products-completed operations hazard" unless the "written contract requiring insurance" specifically requires you to provide such coverage for that additional insured during the policy period.

**3.** The insurance provided to the additional insured by this endorsement is excess over any valid and collectible "other insurance", whether primary, excess, contingent or on any other basis, that is available to the additional insured for a loss we cover under this endorsement. However, if the "written contract requiring insurance" specifically requires that this insurance apply on a primary basis or a primary and non-contributory basis, this insurance is primary to "other insurance" available to the additional insured which covers that person or organization as a named insured for such loss, and we will not share with that "other insurance". But the insurance provided to the additional insured by this endorsement still is excess over any valid and collectible "other insurance", whether primary, excess, contingent or on any other basis, that is available to the additional insured when that person or organization is an additional insured under such "other insurance".

**4.** As a condition of coverage provided to the additional insured by this endorsement:

**a)** The additional insured must give us written notice as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, such notice should include:

   **i.** How, when and where the "occurrence" or offense took place;

   **ii.** The names and addresses of any injured persons and witnesses; and

   **iii.** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b)** If a claim is made or "suit" is brought against the additional insured, the additional insured must:

   **i.** Immediately record the specifics of the claim or "suit" and the date received; and

   **ii.** Notify us as soon as practicable.

The additional insured must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c)** The additional insured must immediately send us copies of all legal papers received in connection with the claim or "suit", cooperate with us in the investigation or settlement of the claim or defense against the "suit", and otherwise comply with all policy conditions.

**d)** The additional insured must tender the defense and indemnity of any claim or "suit" to any provider of "other insurance" which would cover the additional insured for a loss we cover under this endorsement. However, this condition does not affect whether the insurance provided to the additional insured by this endorsement is primary to "other insurance"

available to the additional insured which covers that person or organization as a named insured as described in Paragraph **3.** above.

**5.** The following definition is added to SECTION V. – DEFINITIONS:

"Written contract requiring insurance" means that part of any written contract or agreement under which you are required to include a person or organization as an additional insured on this Coverage Part, provided that the "bodily injury" and "property damage" occurs, and the "personal injury" is caused by an offense committed, during the policy period and:

    **a.** After the signing and execution of the contract or agreement by you; and

    **b.** While that part of the contract or agreement is in effect.

14.    The Policies' CG 00 01 10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A. Bodily Injury And Property Damage Liability, Section V – Definitions provides, in part:

### SECTION V – DEFINITIONS

...

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

...

**16.** "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)** Products that are still in your physical possession; or

        **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

            **(a)** When all of the work called for in your contract has been completed.

            **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    **b.** Does not include "bodily injury" or "property damage" arising out of:

        **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

        **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

...

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

...

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

**(2)** The providing of or failure to provide warnings or instructions.

15.     The Policies' CG 00 01 10 01 Commercial General Liability Coverage Form,

Section IV – Commercial General Liability Conditions, Paragraph 4. Other Insurance provides:

**4.  Other Insurance**
If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:
**a.  Primary Insurance**
This insurance is primary except when **b.** below applies.
...
**b.  Excess Insurance**

This insurance is excess over:

**(1)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

    **(a)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

    **(b)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

    **(c)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

    **(d)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(2)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

16.    CG D3 16 07 04 Contractors Xtend Endorsement contained in the 2005/2006 Policy, the 2006/2007 Policy, 2007/2008 Policy, the 2008/2009 Policy, the 2009/2010 Policy, the 2010/2011 Policy, and the 2011/2012 Policy provides:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**CONTRACTORS XTEND ENDORSEMENT**

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
...

**I.   OTHER INSURANCE CONDITION**

   **A.**   COMMERCIAL GENERAL LIABILITY CONDITIONS (Section **IV**), paragraph **4.** (Other Insurance) is deleted and replaced by the following:

    **4.   Other Insurance**

If valid and collectible "other insurance" is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

   **a.   Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the "other insurance" is also primary. Then, we will share with all that "other insurance" by the method described in **c.** below.

   **b.   Excess Insurance**

This insurance is excess over any of the "other insurance", whether primary, excess, contingent or on any other basis:

   **(1)**   That is Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for "your work";

   **(2)**   That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

   **(3)**   That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

   **(4)**   If the loss arises out of the maintenance or use of aircraft, "autos", or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability; or

   **(5)**   That is available to the insured when the insured is an additional insured under any other policy, including any umbrella or excess policy.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any provider of "other insurance" has a duty to defend the insured against that "suit". If no provider of "other insurance" defends, we will undertake to do so, but we will be entitled to the insured's rights against all those providers of "other insurance".

When this insurance is excess over "other insurance", we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

   **(1)**   The total amount that all such "other insurance" would pay for the loss in the absence of this insurance; and

13

      **(2)** The total of all deductible and self-insured amounts under that "other insurance".

    We will share the remaining loss, if any, with any "other insurance" that is not described in this Excess Insurance provision.

    **c. Method Of Sharing**

      If all of the "other insurance" permits contribution by equal shares, we will follow this method also. Under this approach each provider of insurance contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

      If any of the "other insurance" does not permit contribution by equal shares, we will contribute by limits. Under this method, the share of each provider of insurance is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all providers of insurance.

**B.** The following definition is added to DEFINITIONS (Section **V**):

"Other insurance":

    **a.** Means insurance, or the funding of losses, that is provided by, through or on behalf of:

    **(1)** Another insurance company;

    **(2)** Us or any of our affiliated insurance companies, except when the Non cumulation of Each Occurrence Limit section of Paragraph 5 of LIMITS OF INSURANCE (Section **III**) or the Non cumulation of Personal and Advertising Injury limit sections of Paragraph 4 of LIMITS OF INSURANCE (Section **III**) applies;

    **(3)** Any risk retention group;

    **(4)** Any self-insurance method or program, other than any funded by you and over which this Coverage Part applies; or

    **(5)** Any similar risk transfer or risk management method.

    **b.** Does not include umbrella insurance, or excess insurance, that you bought specifically to apply in excess of the Limits of Insurance shown on the Declarations of this Coverage Part.

17.    CG D4 20 07 08 Amendment – Other Insurance Condition And Meaning Of Other

Insurance, Other Insurer And Insurer contained in the 2012/2013 Policy provides:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDMENT – OTHER INSURANCE CONDITION AND MEANING OF OTHER INSURANCE, OTHER INSURER AND INSURER**

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1.** The following replaces the part of the first paragraph of Paragraph **4.**, **Other Insurance**, of **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** that precedes Paragraph **a.**:

If valid and collectible other insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as described in Paragraphs **a.** and **b.** below.

14

As used anywhere in this Coverage Part, other insurance means insurance, or the funding of losses, that is provided by, through or on behalf of:

**(i)** Another insurance company;

**(ii)** Us or any of our affiliated insurance companies, except when the Non cumulation of Each Occurrence Limit provision of Paragraph **5.** of Section **III** – Limits Of Insurance or the Non cumulation of Personal and Advertising Injury Limit provision of Paragraph **4.** of Section **III** – Limits of Insurance applies because the Amendment - Non Cumulation Of Each Occurrence Limit Of Liability and Non Cumulation Of Personal and Advertising Injury Limit endorsement is included in this policy;

**(iii)** Any risk retention group;

**(iv)** Any self-insurance method or program, including any failure to buy insurance, or decision to not buy insurance, for any reason, in which case the insured will be deemed to be the provider of other insurance; or

**(v)** Any similar risk transfer or risk management method.

Other insurance does not include umbrella insurance, or excess insurance, that was bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

As used anywhere in this Coverage Part, other insurer means a provider of other insurance. As used in Paragraph **c.** below, insurer means a provider of insurance.

**2.** The first Subparagraph **(2)** of Paragraph **4.b.**, **Excess Insurance**, of **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** regarding any other primary insurance available to you is deleted.

**3.** The following is added to Paragraph **4.b.**, **Excess Insurance**, of **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**:

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis, that is available to the insured when the insured is added as an additional insured under any other policy, including any umbrella or excess policy.

18.     The Policies' additional insured provisions do not extend additional insured status to Bartlett Cocke General Contractors, LLC to the extent Bartlett Cocke General Contractors, LLC is not a person or organization that FT Woods agreed and was required under a written contract or agreement to include as an additional insured on the Commercial General Liability Coverage Part of the Policies.

19.     Under the Policies' additional insured provisions, to the extent Bartlett Cocke, L.P. is an organization that FT Woods agreed and was required under a written contract or agreement to include as an additional insured on the Commercial General Liability Coverage Part of the

Policies, Section II – Who Is An Insured is amended to include Bartlett Cocke, L.P. as an additional insured, but only with respect to liability for "property damage" and only if, and to the extent that, the damage is caused by acts or omissions of FT Woods or FT Woods' subcontractor in the performance of "[FT Woods'] work" to which the written contract requiring insurance applies; and Bartlett Cocke, L.P. does not qualify as an additional insured with respect to the independent acts or omissions of Bartlett Cocke, L.P.

20.     Travelers has no duty to defend Bartlett Cocke, L.P. in the Underlying Suit unless and until Bartlett Cocke, L.P. tenders a complaint in the Underlying Suit against Bartlett Cocke, L.P. that alleges Bartlett Cocke, L.P.'s liability for "property damage" that is caused by acts or omissions of FT Woods or subcontractor of FT Woods in the performance of "[FT Woods'] work" to which the written subcontract between Bartlett Cocke, L.P. and FT Woods applies, and not with respect to independent acts or omissions of Bartlett Cocke, L.P.

21.     To the extent Bartlett Cocke, L.P. is included as an additional insured pursuant to the Policies' additional insured provisions, the insurance provided to Bartlett Cocke, L.P. as an additional insured is limited and does not apply to "property damage" arising out of the rendering of, or failure to render, any professional architectural, engineering or surveying services, including: the preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders or change orders, or the preparing, approving, or failing to prepare or approve, drawings and specifications; and supervisory, inspection, architectural or engineering activities.

22.     To the extent Bartlett Cocke, L.P. is included as an additional insured pursuant to the Policies' additional insured provisions, the insurance provided to Bartlett Cocke, L.P. as an additional insured is limited and does not apply to "property damage" caused by "[FT Woods'] work" and included in the "products-completed operations hazard" unless the written contract

requiring insurance specifically requires FT Woods to provide such coverage for Bartlett Cocke, L.P. as an additional insured during the policy period.

23.     To the extent Bartlett Cocke, L.P. is included as an additional insured pursuant to the Policies' additional insured provisions, the insurance provided to Bartlett Cocke, L.P. as an additional insured by the Policies is excess over any valid and collectible other insurance, whether primary, excess, contingent or on any other basis, that is available to Bartlett Cocke, L.P., and when the Travelers Policies' insurance is excess, Travelers will have no duty under Coverage A to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, Travelers will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.  Furthermore, when the Travelers Policies' insurance is excess over other insurance, Travelers will pay only its share of the amount of the loss, if any, that exceeds the sum of: (1)  The total amount that all such other insurance would pay for the loss in the absence of this insurance; and (2)  The total of all deductible and self-insured amounts under all that other insurance.

24.     The Policies' CG 00 01  10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A Bodily Injury And Property Damage Liability, 2. Exclusions, a. Expected Or Intended Injury excludes coverage for any "property damage" expected or intended from the standpoint of the insured.

25.     The 2005/2006, 2006/2007, 2007/2008, 2008/2009, 2009/2010, 2010/2011 and 2011/2012 Policies' CG 00 01  10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A Bodily Injury And Property Damage Liability, 2. Exclusions, b. Contractual Liability excludes coverage for "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion

does not apply to liability for damages: (1) that the insured would have in the absence of the contract or agreement; or (2) assumed in a contract or agreement that is an "insured contract", provided the "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "property damage", provided: (a) liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and (b) such   attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

26.     The 2012/2013 Policy's CG 00 01  10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A Bodily Injury And Property Damage Liability, 2. Exclusions, b. Contractual Liability, as modified by the 2012/2013 Policy's CG D4 21 07 08 Amendment Of Contractual Liability Exclusion – Exception For Damages Assumed In An Insured Contract Applies Only To Named Insured, excludes coverage for "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages: (1) that the insured would have in the absence of the contract or agreement; or (2) assumed by FT Woods in a contract or agreement that is an "insured contract", provided that the ""property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed by FT Woods in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured will be deemed to be damages because of "property damage", provided that: (a) liability to such party for, or for the cost of, that party's defense has also been assumed by FT Woods in the same "insured contract"; and (b) such attorney fees and litigation

expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

27.    The Policies' CG 00 01  10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A Bodily Injury And Property Damage Liability, 2. Exclusions, j. Damage To Property, Paragraph (5)  excludes coverage for "property damage" to that particular part of real property on which the Named Insured or any contractors or subcontractors working directly or indirectly on the Named Insured's behalf are performing operations, if the "property damage" arises out of those operations.

28.    The Policies' CG 00 01  10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A Bodily Injury And Property Damage Liability, 2. Exclusions, j. Damage To Property, Paragraph (6)  excludes coverage for "property damage" to that particular part of any property that must be restored, repaired or replaced because "[FT Woods'] work" was incorrectly performed on it.  However, Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

29.    The Policies' CG 00 01  10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A Bodily Injury And Property Damage Liability, 2. Exclusions, k. Damage To Your Product excludes coverage for "property damage" to "[FT Woods'] product" arising out of it or any part of it.

30.    The Policies' CG 00 01  10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A Bodily Injury And Property Damage Liability, 2. Exclusions, l. Damage To Your Work excludes coverage for "property damage" to "[FT Woods'] work" arising out of it or any part of it and included in the "products-completed operations hazard".  This

exclusion does not apply if the damaged work or the work out of which the damage arises was performed on FT Woods' behalf by a subcontractor.

31.     The Policies' CG 00 01  10 01 Commercial General Liability Coverage Form, Section I – Coverages, Coverage A Bodily Injury And Property Damage Liability, 2. Exclusions, m. Damage To Impaired Property Or Property Not Physically Injured excludes coverage for "impaired property" or property that has not been physically injured, arising out of: (1) a defect, deficiency, inadequacy or dangerous condition in "[FT Woods'] product" or "[FT Woods'] work"; or (2) a delay or failure by FT Woods or anyone acting on FT Woods' behalf to perform a contract or agreement in accordance with its terms. This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "[FT Woods'] product" or "[FT Woods'] work" after it has been put to its intended use.

32.     Pursuant to the Policies' Fungi Or Bacteria Exclusion, the Policies' insurance does not apply to:  a. "Property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any se-quence to such injury or damage. b.   Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treat-ing, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

33.     Under the Policies' Supplementary Payments – Coverage A And B

1.  [Travelers] will pay, with respect to any claim we investigate or settle, or any "suit" against an insured [Travelers] defend[s]:
    a.  All expenses [Travelers] incur[s].

  **b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. [Travelers] do[es] not have to furnish these bonds.

  **c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. [Travelers] do[es] not have to furnish these bonds.

  **d.** All reasonable expenses incurred by the insured at [Travelers'] request to assist [Travelers] in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

  **e.** All costs taxed against the insured in the "suit".

  **f.** Prejudgment interest awarded against the insured on that part of the judgment [Travelers] pay[s]. If [Travelers] make[s] an offer to pay the applicable limit of insurance, [Travelers] will not pay any prejudgment interest based on that period of time after the offer.

  **g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If [Travelers] defend[s] an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", [Travelers]will defend that indemnitee if all of the following conditions are met:

  **a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

  **b.** This insurance applies to such liability assumed by the insured;

  **c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

  **d.** The allegations in the "suit" and the information [Travelers] know[s] about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

  **e.** The indemnitee and the insured ask [Travelers] to conduct and control the defense of that indemnitee against such "suit" and agree that [Travelers] can assign the same counsel to defend the insured and the indemnitee; and

  **f.** The indemnitee:

   **(1)** Agrees in writing to:

    **(a)** Cooperate with [Travelers] in the investigation, settlement or defense of the "suit";

    **(b)** Immediately send [Travelers] copies of any demands, notices, summonses or legal papers received in connection with the "suit";

    **(c)** Notify any other insurer whose coverage is available to the indemnitee; and

    **(d)** Cooperate with [Travelers] with respect to coordinating other applicable insurance available to the indemnitee; and

   **(2)** Provides [Travelers] with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by [Travelers] in the defense of that indemnitee, necessary litigation expenses incurred by [Travelers] and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

34. Under the Policies' CG 00 01 10 01 Commercial General Liability Coverage Form, Section III – Limits Of Insurance, as modified by CG D2 03 12 97 Amendment – Non Cumulation Of Each Occurrence Limit Of Liability And Non Cumulation Of Personal And Advertising Injury Limit:

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C**;

**b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B**.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

...

**5.** Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A**; and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

Non cumulation of Each Occurrence Limit – If one "occurrence" causes "bodily injury" and/or "property damage" during the policy period and during the policy period of one or more prior and/or future policies that include a commercial general liability coverage part for the insured issued by us or any affiliated insurance company, the amount we will pay is limited.  This policy's Each Occurrence Limit will be reduced by the amount of each payment made by us and any affiliated insurance company under the other policies because of such "occurrence".

...

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

35.     The contract referenced in Plaintiff's Original Petition has an unenforceable indemnity provision.  As such, there is no coverage for contractual liability under the Policies for same for FT Woods and/or in favor of Bartlett Cocke General Contractors, LLC or Bartlett Cocke, LP. or in favor of any insurer claiming subrogation rights.

36.     Travelers contends that, to the extent Plaintiff has made voluntary payments, there is no subrogation rights.

37.     Plaintiff failed to segregate covered damages from non-covered damages.

38.     Travelers pleads that the "other insurance" clauses in the Policies make clear that Travelers' Policies are solely excess on behalf of any putative additional insured.  As such, Travelers owes no defense to Bartlett Cocke, and therefore, owes no reimbursement of defense costs to Plaintiff.

39.     Travelers also alternatively pleads that if it is found to have any duties with respect to potential defense to Plaintiff, that the "other insurance" clauses between Plaintiff and Defendant

apply so that a pro-rata sharing or allocation scheme is to be adopted by the Court with respect to the sharing of any defense obligations to Plaintiff.

40.     Travelers pleads that either Plaintiff and/or its subrogors or an unnamed party caused damages to Plaintiff and/or its subrogors, and therefore, Plaintiff cannot recover from Travelers.

41.     In the event that Plaintiff prevails on its claim that Travelers owes Bartlett Cocke a duty to defend,  Travelers is entitled to an offset, credit, and/or contribution for the cost of defense, for all payments made by or due from insurers or other entities with a duty or other obligation or liability to defend Bartlett Cocke, including but not limited to Plaintiff.

42.     Travelers has no duty or other obligation or liability to provide or pay for defense of an insured unless and until the insured complies with the Policies' Conditions, including those with respect to notice of "suit" and delivery of summonses or legal papers received in connection with the "suit".

43.     The claims against Travelers are barred, in whole or in part, to the extent that it is discovered that the insured failed to comply with the terms and conditions of the Policies, including but not limited Section IV – Commercial General Liability Conditions in the Commercial General Liability Coverage Part of the Policies, or failed to perform any obligations required by the Policies.

44.     The claims against Travelers are barred, in whole or in part, to the extent that any insured has compromised or paid any claims or assumed any obligations without first notifying Travelers and obtaining its consent.

WHEREFORE, PREMISES CONSIDERED, Defendant, THE TRAVELERS LLOYDS INSURANCE COMPANY, prays upon final hearing of this lawsuit, that judgment be entered in favor of Defendant, that Plaintiff, Amerisure Insurance Company, take nothing by reason of its claims and causes of action against Travelers, and that Travelers be awarded its costs, and for all such other and further relief, at law or in equity, that Defendant may show itself justly entitled.

Respectfully submitted,

LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD, A LAW CORPORATION

By:  */s/ Michael W. McCoy*
_____
Michael W. McCoy – SBN:  13471850
mmccoy@lawla.com
801 Travis Street, Suite 1800
Houston, Texas 77002
PH:    (713) 222-1990
FAX:   (713) 222-1996

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice was served in accordance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this the 12th day of April, 2021, to all known counsel of record as follows:

Julie A. Shehane                              *Via E-Service*
Julie.Shehane@cooperscully.com
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202

*/s/ Michael W. McCoy*
_____
Michael W. McCoy

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Angie Bryan on behalf of Michael McCoy
Bar No. 13471850
abryan@lawla.com
Envelope ID: 52377421
Status as of 4/14/2021 2:44 PM CST

Associated Case Party: Amerisure Mutual Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Julie A.Shehane | | Julie.Shehane@cooperscully.com | 4/12/2021 4:30:52 PM | SENT |
| Theressa Washington | | theressa.washington@cooperscully.com | 4/12/2021 4:30:52 PM | SENT |

Associated Case Party: The Travelers Lloyds Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Angie Bryan | | abryan@lawla.com | 4/12/2021 4:30:52 PM | SENT |
| Michael McCoy | | mmccoy@lawla.com | 4/12/2021 4:30:52 PM | SENT |